716 A.2d 458

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
AMBROSE A. HARRIS, DEFENDANT-APPELLANT.

Argued September 23, 1997—Decided July 30, 1998.

124

125

*Frank J. Pugliese* and *Donald T. Thelander*, Assistant Deputies Public Defender, argued the cause for appellant (*Ivelisse Torres*, Public Defender, attorney).

*Nancy A. Hulett*, Deputy Attorney General, argued the cause for respondent (*Peter Verniero*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

O'HERN, J.

In his concurring opinion in *State v. Allen*, 73 *N.J.* 132, 146, 373 *A.*2d 377 (1977), Justice Pashman described a similar case as one involving "the interplay between two of our most basic constitutional guarantees—free speech and fair trial—which are also, as Mr. Justice Black correctly noted, 'two of the most cherished policies of our civilization.'" *Id.* at 146, 373 *A.*2d 377 (quoting *Bridges v. California*, 314 *U.S.* 252, 260, 62 *S.Ct.* 190, 192, 86 *L. Ed.* 192, 201 (1941)).

In this capital case a jury has convicted defendant of the murder of Kristin Huggins and recommended that he be sentenced to death. Pervasive media publicity surrounded the conduct of the trial. In *Sheppard v. Maxwell*, 384 *U.S.* 333, 86 *S.Ct.* 1507, 16 *L. Ed.*2d 600 (1966), the Supreme Court held that

[d]ue process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial

courts must take strong measures to ensure that the balance is never weighed against the accused. And appellate tribunals have the duty to make an independent evaluation of the circumstances.

[*Id.* at 362, 86 *S.Ct.* at 1522, 16 *L. Ed.*2d at 620.]

Defendant contends that he was denied a fair trial because the court did not "take strong measures" to assure that his trial was free from the outside influence of prejudicial publicity. Central issues raised in his appeal are (1) whether the trial court should have granted defendant's motion for a change of venue, that is, whether it should have transferred the case for trial outside the county where the crime was committed, and (2) whether, because of recurring prejudicial publicity during the course of the trial, the court should have questioned jurors individually concerning their exposure to such midtrial publicity. We find that the measures taken by the trial court, the selection of a jury composed of out-of-county residents, and its general questioning of the jurors during the trial concerning any exposure to trial publicity sufficiently ensured that defendant's trial was free of extraneous influences. We find no other errors that tainted his trial. We affirm the convictions for murder and other crimes found and affirm the sentence of death. Proportionality review will take place in later proceedings.

■ Because in cases involving the death penalty a trial court's responsibility under both the federal and state constitutions is to "minimize the danger that prejudice will infiltrate the adjudicatory process," *State v. Williams,* 93 *N.J.* 39, 63, 459 ■ 641 (1983) (*Williams I* ), we hold that when hereafter there is a reasonable likelihood that the trial of a capital case will be surrounded by presumptively prejudicial media publicity (as that phrase is understood in the law) the court should transfer the case to another county. Other devices, such as restraints against the publication of material concerning the trial or the sequestration of jurors, have proven either to be unavailable to counter the effects of continuing prejudicial publicity or to produce a contrary effect than desired. In some cases a court may conclude that an initial tide of inherently prejudicial publicity will have subsided at time of

trial and will not require a change of venue if the jury selection process yields an impartial jury. *E.g., State v. Koedatich,* 112 *N.J.* 225, 273–82, 548 *A.*2d 939 (1988), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L. Ed.*2d 803 (1989) (*Koedatich I* ). When, however, a court is satisfied that there is a reasonable likelihood of the continuing recurrence at a capital trial of presumptively prejudicial publicity that might infiltrate the trial, a change of venue is required.

## I

## FACTS

On December 17, 1992, Kristin Huggins left her parents' home in Bucks County, Pennsylvania, to paint a mural at the Trenton Club, in downtown Trenton. She was driving a red Toyota sports car. Huggins never returned home. According to the State's case, Ambrose Harris, with the aid of Gloria Dunn, raped and killed Huggins in the course of a carjacking and robbery.

Police discovered Huggins' car on December 18, 1992, but were unable to locate her. In the later stages of the investigation, witnesses informed the police that defendant had been seen driving a red Toyota with Pennsylvania plates on the night of Huggins' disappearance. One witness, Tariq Ayres, told the police that Harris said he had "knocked off some white girl" and "hijacked" the car. Another witness reported that Harris had a wallet containing an ATM (automatic teller machine) card and a driver's license with Huggins' picture on it. An ATM video showed defendant attempting to make a $400 cash withdrawal from Huggins' account on that night.

On February 18, 1993, Gloria Dunn went to the police with her sister, Eleanor Williams, and told the police that she knew where Huggins' body was, claiming at first that the two had found the body by following Williams' "psychic vision." They asked about reward money.

Dunn led the police to Kristin Huggins' badly decomposed body. That same day, she gave the police a statement about the murder. Over the next year and a half, Dunn provided the police with several additional statements containing a number of inconsistencies and additions. Of greatest significance, she waited a year and a half to inform the police about defendant's having raped Huggins. When she did inform the police about the rape, she lied about the circumstances.

On June 8, 1994, a Mercer County Grand Jury indicted defendant for purposeful or knowing murder by his own conduct, felony murder, kidnapping, robbery, aggravated sexual assault, possession of a handgun for an unlawful purpose, and various theft offenses. The State served a notice of aggravating factors as a basis for the death penalty, alleging that the murder was committed in the course of a felony, *N.J.S.A.* 2C:11–3c(4)(g), and for the purpose of escaping detection, *N.J.S.A.* 2C:11–3c(4)(f).

Defendant filed a number of pretrial motions, several of which were appealed to the Appellate Division on an interlocutory basis. A significant pretrial motion, based on massive pretrial publicity in the Trenton area, was for a change of venue or, in the alternative, empanelment of a jury from a county other than Mercer. The trial court denied the motion for a change of venue but agreed to empanel a jury from Hunterdon County. Both parties sought leave to appeal. The State contended that an out-of-county jury was unnecessary. Defendant argued that Camden County was the proper juror source.

The Appellate Division granted leave to appeal and held that defendant was entitled to an out-of-county jury and that the trial court should consider the racial makeup of the county from which jurors would be drawn. *State v. Harris,* 282 *N.J.Super.* 409, 419, 660 *A.*2d 539 (1995). On that basis, the Appellate Division held that the trial court had erred in choosing a pool of jurors from Hunterdon County, which has a small minority population. *Id.* at 420, 660 *A.*2d 539. On remand, after denying defendant's request to reconsider the motion for a change of venue, the trial court

selected Burlington County as the county from which jurors would be selected, rejecting defendant's suggestion that Camden County be used.

Defendant also moved for closure of the trial, for exclusion of his criminal record if he were to testify, and for separate guilt-phase and penalty-phase juries. The court denied those motions. The court did limit media photographs of defendant in order that shackles did not appear.

Jury selection occurred between October 10, 1995, and January 3, 1996. Defendant made several motions during *voir dire* (the process of questioning of potential jurors), relating principally to the court's termination of attorney-conducted *voir dire*, the court's limitation on inquiry into the racial attitudes of prospective jurors, and death-qualification. The trial court refused to delay the *voir dire* further to consider these motions. The Appellate Division, taking an interlocutory appeal on an emergency basis, affirmed that refusal, but one member of the appellate panel expressed concern at oral argument about the scope of the *voir dire* on racial bias. The trial court thereafter questioned more extensively concerning racial bias.

After *voir dire* was complete, the trial court denied defendant's motions to dismiss the entire jury panel because of the allegedly faulty selection process, to reconsider various other pretrial issues raised, and to increase juror security in order to protect the jury from pervasive publicity, which included newspaper headlines displayed prominently at courthouse newsstands.

The guilt phase began on January 10, 1996. The jury reached its verdict on February 20, 1996. Dunn's testimony provided the only direct evidence linking defendant to the crime. From the evidence a jury could have found the following facts. Dunn and defendant met several months before the murder and had spoken on several occasions thereafter. Harris offered to give her drugs and to "pop" an ex-boyfriend who was giving her trouble.

In late November 1992, defendant asked Dunn to take part in a holdup. She hesitated at first but agreed to participate in return

for a part of the proceeds, which she intended to use to buy drugs for resale. The two agreed to meet at 8:00 a.m. on December 17. Harris came on a bicycle. He had a gun in his possession. He decided to "carjack" someone so that he and Dunn would not have to walk through the rain to the luncheonette they planned to rob. The two took a route through downtown Trenton at a time when many employees were arriving for work.

Dunn asked defendant what he was going to do with the people who were in the car he carjacked. According to Dunn, defendant said he would "tie them up and leave them somewhere" if they were black. He said he would kill them if they were white.[1] Dunn claimed to want no part of a murder but to have remained because she feared defendant.

As the two passed the Trenton Club on West State Street, they saw a young woman drive a red Toyota into the parking lot. Harris said, "I'm going to get that bitch." He followed on his bicycle to the rear of the driveway, leaving Dunn in the front area. Dunn did not leave because she feared for herself and for the woman. Defendant returned, driving the car with Huggins in the passenger seat. Dunn was "relieved" that Huggins was then unhurt.

Harris told Dunn to get into the car. Huggins sat on Dunn's lap. Dunn tried to calm Huggins, but defendant told Dunn to shut up. He drove to a deserted area under the Southard Street Bridge, near Route 1 and Perry Street in Trenton. He asked Huggins how to open the front trunk of the car. Harris forced Huggins into the trunk because he feared that the image of a white woman riding in a two-seated sports car with a black man and woman would create suspicion.

---

[1] The State did not disclose that defendant had made this statement until Dunn testified at trial. After the guilt phase, the defense complained about the State's failure to disclose the evidence before *voir dire* (given its racial implications). The State responded that it had not known that Dunn had intended to make the statement until after *voir dire* was complete.

With Huggins in the trunk, Harris drove to West End Avenue and parked. He then walked back to the Trenton Club to recover the bicycle. Two club employees saw defendant walk to the rear of the parking lot at 9:15 a.m. and return with a bicycle. Harris drove the car back to the Southard Street area. He had Huggins get out of the trunk. Defendant then raped Huggins, ignoring her cries for mercy. After the rape, defendant put Huggins back in the trunk but then decided to kill her. He opened the trunk and shot her in the back of the head as she climbed out of the trunk. He placed the body under a mattress located a short distance from the car.

Harris went to his mother's home to get a shovel. When he returned, he planned to shoot Huggins again. Dunn asked him why he was doing it, since Huggins was already dead. Defendant said he wanted to make sure, and he shot Huggins in the face. Defendant dug a shallow grave in which he and Dunn buried Huggins' body. Dunn also testified that defendant took thirty dollars and an ATM card from Huggins' wallet. Dunn claimed that she did not get any of the cash.

Harris threatened to "come looking" for Dunn if she told anyone about what had occurred. Dunn claimed that his threats prevented her from going to the police immediately, as did her fear of being implicated in the crimes herself. When news of Huggins' disappearance appeared on the television news, Harris called Dunn to say, "That white bitch is on the news."

Several pieces of physical evidence linked defendant to the crimes. The gun that a ballistics expert later linked to the crime was seized from defendant during an unrelated arrest on December 27, 1992. Defendant's nephew further connected defendant to the gun. The nephew bought the gun for his own protection and then gave it to defendant before the murder. The nephew also testified that defendant had the gun on the night of the murder. Finally, Dunn identified the gun as the murder weapon. Because Huggins' body had so badly decomposed, DNA and forensic evidence regarding the sexual assault was inconclusive.

Defendant did not testify during the trial. He attacked the credibility of the State's witnesses, seeking to convince the jury that those witnesses, not he, were actually responsible for the murder of Kristin Huggins and that they were attempting to frame him. Although his defense was not entirely consistent, his major goal was to cast doubt on Dunn's version of defendant as principal and Dunn as accomplice. He thus came close to admitting his presence during the crime, while pointing to Dunn as triggerperson. That distinction had death-eligibility consequences. According to *N.J.S.A.* 2C:11–3c, one who kills by his own conduct is death eligible.

Defendant attacked Dunn's credibility, pointing out the various inconsistencies in Dunn's testimony and statements to the police. He stressed her involvement in the crimes, her failure to attempt to escape or to seek help for Huggins when presented with the opportunity, and her long delay in notifying the police. Defendant also emphasized the reduction in charges that Dunn had received in exchange for her testimony against defendant,[2] the allegedly leading nature of the questioning by the police when Dunn gave her statement on October 5, 1994, and the State's failure to investigate fully whether Dunn, not defendant, was the one who pulled the trigger. Defendant sought to introduce evidence of Dunn's violent disposition in order to rebut her claim that she feared him and to cast doubt on his status as triggerperson. The trial court, however, excluded the evidence. Defendant challenges that exclusion.

Defendant specially emphasized Dunn's desire to get the $25,-000 reward money as her motive to implicate Harris. At trial, Dunn denied ever having been interested in obtaining a reward for leading authorities to the body and to defendant, but parts of her

---

[2] Under the agreement, Dunn pled guilty to kidnapping and robbery, with a maximum sentence of thirty years' imprisonment with fifteen years of parole ineligibility. The murder charge was dismissed. Dunn eventually received a sentence of thirty years' imprisonment with ten years of parole ineligibility.

testimony and the testimony of various police officers demonstrated that she and her sister repeatedly inquired about the reward. She explained her inquiries about the reward as a strategy to lead the police to the body without incriminating herself.

Defendant also attacked the credibility of the young men who gave evidence, all of whom had either been involved with drugs, had criminal records, had motives to seek favor with prosecutors, or had lied to the police. Defendant presented testimony that one of the men had shown off a gun similar to the murder weapon sometime in December and stated that he had plans for the gun. Certain of the witnesses had been seen driving Huggins' car without defendant. One had Huggins' Blockbuster Video card. Defendant also elicited testimony that the police had not compared hair found in the car with the hair of the witnesses.

At the conclusion of the guilt phase, the jury convicted defendant on all counts and found that he had killed Huggins by his own conduct.

During the penalty phase, the State presented no new evidence to support the aggravating factors that it had submitted, the escape-detection and felony-murder factors. Nor did the State rebut defendant's mitigating evidence beyond cross-examination.

Defendant sought to submit 180 mitigating factors to the jury, all related to various aspects of his childhood and the abuse that he had suffered during that period. The trial court consolidated those "factors" into one factor with 180 supporting points. Defendant challenges that "deflation" of his mitigating evidence.

Defendant presented his evidence through three experts—a mitigation expert, a child psychologist, and a psychiatrist. The evidence revealed that defendant came from a dysfunctional family. His mother had been abused by her father and had married, when she became pregnant, a man whom she did not love—a man who abandoned her and their child. She raised a child whom she did not want and whom she neglected. She and a new boyfriend often abused Harris physically. Defendant was exposed to sexual activity in the home. A neglected child, he was soon involved in

violent and sexual activity. He was hospitalized and placed on Thorazine (a mood elevator) and diagnosed as mentally retarded. He began to experiment with drugs.

A defense expert expressed the opinion that because of defendant's neglected and violent life, his problems at school, his experience at the mental hospital, and his self-perception as being mentally retarded, he harbored "rage against women." Harris should have been classified at age thirteen as having a "severe conduct disorder." The witness said that defendant should not have been allowed to remain in his dysfunctional home and that he should have been placed in a structured residential facility where he could get intensive psychiatric treatment for his mental illness. The witness also testified that defendant's poor treatment by school officials contributed to his problems. Another defense expert concurred that defendant suffered from a conduct disorder stemming from biological, psychological, and social causes and that he should have been removed from the "squalor" of his home. He stated that "[i]f I were trying to write a book about how not to raise a child during those years, I would [have the parents] do everything that was done to him."

At the conclusion of the penalty phase, the jury found the existence of both aggravating factors and the sole consolidated mitigating factor. It also concluded that the aggravating factors outweighed the mitigating factor beyond a reasonable doubt and that Harris should be sentenced to death. Defendant appeals to us as of right under *Rule* 2:2–1(a)(3).

## II

## PUBLICITY ISSUES

### A.

### Motion to Transfer Trial from Mercer County

#### 1.

Defendant challenges his conviction on the ground that prejudicial pretrial and midtrial publicity in Mercer County undermined

his right to trial by a fair and impartial jury, a right guaranteed to criminal defendants by the state and federal constitutions. *U.S. Const.* amend. 14; *N.J. Const.* art. 1, ¶ 10; *see Williams I, supra,* 93 *N.J.* at 59–62, 459 *A.*2d 641. Justice Stein set forth a concise account of the relevant principles in *State v. Bey,* 112 *N.J.* 45, 548 *A.*2d 846 (1988) (*Bey I* ):

> "The securing and preservation of an impartial jury goes to the very essence of a fair trial. * * * [This right] is of exceptional significance. * * * [T]riers of fact must be as nearly impartial 'as the lot of humanity will admit.'" "It is axiomatic that a criminal defendant's right to a fair trial requires that he be tried before a jury panel not tainted by prejudice." "[F]ailure to accord an accused a fair hearing violates even the minimal standards of due process."
>
> Of particular significance here is that aspect of impartiality mandating "that the jury's verdict be based on evidence received in open court, not from outside sources." As expressed by Justice Holmes, "[t]he theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." ... The Court has consistently required trial courts to protect both jurors and their deliberations from illegitimate influences that threaten to taint the verdict. [T]rial judges must "seek out and expose outside factors impinging upon the jury's freedom of action and its impartiality and essential integrity."
>
> [*Bey I, supra,* 112 *N.J.* at 75, 548 *A.*2d 846 (citations omitted).]

Before applying these principles, we digress to examine important differences in four related concepts: (1) media publicity that is inherently prejudicial; (2) media publicity that is presumed to prejudice a fair trial; (3) the federal standard for reversing a state court conviction, and (4) the state standard for ordering a change of venue.

Obviously, not all publicity about a crime is prejudicial to an accused. Some news accounts may simply report that charges have been made and include an outline of facts alleged in the indictment. Other types of media publicity, however, are prejudicial to fair trial rights because the publicity is

> inherently prejudicial or inflammatory. Several types of publicity fall into this category. The [perfect example] is a report of a confession or of other significant evidence that is suppressed or otherwise inadmissible. Closely related are reports of important factual details that the defendant will actively seek to dispute at trial. Also included are emotionally charged editorials. This category [of inherently prejudicial publicity] further encompasses prejudicial accounts of the defendant's criminal history, particularly when such accounts are inaccurate.

[*Newcomb v. State,* 800 *P.*2d 935, 939 (Alaska Ct.App.1990).]

Our cases have described such publicity as "presumptively prejudicial." *Koedatich I, supra,* 112 *N.J.* at 351, 548 *A.*2d 939. It is preferable to refer to the type of such media publicity described in *Newcomb* as "inherently prejudicial" publicity in order to distinguish such publicity from publicity that is "presumptively prejudicial" to fair trial rights. The latter concept describes a torrent of publicity that creates a carnival-like setting in which "the trial atmosphere is so corrupted by publicity that prejudice may be presumed." *State v. Biegenwald,* 106 *N.J.* 13, 33, 524 *A.*2d 130 (1987) (*Biegenwald II* ). In *Murphy v. Florida,* 421 *U.S.* 794, 95 *S.Ct.* 2031, 44 *L. Ed.*2d 589 (1975), the Supreme Court described the cases in which prejudice may be presumed. In such cases,

> the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings.... The trial in *Estes* [,for example,] had been conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment. Similarly, *Sheppard* arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival. The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob.

[*Id.* at 799, 95 *S.Ct.* at 2035–36, 44 *L. Ed.*2d at 594.]

Cases of presumed prejudice due to pretrial publicity are "relatively rare and arise out of the most extreme circumstances." *Koedatich I, supra,* 112 *N.J.* at 269, 548 *A.*2d 939. *Coleman v. Kemp,* 778 *F.*2d 1487 (11th Cir.1985), *cert. denied,* 476 *U.S.* 1164, 106 *S.Ct.* 2289, 90 *L. Ed.*2d 730 (1986) offers an example of the analysis that is required to reach the conclusion that the "presumed prejudice" standard may be invoked. In *Coleman,* the community had been saturated with prejudicial and inflammatory pretrial publicity and an insufficient effort had been made to root out jurors exposed to the publicity.

The doctrine of "presumed prejudice" arising from massive and pervasive publicity is one of two tests currently prescribed by

the federal courts to demonstrate that fair trial rights have been infringed. The other is a test for "actual prejudice."

> If prejudicial pretrial publicity makes it impossible to seat an impartial jury, then the trial judge must grant the defendant's motion for a change of venue. The prejudice requirement will be satisfied by a finding of: (1) presumed prejudice; or (2) actual prejudice.

### 1. *Presumed Prejudice*

> "Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." Courts rarely find presumed prejudice because "saturation" defines conditions found only in extreme situations.

. . . .

### 2. *Actual Prejudice*

> Actual prejudice exists if the jurors demonstrated actual partiality or hostility that cannot be laid aside. "[J]urors need not, however, be totally ignorant of the facts and issues involved."

> [*Jeffries v. Blodgett*, 5 *F*.3d 1180, 1189 (9th Cir.1993) (citations omitted), *cert. denied*, 510 *U.S.* 1191, 114 *S.Ct.* 1294, 127 *L. Ed.*2d 647 (1994).]

According to the Ninth Circuit, trial courts must grant a defendant's motion for a change in venue if either test is met. *Ibid.* And federal *habeas corpus* relief is warranted if a state trial court has failed to comply with the rule. *Ibid.* The federal standard for reversal of a state court conviction should not, however, be confused with the state standard for granting a change of venue. *See United States v. Houlihan*, 926 *F.Supp.* 14, 16 n. 3 (D.Mass.1996) (observing that "the [supervisory] threshold for unacceptable prejudicial publicity triggering a change in venue may well be lower than the constitutional standard"). New Jersey *Rule* 3:14–2 authorizes a change of venue or trial by a foreign jury "if the court finds that a fair and impartial trial cannot otherwise be had." Our law respecting motions for a change of venue in capital cases was initially considered in *Williams I, supra*, 93 *N.J.* 39, 459 *A.*2d 641. It was further developed in *Biegenwald II, supra*, 106 *N.J.* 13, 524 *A.*2d 130, and in *Bey I, supra*, 112 *N.J.* 45, 548 *A.*2d 846. In *Biegenwald II* the Court observed that under

the former test set forth in *State v. Wise,* 19 *N.J.* 59, 73–74, 115 *A.*2d 62 (1955), which required clear and convincing proof that an impartial jury could not be obtained in the county where the indictment took place, few defendants succeeded in obtaining a change of venue. *Biegenwald II, supra,* 106 *N.J.* at 33, 524 *A.*2d 130. Accordingly, in *Williams I,* the Court modified the defendant's burden, conferring on trial courts the discretion to change venue when it is "necessary to overcome the realistic likelihood of prejudice from pretrial publicity." *Williams I, supra,* 93 *N.J.* at 67 n. 13, 459 *A.*2d 641.

2.

There can be no doubt that this case was accompanied by widespread, inherently prejudicial pretrial media coverage. Strong measures were "necessary to overcome the realistic likelihood of prejudice from pretrial publicity." *Id.* at 67–68, 459 *A.*2d 641. The trial court found that one media source, the *Trentonian,* a Mercer County newspaper, had conducted a "vengeance seeking crusade" against defendant. It had published a "stream of invective" that had been "constant," "prolonged," and "sensationalized." According to the trial court, there was a "reasonable likelihood of its taint permeating the trial."

The newspaper ran many front-page, invective-filled headlines: "Ex–Inmate: Suspect is a Loudmouthed Punk," "Huggins Suspect 'Would Kill You in a Heartbeat,' " "Profile of a Monster: The Man Who Killed Kristin Huggins Committed His First Rape as a Teenager," "From Boy to Beast," "Huggins Slayer Terrorizes Prison," "He's Satan in Disguise." Other news accounts discussed the defendant's prior criminal record as well as other crimes he was suspected of committing. An editorialist predicted that death by lethal injection would rid society of "one of the biggest pieces of human trash ever to blight Trenton streets." A sample of the accounts is attached as Schedule A.

Based on the content of the newspaper coverage and the paper's editorial stance, the trial court concluded that Ambrose Harris "was no longer the subject of a news story, but rather the target

of the newspaper's crusade." The court concluded that the pretrial publicity met the federal standard of "presumed prejudice." In its decision affirming the importation of foreign jurors the Appellate Division observed that such coverage had continued unabated, even during the oral argument of the interlocutory appeal. That event generated a full-page headline: "Justice for Kristin Delayed Again." *State v. Harris, supra,* 282 *N.J.Super.* at 415, 660 *A.*2d 539.

The reason that we do not reverse defendant's conviction is that the trial court agreed with defendant that there was a realistic likelihood of prejudice from prejudicial trial publicity and used one of the trial management techniques specifically approved to ensure that a defendant's right to an impartial jury is not compromised. We said in *Biegenwald II* :

> In criminal cases attended by widespread and inflammatory publicity, *various* trial management techniques can be employed to assure that the defendant's right to an impartial jury is not compromised. One available option is a change in venue. Other means of protecting the defendant's constitutional rights include the use of searching *voir dire* examinations, the impaneling of "foreign jurors" to augment the pool of eligible jurors in the vicinage, adjournment of the trial date, and restraints on public comments by participants in the trial.
>
> [*Biegenwald II, supra,* 106 *N.J.* at 32, 524 *A.*2d 130 (emphasis added).]

In fact, the empanelment of foreign jurors was the first trial management technique that *Williams I* suggested to combat the effects of preexisting prejudicial pretrial publicity. The Court said: "The court should explore the feasibility of augmenting the pool of eligible jurors in the vicinage, and should consider the practicability of using citizens from beyond the particular vicinage to serve as potential jurors, the use of so-called 'foreign jurors.' *Similarly,* a change of trial venue may help to overcome the risk of prejudice." *Williams I, supra,* 93 *N.J.* at 67, 459 *A.*2d 641 (emphasis added).

In the footnote to its opinion, the *Williams I* Court observed that "a change of venue has the same benefits and drawbacks as the impanelling of a foreign jury since both methods utilize jurors from communities where publicity may be less intense." *Id.* at 67 n. 13, 459 *A.*2d 641. In order to "facilitate" the empanelment of

foreign juries, the court held that the number of peremptory challenges should not be reduced if a foreign jury was chosen by the court in the exercise of its sound discretion. *Id.* at 67 n. 12, 459 *A.*2d 641. In short, every intendment of our law was that the empanelment of a foreign jury be an adequate response to the realistic likelihood that the jury would be subjected to adverse trial publicity.

3.

■ Hence, we find no error in the trial court's decision to empanel a foreign jury rather than to transfer venue. When, however, a capital case is accompanied by a stream of public invective such as surrounded this case, it occasions us to reconsider our precedent.

In analyzing this conflict between free press and fair trial rights, we take guidance from Justice Jackson. He wrote:

> The right of the people to have a free press is a vital one, but so is the right to have a calm and fair trial free from outside pressures and influences. Every other right, including the right of a free press itself, may depend on the ability to get a judicial hearing as dispassionate and impartial as the weakness inherent in men will permit.
>
> [*Craig v. Harney,* 331 *U.S.* 367, 394–95, 67 *S.Ct.* 1249, 1263, 91 *L. Ed.* 1546, 1561 (1947) (Jackson, J., dissenting).]

In an ideal world a free press would seek to foster fair trial rights by not circulating inherently prejudicial publicity at least during a time of trial. *See* Fred W. Friendly & Martha J.H. Elliott, *The Constitution: That Delicate Balance* 148 (1984). If this cannot be so, courts must guarantee the preservation of fair trial rights without any restraint of the editorial freedom of the press. We long ago made the choice that "free speech is the national currency." *Maressa v. New Jersey Monthly,* 89 *N.J.* 176, 201, 445 *A.*2d 376, *cert. denied,* 459 *U.S.* 907, 103 *S.Ct.* 211, 74 *L. Ed.*2d 169 (1982).

■ In future capital cases a court should change the venue of a capital trial when there is a realistic likelihood that presumptively prejudicial publicity will continue during the conduct of a trial. Presumptively prejudicial publicity is recognized as a barrage of

inflammatory reporting that may but need not include all of the following: evidence that would be inadmissible at the trial, editorial opinions on guilt or innocence, and media pronouncements on the death-worthiness of a defendant. We realize that this respect for a free press imposes an added expense and inconvenience on the State and the victims of crime. The alternatives, sequestration of jurors or gag orders on the press, have proven unacceptable. *See generally Allen, supra,* 73 *N.J.* 132, 373 *A.*2d 377.

## B.

### Selection of a Burlington County Jury

In his initial motion for a change of venue, Harris asked the trial court to select Camden County as the place for trial because of the county's relative proximity to Mercer County, the minimum circulation of newspapers containing prejudicial publicity, and because the racial makeup of the county's population (its demographics) was nearly the same as Mercer County. Initially, the court rejected Camden County as a transfer site or source for a jury because it was not one of the counties contiguous to Mercer County and because there was no legal authority requiring the court to consider the racial makeup of the alternate jury pool in its decision. The court considered the two contiguous counties of Hunterdon and Burlington. It chose Hunterdon because the two Trenton newspapers (the *Times* and the *Trentonian*) had a combined Burlington County circulation of approximately 20,000, split fairly evenly between the two. The circulation of the two Trenton newspapers in Hunterdon County was about 3,000 daily, of which some 1,200 were of the *Trentonian.*

After the Appellate Division determined that racial demographics should be considered by the court and that the trial court had erred in refusing to consider Camden County merely because it was not contiguous to Mercer County, Harris again urged the selection of Camden County based upon publicity and the demographic considerations. Camden County, like Mercer County, consisted of an urban center surrounded by rural areas with a

sixteen percent African–American population. At most, 250 copies of the *Trentonian* circulated in Camden County. In contrast, Burlington County consisted of largely rural areas with an African–American population of only fourteen percent.

The trial court concluded that the racial demographics of the counties were virtually identical and that the circulation of the Trenton newspapers in Burlington County was not large enough to prejudice defendant. Relying upon the considerations of proximity and efficiency, it chose Burlington County as the source for selection of the jury.

Defendant finds it to be a paradox that although the relatively large local circulation of the Trenton papers had motivated the trial court to reject Burlington County in the first instance (Hunterdon's circulation of 3,000 having been preferable to Burlington's circulation of 22,000), when required by the Appellate Division to reconsider, the court chose Burlington County over Camden even though the circulation figures were more widely disparate: Burlington's 22,000 copies compared with Camden's 250. The trial court held that the extent of news coverage in Burlington County should not be decisive because even if the case were tried "on the Ross Ice Shelf [in Antarctica], it would generate publicity. There is no way to avoid that."

Defendant argues that because the goal is to "minimize the danger that prejudice [from extensive pretrial publicity] will infiltrate the adjudicatory process," *Koedatich I, supra,* 112 *N.J.* at 268, 548 *A.*2d 939 (quoting *Williams I, supra,* 93 *N.J.* at 63, 459 *A.*2d 641), the most effective method of minimizing the potential was to select a jury from a county which was outside of the circulation range of the Trenton newspapers.

Defendant would prevail if the court had taken no other steps to minimize the danger that prejudice would infiltrate the adjudicatory process. The court took firm steps to ensure that none of those households that received the *Trentonian* (the newspaper containing the most inflammatory material) would be on this jury. A questionnaire specifically inquired whether a potential juror had

read the Trenton newspapers. Any juror who regularly read the *Trentonian* was effectively subject to elimination for cause in the jury selection process. In addition, the court ensured that during the course of the trial most jurors were assembled at the Burlington County Court House and transported directly to the Mercer County Court House with attempts to minimize the exposure to the hawking of papers en route to the court house.

Although the court empaneled the jurors from Burlington County, the net effect was not significantly different than if the jury had been from Camden County. As noted, the racial demographics of the two counties were substantially similar, although Camden is more urban. When the jury panel was finally composed, it included two minority members. The court systematically excluded readers of the *Trentonian* from the panel of jurors. (The court's initial goal was to select sixty jurors and eventually qualified forty-nine jurors on the day before trial was to commence on January 3, 1996.) The principal risk of jury contamination in this case arose in Mercer county and not in the home counties of the jurors. It made little difference whether the jurors were from Burlington or Camden counties.

## C.

### Midtrial Publicity

Defendant contends that assuming that it was not an abuse of discretion to employ an out-of-county jury, the court's refusal to question jurors individually concerning any possible exposure to inherently prejudicial midtrial publicity deprived defendant of a fair trial. Defendant specially challenges the penalty-phase portion of the trial. After the guilt verdict was returned, defense counsel moved for sequestration of the jury and that the court conduct an individual *voir dire*. Counsel argued that jurors, particularly juror number seven, may have been exposed to prejudicial publicity that the jurors might have been reluctant to discuss in a group setting.

Dramatically prejudicial headlines were attendant to the guilt-phase deliberations. The *Trentonian* headlines read, "One Juror Stalls Verdict," and "Battling Harris Jury Draws Public Fire." A feature story quoted a Trenton resident as expressing the opinion that "[m]ost people figure the jury would think, 'We'll have lunch on the county, and we'll squirt him—this afternoon.'" Similar publicity continued during the penalty phase. A headline such as "Ambrose Eyed in '67 Slay." An editorial recommended death for Harris. The day after the jury returned its guilt verdict, a front-page photograph of Harris ran over a caption which read, "So why's this killer smiling? Because he's seen juror No. 7 crying, and he thinks she'll never go for the death penalty."

Defense counsel acknowledge that whenever they requested the court to question jurors concerning any prejudicial headlines and accounts, the court did ask the jurors to acknowledge by a show of hands if they had seen or read any news accounts of the trial and that on each of these occasions it received no response. But defendant argues that because of the inherently prejudicial nature of these articles, particularly those that singled out a specific juror, the court should have granted defense counsel's request for an *in camera* individual *voir dire* of the jurors. (*In camera* individual *voir dire* means one-on-one interviews between the judge and each juror, without the press or the public present.)

*Bey I, supra,* 112 *N.J.* 45, 548 *A.*2d 846, presented a similar issue. In that case the defendant had been charged almost simultaneously with two murders in the same county. Because the defendant had not been convicted of either murder, evidence of the other murder was inadmissible at the first guilt-phase trial. During *voir dire,* the court questioned jurors concerning exposure to any pretrial publicity and admonished prospective jurors not to read newspaper accounts of the case. These protective instructions were repeated frequently at trial. After the commencement of trial, a newspaper circulating in the county printed articles concerning the other murder and also published a strongly worded

commentary criticizing sentences in other murder cases as overly lenient. *Id.* at 79–80, 548 *A.*2d 846.

Defense counsel produced the articles and requested a mistrial or, in the alternative, that the jury be polled concerning any exposure. The court declined to question the jury with respect to any exposure to the newspaper articles, relying on the presumption that jurors would faithfully adhere to the court's instruction. *Id.* at 80, 548 *A.*2d 846.

Notwithstanding the general presumption that jurors act in good faith and seek to comply with a court's instructions, we held that general warnings not to read trial publicity are inadequate when inherently prejudicial information has been published during a trial and it is likely that one or more jurors may have been exposed to the publicity. *Id.* at 81, 548 *A.*2d 846. If a court is satisfied that published information has the capacity to prejudice a defendant, the court should first "determine if there is a realistic possibility that such information may have reached one or more of the jurors." *Id.* at 86, 548 *A.*2d 846. If such a "possibility exists, the court should conduct a *voir dire* to determine whether any exposure has occurred." *Ibid.* In a footnote, the Court wrote that "[t]hough the form and content of this initial questioning is better left within the trial court's sound discretion, we note that a practice of polling the jurors individually, *in camera,* is likely to be more effective in uncovering any exposure than is questioning the jury *en banc,* in open court." *Id.* at 86 n. 26, 548 *A.*2d 846. Justice Stein further prescribed that

[i]f there is any indication of such exposure or knowledge of extra-judicial information, the court should question those jurors individually in order to determine precisely what was learned and establish whether they are capable of fulfilling their duty to judge the facts in an impartial and unbiased manner, based strictly on the evidence presented in court.

[*Id.* at 86–87, 548 *A.*2d 846.]

We reversed the conviction in *Bey I* because the court refused to question the jurors in accordance with defense counsel's request. We observed that "[s]uch an inquiry might have revealed that no exposure to the publicity had occurred at all." *Id.* at 91,

548 *A*.2d 846. That scenario did not occur in this case. Harris' jurors were questioned generally and that inquiry revealed that no exposure had occurred.

*United States v. Bermea,* 30 *F*.3d 1539 (5th Cir.1994), *cert. denied sub nom. Rodriguez v. United States,* 513 *U.S.* 1156, 115 *S.Ct.* 1113, 130 *L. Ed.*2d 1077 (1995), is similar. After instances of possible exposure to inherently prejudicial publicity had been brought to its attention, the court conducted a collective *voir dire.* The negative response received on each occasion disclosed that jury exposure did not occur and supported the court's discretionary decision that individual *voir dire* was unnecessary. The *Bermea* court wrote: "We have found nothing in our cases to support a rule that midtrial publicity requires individual *voir dire* even after the district judge has made a collective inquiry to the jury and received no positive response." *Id.* at 1560; *see also United States v. Tolliver,* 61 *F*.3d 1189, 1204 (5th Cir.1995) (holding that a two-step inquiry is necessary to assess whether individualized *voir dire* is necessary because of midtrial publicity, concerning the nature of the media coverage and its prominence).

In *Bey I,* the court was at pains to point out that "with respect to the trial court's failure to poll the jury about exposure to media reports, we have gone no further than to adopt the approach accepted by the majority of states that have considered the matter for capital and noncapital cases alike." *Bey I, supra,* 112 *N.J.* at 92, 548 *A*.2d 846. Had we intended to go further than prevailing practice on the question of exposure to midtrial publicity, we should have done so explicitly. Not having done so in *Bey I,* a denial of individual *voir dire* should not form the basis for reversing a conviction when there is no evidence of exposure.

■ Unlike in *Bey I* and *Bermea,* in which the jurors were exposed in their homes to newspapers and television accounts of inherently prejudicial material, the jurors in this case were not exposed to publicity in their homes. The question was whether, in their travels by bus in and out of the county and in their trips for lunch, they would have read and been influenced by the promi-

nently displayed headlines of the tabloid newspaper involved. In such circumstances, the collective *voir dire* was acceptable.

A question may arise whether we should reconvene the jury and poll the members individually to determine whether any individual juror was, in fact, exposed to prejudicial midtrial publicity. In *Koedatich I, supra,* 112 *N.J.* 225, 548 *A.*2d 939, defendant sought to question jurors after his trial. He relied on a newspaper article that quoted some jurors as having knowledge of his involvement in a second murder. We held that questioning jurors after a trial is "an extraordinary procedure" that should be invoked only when there is a strong representation that a defendant may have been harmed by juror misconduct. *Id.* at 288, 548 *A.*2d 939 (quoting *State v. Athorn,* 46 *N.J.* 247, 250, 216 *A.*2d 369, *cert. denied,* 384 *U.S.* 962, 86 *S.Ct.* 1589, 16 *L. Ed.*2d 674 (1966)). We did not wish to create a situation where "disappointed litigants would be encouraged to tamper with jurors to harass them and to employ fraudulent practices in an effort to repudiate their decisions." *Ibid.* (quoting *Athorn, supra,* 46 *N.J.* at 250, 216 *A.*2d 369). Nor did we wish to extend "an open invitation ... to any disgruntled juror who might choose to destroy a verdict to which [the juror] had previously assented." *Ibid.* (quoting *Athorn, supra,* 46 *N.J.* at 250, 216 *A.*2d 369). Privacy and secrecy must attach to the process, not only to promote the finality of jury verdicts but also to aid the deliberative process itself, allowing each juror the freedom to discuss his or her thoughts. *Ibid.* For the same "strong policy reasons" that led us to the decision not to interrogate the *Koedatich* jury, *Koedatich, supra,* 112 *N.J.* at 288–90, 548 *A.*2d 939, we ought not reconvene the jury that convicted and sentenced defendant.

## D.

### Refusal to Sequester Jury

On February 22, 1996, prior to the commencement of the penalty phase, defense counsel moved to sequester the jury. The impetus for this motion was a "new direction" that the publicity

had taken. The February 21, 1996, edition of the *Trentonian* contained in bold type the bold headline, "Guilty," over a picture of Mr. Harris with a caption, "So why's this killer smiling? Because he's seen juror No. 7 crying, and he thinks she'll never go for the death penalty." Several days before, while the jury was deliberating defendant's guilt, a cover page headline said, "One Juror Stalls Verdict." Defendant describes this as a clear attempt by the media to seek to influence or intimidate this jury, and, more specifically, to intimidate, by personal attack, a single juror who happened to be a black female.

In this context, sequestration of jurors means that jurors would not return to their homes at the end of a day of trial and would be housed by the court, take all meals, and receive outside information under the supervision of court officers. *See* Marcy Strauss, *Sequestration,* 24 *Am. J.Crim. L.* 63, 66 (1996). This is not to be confused with the sequestration of witnesses, the practice of not allowing prospective witnesses to hear the testimony of other witnesses, the theory being that the witnesses might shape their testimony to that which they have heard.

Defendant emphasizes that under our prior death-penalty practice, sequestration of the jury was required at all times in capital cases. *State v. Pontery,* 19 *N.J.* 457, 479, 117 *A.*2d 473 (1955) (Heher, J., concurring). It was not until September 5, 1972, that judges were permitted to disperse a criminal jury during deliberations. Pressler, *Current N.J. Court Rules,* comment 3 on *R.* 1:8–6 (1998). The Sub–Committee on Jury Deliberations of this Court's Criminal Procedure Committee, which recommended the 1972 rule change, suggested that sequestration after commencement of deliberations be a discretionary decision for the trial court based on such factors as the nature of the case, the identity of the defendant, the length of the trial, and the kind of public interest evidenced on the day and the hour when deliberations begin. More importantly, the Committee recommended that the presumption against sequestration, which applies during the course of the trial, not carry over to the deliberations phase. *Ibid.*

We acknowledge that sequestration was once considered the norm during jury deliberations in criminal cases, where the need to protect jurors from the outside influences of pretrial publicity was a constant. *Allen, supra,* 73 *N.J.* at 155, 373 *A.*2d 377 (Pashman, J., concurring). Yet, sequestration did not originate as a means of preserving juror impartiality.

> Rather than to protect the defendant by keeping the deliberating jurors from being improperly influenced by contacts with or communication from outside sources, it appears that the purpose of the ancient common law practice of keeping the jurors locked up without food or drink and sometimes without heat and light until they have reached a verdict was simply to force them to agree.
>
> [Strauss, *supra,* 24 *Am. J.Crim. L.* at 70–71.]

Because trials then generally lasted less than a day, this ancient requirement was "less onerous in practice than may appear on first glance." *Id.* at 71. The "trend of modern decisions seems to be constantly tapering off from the ancient idea that the confinement of the jury in a criminal case is a prerequisite to insure an uninfluenced verdict." *Id.* at 72.

The principal reason for the decline in sequestration is the burden it imposes on the judicial system and on jurors themselves. Sequestration has been described as "a glorified prison," where "[e]very contact to the outside world is censored," and where "[e]verything the sequestered jury reads, hears, and sees is monitored." Christo Lassiter, *TV or Not TV—That Is The Question,* 86 *J.Crim. L. & Criminology* 928, 986 (1996). Such conditions can cause feuding among jurors and can motivate jurors to rush their deliberations. *Id.* at 985–86.

In addition, even a short sequestration will reduce the number of potential jurors because the prospect of sequestration will deter many potential jurors from serving. *Id.* at 985. In one highly publicized case, ninety-five percent of the nearly 4500 potential jurors said that sequestration would impose a prohibitive hardship. Mark Hansen, *Sequestration: Little Used, Little Liked: Tensions on Simpson Jury Could be Symptom of Record Confinement,* 81 *A.B.A.J.* 16, 17 (Oct.1995).

■ Sequestration has thus been viewed as a "drastic remedy [that] cannot be recommended lightly." *United States v. Simon,* 664 *F.Supp.* 780, 794 (S.D.N.Y.1987), *aff'd sub nom. In re Application of Dow Jones & Co.,* 842 *F.*2d 603 (2d Cir.), *cert. denied sub nom. Dow Jones & Co. v. Simon,* 488 *U.S.* 946, 109 *S.Ct.* 377, 102 *L. Ed.*2d 365 (1988). Although the trial court did alert the jurors during orientation that they might be sequestered for several days during deliberations, the court was understandably reluctant to sequester the jury on the basis of the contemporaneous publicity reported in the *Trentonian.* As near as can be determined from this record, no prejudicial publicity appeared on any of the televised news broadcasts to which the jurors might have been exposed in their homes, nor in any of the other newspapers circulating in the State. The jurors chosen tended not to read the *Trentonian.* Because the overnight activities of the jurors did not pose a threat of taint and because there is no indication of any actual exposure during the jurors' lunch hours, it was not necessary to sequester the jury.

## III

## PRETRIAL ISSUES

### A.

Motion to Empanel Separate Guilt– and Penalty–Phase Juries

■ Before trial, defendant requested that the court bar the State from introducing evidence of defendant's prior criminal record or, in the alternative, that the court empanel separate guilt-phase and penalty-phase juries. The trial court denied defendant's motion. The court found that defendant possessed an "extensive criminal record which could be used to impeach him in the event he elects to testify during the guilt phase of the trial." Defendant had been convicted of possession of stolen property, larceny, burglary, robbery, attempt to commit robbery, and unlawful possession of a weapon for unlawful purposes. The court found that use of defendant's criminal record would not prejudice

defendant at the penalty phase. The court relied on two consider-
ations. First, the court found that "sanitizing" defendant's crimi-
nal record, as required by *State v. Brunson*, 132 *N.J.* 377, 625
*A.*2d 1085 (1993), would lessen the possibility of prejudice consid-
ered in *State v. Erazo*, 126 *N.J.* 112, 594 *A.*2d 232 (1991) and *State
v. Monturi*, 195 *N.J.Super.* 317, 478 *A.*2d 1266 (Law Div.1984).
Under *Brunson, supra,* a prosecutor may impeach a defendant's
credibility by introducing evidence of prior criminal convictions.
132 *N.J.* at 394, 625 *A.*2d 1085. However, if the past crimes are
similar to the instant charge, the prosecutor may only inform the
jury of the degree of the prior crimes and the dates of conviction.
*Ibid.* Counsel may not specify the nature of the offenses. *Ibid.*
The trial court found that the *Brunson* decision obviated the need
for separate guilt-phase and penalty-phase juries. Second, the
court found that selection of a foreign jury would "reduce[ ] the
possibility that the jurors will be aware of the exact nature of
defendant's crimes by virtue of pretrial publicity."

Despite his expressed desire to testify without regard for the
trial court's decisions on these issues, defendant did not testify
during the guilt phase. Defendant argues that the trial court's
ruling prevented him from testifying, denying him his Sixth
Amendment rights to a fair trial, because he was unable to present
fully his contention that Gloria Dunn was in fact the trigger
person causing Kristin Huggins' death. Defendant contends that
the use of his criminal record for impeachment purposes, while
proper during the guilt phase of the trial, would have led the jury
to improper consideration of that evidence during the penalty
phase. During *voir dire,* six of the jurors who ultimately went on
to deliberate expressed the opinion that defendant's criminal
record would be a relevant consideration during sentencing. De-
fendant contends that no limiting instruction would have been
effective.

██ Trial courts are authorized to empanel separate guilt-phase
and penalty-phase juries in capital murder cases. *N.J.S.A.* 2C:11–
3c(1) provides, in part:

Where the defendant has been tried by a jury, the [penalty] proceeding shall be conducted by the judge who presided at the trial and before the jury which determined the defendant's guilt, except that, for good cause, the court may discharge that jury and conduct the proceeding before a jury empaneled for the purpose of the proceeding.

Thus, although a single jury is preferable, *State v. Biegenwald,* 126 *N.J.* 1, 44, 594 *A.*2d 172 (1991) (*Biegenwald IV*), a trial court may, for good cause, empanel two juries. That decision rests in the sound discretion of the trial judge. *State v. Long,* 119 *N.J.* 439, 475, 575 *A.*2d 435 (1990).

▉▉▉▉ "One of the purposes of the bifurcated-trial system established by the New Jersey Death Penalty Act is to prevent the jury's determination of death-eligibility from being influenced by evidence relevant only to adjudgement of the appropriate sentence." *Biegenwald IV, supra,* 126 *N.J.* at 44, 594 *A.*2d 172. Evidence of other crimes has the capacity to prejudice the penalty-phase proceedings of a capital murder case. *Erazo, supra,* 126 *N.J.* at 132, 594 *A.*2d 232; *State v. Moore,* 113 *N.J.* 239, 276–77, 550 *A.*2d 117 (1988). "With the stakes so high, the possibility of prejudice on the penalty phase persists as a cause for continuing concern." *Erazo, supra,* 126 *N.J.* at 132, 594 *A.*2d 232. The use of two juries "commends itself when guilt-phase evidence is so prejudicial that the same jury could not fairly sit on both phases of the trial." *Id.* at 133, 594 *A.*2d 232 (citing *Monturi, supra,* 195 *N.J.Super.* 317, 478 *A.*2d 1266). One instance in which the Court has required separate juries is when the State relies on aggravating factor c(4)(a), conviction of another murder. *See Biegenwald IV, supra,* 126 *N.J.* at 43–44, 594 *A.*2d 172 (recognizing "that our finding that defendant is entitled to *voir dire* potential jurors on the possible blinding impact of the c(4)(a) factor most likely will require a two-jury system for all capital cases in which the State seeks to prove that factor").

▉▉▉▉ Except for that specific category of cases (in which it is inevitable that a reverse spillover will taint the guilt phase of a capital trial), a motion for separate guilt- and penalty-phase juries should be decided at the close of the guilt phase of a criminal

proceeding. The statute contemplates that procedure. It is then that a trial court may properly assess whether prejudicial evidence has been presented to the jury. In *Monturi, supra,* Judge Stern addressed a defendant's pre-trial motion to empanel separate guilt- and penalty-phase juries. 195 *N.J.Super.* at 321–23, 478 *A.*2d 1266. The defendant was accused of two murders and two counts of conspiracy to commit murder as well as a number of unrelated, "post-murder" crimes. The court found that some evidence necessary to prove guilt of the "post-murder" offenses would be inadmissible during the penalty phase. *Id.* at 326, 478 *A.*2d 1266. "Nevertheless, to prejudge the evidence and order pre-trial that the case be tried to separate juries would be imprudent." *Id.* at 327, 478 *A.*2d 1266. The court withheld decision on the issue of separate juries, suggesting that a court should wait until the end of the guilt phase to decide if the evidence presented was prejudicial in fact or would be admissible in some way during the penalty phase of the proceeding. *Id.* at 329–30, 478 *A.*2d 1266. The potential introduction of Harris' sanitized prior convictions did not pose so grave a risk of prejudice as to warrant before trial the empanelment of two juries.

We will not speculate whether the trial court's decision prevented defendant from testifying. There are many factors that influence that decision. Defendant stated that he would testify regardless of the court's decision to admit his criminal record or empanel only one jury. It may be, then, that some other consideration prevented defendant from testifying.

 The trial court did not abuse its discretion in failing to empanel two juries before trial. Whether a guilt-phase jury's exposure to a "Brunsonized" version of a criminal defendant's prior record of convictions rises to the level of "good cause" required under *N.J.S.A.* 2C:11–3c(1), must remain in the sound discretion of the court. We can envision circumstances in which evidence of other "unsanitized" convictions, such as child sexual abuse, might pose a potential for impermissible spillover into the

penalty phase thus requiring two juries. *See Erazo, supra,* 126 *N.J.* at 132–33, 594 *A.*2d 232.

## B.

### Jury Selection Process

Defendant contends that the trial court, without proper justification, excluded defense counsel from direct participation in jury selection and, remaining insensitive to counsel participation throughout jury selection, proceeded to conduct an entirely value-less *voir dire.* He contends that the jury *voir dire* · was so inadequate that he was denied his right to a fair trial by an impartial jury. Although his argument states a broad-based challenge to the trial court's conduct of *voir dire,* there are distinct aspects to the challenge: (1) whether the trial court improperly terminated attorney-conducted *voir dire;* (2) whether the overall quality of the *voir dire* was insufficient to enable counsel to exercise peremptory challenges with respect to issues such as the presumption of innocence, the exposure to publicity, and the awareness of other crimes on the defendant's part; (3) whether the court failed to explore a potential racial bias of jurors; and (4) whether the court failed to excuse for cause jurors whose views substantially interfered with their ability to be fair and impartial.

The death-qualification and jury selection process is "important, delicate, and complex," and requires a "thorough and searching inquiry" into jurors' opinions and biases. *State v. Williams,* 113 *N.J.* 393, 413, 550 *A.*2d 1172 (1988) *(Williams II ).* Under our single-jury capital trial system, jury selection must serve double duty as both a time to "death qualify" jurors and a time to enable counsel to exercise the valuable constitutional prerogative of selecting a fair and impartial jury. The two purposes of the inquiry tend to overlap. *See State v. Zola,* 112 *N.J.* 384, 398, 548 *A.*2d 1022 (1988), *cert. denied sub nom. Zola v. New Jersey,* 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L. Ed.*2d 205 (1989).

Significant inquiry into jurors' feelings, views, and attitudes on the death penalty and relevant issues in a case is required in capital *voir dire*. We have therefore encouraged open-ended questioning. We have strongly disapproved closed-ended questions that predetermine answers or elicit narrow yes-or-no responses. *Williams II, supra,* 113 *N.J.* at 423, 550 *A.*2d 1172. We have encouraged the formulation of additional questions that will provide insight into a juror's views on a subject in controversy. Obviously, a court must control *voir dire* examination, but in doing so it must remain neutral. The court must not proselytize, and it must not indicate in any way its views of the "right" or "wrong" answers to *voir dire* questioning. The *voir dire* should be probing, extensive, fair, and balanced. Such *voir dire* is the essential predicate to securing a jury with the strong sense of fairness necessary in a capital prosecution. We have repeatedly stressed that the need for jury impartiality is heightened in cases in which the defendant faces death. *Williams I, supra,* 93 *N.J.* at 61, 459 *A.*2d 641. We have therefore repeatedly held that in capital cases trial courts should be especially sensitive to permitting attorneys to conduct a portion of *voir dire. Biegenwald II, supra,* 106 *N.J.* at 30, 524 *A.*2d 130. It is against these standards that we must assess the conduct of the *voir dire* in this case.

### 1. Court Conducted *Voir Dire*

Prior to the commencement of jury selection, the parties agreed that the court would begin the questioning of jurors and allow each side an opportunity to ask follow-up questions. In the course of the first several days, sixty potential jurors were dealt with in this manner. The overwhelming majority were excused for various hardships. Seven were fully questioned and four were qualified for service. On the fourth day of jury selection, the court reached the belief that defense counsel had asked questions designed to confuse and exhaust the potential jurors, citing the questioning of two excused jurors in particular. The court concluded that counsel was using the procedure to shop for a jury favorable to the defense. Defendant argues that pursuant to

*Biegenwald IV, supra,* 126 *N.J.* 1, 594 *A.*2d 172, there is nothing wrong with shopping for jurors and that his questioning of these jurors was appropriate. The attorney-conducted *voir dire* resulted in excusals for cause of each of the disputed jurors, one having subscribed to the philosophy of "an eye for an eye" and another stating, "You take a life, you give your life." Both beliefs constituted sound bases for excluding the jurors. Hence, defendant argues that it was inappropriate to curtail attorney participation.

The basic issue was resolved by our decision in *Biegenwald II, supra,* 106 *N.J.* 13, 524 *A.*2d 130. We there held applicable to capital cases the rule of *State v. Manley,* 54 *N.J.* 259, 281, 255 *A.*2d 193 (1969), as well as *Rule* 1:8–3a, which states that for purposes of determining whether a challenge should be interposed, "the court shall interrogate the prospective juror." *Biegenwald II, supra,* 106 *N.J.* at 28–29, 524 *A.*2d 130. It may be unwise but it is not unconstitutional for a court exclusively to conduct *voir dire* in capital cases. Whether conducted by court or counsel, *voir dire* is not an end in itself, but rather a means to select an impartial jury. *Long, supra,* 119 *N.J.* at 479, 575 *A.*2d 435. The question is whether, despite excluding counsel, the court provided a "thorough and searching inquiry" into the jurors' attitudes and biases. The general tenor of *voir dire* in this case was that the court, in consultation with counsel, first reviewed a questionnaire that it had submitted to all jurors. The questionnaire covered issues such as racial attitudes and exposure to pretrial publicity. Submission of the questionnaire followed a general orientation of jurors in which the court outlined the contours of the case, what the issues were, and how long it would take. As the jurors were called individually, the court addressed general questions to them concerning their ability to follow the death penalty law and concerning specific issues raised by their answers to the questionnaire. During the course of the questioning, many jurors candidly admitted that they were biased, had been exposed to pretrial publicity, or had formed opinions of guilt.

As noted, the court initially commenced *voir dire* with counsel asking follow-up questions. The court's decision to curtail counsel's role produced a curious contretemps. Even as court and counsel were debating their proper roles, prospective jurors were reading contemporaneous accounts in the *Trentonian* reporting with editorial approval that the court had cut down the role of Harris' defense attorneys, implying that an attorney who zealously pursues his client's Sixth Amendment rights is an obstructionist. We would have preferred that the court have permitted direct participation by counsel in the *voir dire* process. The trial court reasoned that counsel were posing hypothetical questions to the jurors that were inconsistent with the capital sentencing scheme and that were designed to confuse potential jurors. Rather than cut off all questioning, the court could have controlled such questioning. We are not so certain that there was any great savings of time through a court-conducted *voir dire*. There were frequent side-bar conferences following the court's questioning, resulting, at times, in ten or fifteen minutes of objection to the court's questioning. The time might better have been spent in allowing counsel seven to ten minutes of direct questions of their own.

Nonetheless, the court-conducted *voir dire* was sufficiently probing to meet constitutional standards. The court discharged every juror who responded "unsure" on the questionnaire concerning whether the race of defendant and the victim would affect his or her judgment. Almost every regular reader of the *Trentonian* was excused either because they had learned extraneous information concerning the defendant or had formed an opinion as to his guilt. At first, the court asked closed-ended questions about jurors' attitudes concerning whether they would be able to consider mitigating factors in the context of a murder accompanied by rape, robbery, and kidnapping. The court frequently followed up with open-ended questioning sufficient to draw out their attitudes, explaining on one occasion, "The court is just trying to understand your feelings." The court was not insensitive to counsel's requests

for further inquiry. Very early on, the court agreed to ask more open-ended questions concerning the jurors' understanding of the meaning of the presumption of innocence. For example, one prospective juror was asked, "What do you understand the presumption of innocence to mean?" This type of questioning furnished counsel with a good insight into the jurors' understanding of such concepts.

Concerning the issue of death-qualification, there can be no doubt that the court's questioning was sufficiently probing to provide a fair and impartial jury. The court began the questioning of each juror with open-ended questions about their general attitudes concerning the death penalty. The court then went through the specific pattern of the death penalty, inquiring if the jurors could follow the law. In this way the court was able to root out many jurors who found it "pretty difficult" to assess mitigating factors or did not "want to hear" about a defendant's troubled life. Jurors who expressed philosophies such as "the punishment fits the crime," "it's worse if they had to stay thirty years in prison," or "I would go with death no matter what the background" were excused.

On potential racial bias, many jurors candidly expressed on their initial questionnaires that they were unsure whether race would affect their determinations. These jurors were immediately excused by the court. The court's own questioning on race was initially closed-ended, usually asking whether the fact that the victim was white and the defendant black would affect their ability to be fair and impartial. Defense counsel strongly protested such closed-ended questioning, describing the case as "every suburban housewife's worst nightmare, ... an interracial crime to the nth degree." Defense counsel are sometimes criticized for their advocacy roles in the conduct of criminal trials. Had defense counsel in this case been obstructive, they could have sat back and let the *voir dire* on racial attitudes of jurors proceed with built-in error that would most likely have guaranteed a new trial for the defendant had the verdict been unfavorable. *See Rosales–Lopez*

*v. United States*, 451 *U.S.* 182, 191, 101 *S.Ct.* 1629, 1635, 68 *L. Ed.*2d 22, 30 (1981); *Ristaino v. Ross*, 424 *U.S.* 589, 597, 96 *S.Ct.* 1017, 1021, 47 *L. Ed.*2d 258, 264 (1976); *State v. Ramseur*, 106 *N.J.* 123, 246, 524 *A.*2d 188 (1987); *see also post* at 211, 716 *A.*2d at 507 (Handler, J., dissenting). Knowing that their obligation as attorneys was to insure a trial that was fair to both the defendant and to the State, defense counsel sought leave to appeal the court's ruling on questioning on cross-racial bias. Although the Appellate Division did not grant leave to appeal, the doubts expressed by one member of that panel and the pendency of an application for single-justice relief to this Court occasioned the State and defense to agree on a series of ten questions that would have better explored cross-racial attitudes. The trial court did not accept the ten agreed-upon questions, although it did agree to ask several of the questions. (On the choice of questions, defendant disputed the value of the court's asking white jurors if they had ever experienced feelings of discrimination, asking rhetorically whether it could be that black people would not have let whites move into their neighborhoods. In fact, some of the white jurors did report experiences of felt discrimination.) The most significant question asked was whether or not the defendant's repeated reference to Huggins as a "white bitch" would affect potential jurors' deliberations. The question was frequently phrased as whether that fact, standing alone, would affect their deliberations. Defendant appealed again to the court to be more open-ended in its questioning. The court appeared concerned that by doing so it would inject into the case an issue of racism that it did not perceive to be present in the case. The court may have sensed that to describe the case as a bias crime would have crossed the line defined in *State v. Carter*, 91 *N.J.* 86, 449 *A.*2d 1280 (1982). In that case the prosecution was criticized for attributing a racial bias for a crime when one did not exist. We said "[t]here is no place in the courtroom for ... group labelling." *Id.* at 105, 449 *A.*2d 1280.

Still, the questioning was sufficiently probing to enable court and counsel to gain a perception of jurors' attitudes. As the

questioning of jurors continued, more open-ended questions, asking how the issue of race would weigh in their deliberations, produced more open-ended responses. The court excused one juror who "left [the court with] a lingering feeling about race."

Jurors who had initially been qualified without the later, more extensive questioning on race were recalled for further questioning. Some expressed reservations, saying "I wonder if I could be fair;" "I would certainly try;" "it might be somewhat of a factor, all those [racial] things." One juror expressed the view that Harris "was a bit of a racist, taking his anger out on her because she was white or something." Fortunately, all jurors were asked during initial questioning fairly open-ended questions concerning attitudes they might have had about the O.J. Simpson trial, the highly-publicized trial of a celebrity athlete accused of a cross-racial murder and a case that stirred deeply emotional responses and polarized attitudes between whites and blacks. The combination of questioning on the *Simpson* case and the later more open-ended questioning produced a *voir dire* that was sufficient to probe jurors' racial attitudes and biases. As noted, many jurors were extraordinarily candid in expressing their hesitation about impartiality in a case of cross-racial sexual attack. It strikes us that the court may have relied too much on its intuitions about the fairness of potential jurors after observing their demeanor. Still, to observe a juror answering questions is an invaluable asset. The prosecutor observed that seeing one juror "biting her lips" and "breathing very hard" during questioning left those in the courtroom with impressions that cannot be perceived in reading a cold record.

On balance, the *voir dire* insured that counsel were sufficiently informed to exercise their peremptory challenges and that a properly-qualified, fair and impartial jury was selected. The court was consistent in its rulings. In many ways, defendant was his own worst enemy. During at least two orientation sessions, jurors observed defendant making an obscene gesture to the judge. In the thirty-nine days of jury selection, there was not one bitter

exchange between court and counsel. Although court and counsel disagreed strenuously on their understanding of the law, the court never failed patiently to consider, even if it did not accede to, counsel's requests. Counsel would have been better served had they more sharply focused their requests for follow-up questions than to have presented the court with a preprinted series of follow-up questions. On many occasions when counsel focused on a specific area the court did follow with more questions.

### 2. Jurors Excluded for Cause

■■■■■ We have considered whether the exclusion of two prospective black jurors, Harry Corbett and Margaret Proctor, violated defendant's constitutional rights. Under the *Adams/Witt* test[3] that this Court adopted, the right to an impartial jury prohibits the exclusion of jurors for cause in capital cases unless their stated opposition to the death penalty would prevent or substantially impair the performance of their duties as jurors.

Over defense objection, the trial court excused Corbett because of his views on capital punishment. Defendant complains that the court's actions were premature because they were taken without first fully explaining the law or the duties and obligations of a capital juror.

We disagree that it was premature to have excused juror Corbett. The court had questioned Corbett for several minutes before the concern arose. In the preceding questions, he had been asked about the standard of proof and whether he would be able to decide the case based upon a standard of proof which is beyond a reasonable doubt. He answered, "I imagine I would."

---

[3] New Jersey has adopted the *Adams v. Texas*, 448 *U.S.* 38, 100 *S.Ct.* 2521, 65 *L. Ed.*2d 581 (1980), and *Wainwright v. Witt*, 469 *U.S.* 412, 105 *S.Ct.* 844, 83 *L. Ed.*2d 841 (1985), test for excluding prospective jurors for cause. *See State v. Ramseur*, 106 *N.J.* 123, 256, 524 *A.2d* 188 (1987). Basically, the test involves whether, in the trial court's discretion, the juror's beliefs or attitudes would substantially interfere with his or her duties. *State v. Koedatich*, 112 *N.J.* 225, 293, 548 *A.2d* 939 (1988), *cert. denied*, 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L. Ed.*2d 803 (1989).

The court continued: "Do you have any doubt in your mind about your ability to do so?" Corbett answered, "I believe I'd be able to judge this case for guilt or innocence but I do have reservations about life or death." The court asked, "What are your reservations about life or death?" Corbett answered, "Historically, the death penalty has been disproportionately applied against minority and poor people. That's the reservations that I have."

The court acknowledged that his was a concern "shared by many people." Nonetheless, the court asked, "Will those concerns [about disproportionality] affect your ability to decide this case on its own merit?" After repeating his willingness to come to a "reasonable conclusion" as to guilt or innocence, there was a pause. The court asked the juror if he found the State had proven "whatever it has to prove to obtain a death sentence," would "your concerns about this disproportionate application of the death penalty preclude you from following what your mind tells you is the proper verdict?" Corbett replied, "Truthfully, honestly, I can't answer that. I guess I just don't know at this time." Corbett was an intelligent juror. We cannot fault the court for concluding that these honestly held convictions would substantially interfere with the juror's obligations to apply the law. The question of disproportionality in sentencing is one that this Court will ultimately have to decide.

Margaret Proctor was another prospective juror whom the trial court excused over defense objections because of her views on capital punishment. Although Proctor stated, "I believe in the death penalty," the court excused her because she believed that all criminals were capable of being rehabilitated except those who kill over and over again. Defendant challenges the excusal as premature. Defense counsel asked the court to give further explanation of the legal definition of murder but the court dismissed Proctor because of what defendant describes as "her conscientious scruples regarding capital punishment."

The colloquy sustains the court's decision. After explaining her views on rehabilitation, the court asked under what circumstances

Proctor would impose the death penalty. "Would you do it under any circumstances?" Answer: "I personally wouldn't." Question: "All right. Then I don't want to put words in your mouth. Can you think of any circumstances under which you would impose the death penalty?" Answer: "I think if a person, if someone [has] committed murder probably over and over again, you know, I probably think that the death penalty would be best for him." Continuing, she stated that if it were the first murder a person committed, even if accompanied by a rape, robbery or kidnapping, it would be "kind of hard" to impose the death penalty. The court continued its inquiry into the juror's views and asked, "Am I right or wrong when I say that unless somebody committed a previous murder, that you would be unwilling to apply the death penalty, am I right or wrong when I say that?" Answer: "You're right." Again, Mrs. Proctor was an intelligent juror who was very clear in her views. We believe the record sustains the determination that those views would have substantially interfered with her duties as a juror.

## IV

### GUILT PHASE ISSUES

#### A.

#### Other–Crime Evidence and Reference to Mug Shot

Defendant contends that the trial court improperly admitted testimony from two witnesses. Specifically, defendant challenges Gloria Dunn's testimony that defendant offered to kill Anthony Boone, the father of one of her children, and the testimony of Edward Borm, an employee of the Trenton Club, that he identified defendant out of a "mug shot" photo array. We find no material prejudice to defendant from the testimony.

Prior to trial the State indicated that it did not intend to present other-crime evidence under *N.J.R.E.* 404(b). The trial court accepted this representation.

At the beginning of Dunn's testimony, the State sought to establish how Dunn and defendant came to be acquainted. Dunn testified that she met defendant in September 1992 at the Trenton Welfare Office. Dunn approached defendant because a friend mistook defendant for defendant's brother whom she knew. Defendant asked Dunn for her name, address and phone number presumably so that his brother, who was incarcerated at that time, could call Dunn.

Dunn said that defendant called her later in the day and began to ask her a variety of personal questions about her children and whether she was married or had a boyfriend. During this conversation, Dunn told defendant that her children were not living with her because she was having domestic problems with Boone. The prosecutor asked Dunn what else she and defendant talked about during that conversation. The following colloquy ensued:

A. That we was having problems, that [Boone] busted my windows out of my apartment and stuff. And [defendant] asked me did [Boone] hurt me, and what I wanted to be done about him doing that to me, because I should have my kids with me. And I told him nothing. He kept asking me.

He said when was the last time I seen them and stuff. And I told him that I seen them. And he asked me did I want [defendant] to take care of [Boone] for me, and I told him no.

Q. Did [the defendant] tell you what he meant when he asked you if you wanted him to take care of Anthony Boone for you?

A. He asked me did I want [defendant] to pop [Boone].

Q. What does that mean to you?

A. To hurt him or kill him.

Q. Did you want that to happen to Anthony Boone?

A. No, no. I didn't want [defendant] to hurt [Boone]. I never asked him until he kept talking about it.

Defendant did not object to this testimony nor did he request a limiting instruction. Defense counsel did raise the issue on cross, noting that in all of her statements given to the police, Dunn had never mentioned this conversation. Defendant now argues that this testimony portrayed him "as a killing machine," thus eliminating the possibility that he would receive a fair trial.

*N.J.R.E.* 404(b) prohibits the use of evidence of other crimes, wrongs, or acts for the purpose of showing that a criminal

defendant is predisposed to commit a crime. *State v. Cofield*, 127 *N.J.* 328, 605 *A.*2d 230 (1992); *State v. Stevens*, 115 *N.J.* 289, 558 *A.*2d 833 (1989); *State v. Weeks*, 107 *N.J.* 396, 526 *A.*2d 1077 (1987). However, such evidence may be admitted for limited purposes "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute." *N.J.R.E.* 404(b).

The State seeks to justify admission of the evidence to show why Dunn was rightfully afraid of defendant during Huggins' abduction. Had the State proffered to the trial court that basis for admission of the evidence, it is highly unlikely that the trial court would have sustained the State's position. *See* Part IV, Sec. C hereof, *post* at 176, 716 A.2d at 485, discussing balance of probative value versus prejudicial effects of 404(b) evidence. Dunn's fear of defendant was not a material issue at that stage of the case. Dunn was testifying without challenge on direct examination. Dunn's testimony sought to explain that her fear of defendant prevented her from helping Huggins when she had the chance and from immediately notifying the police of the crime. The probative value relevant to that issue was slight compared to the prejudicial effect. Moreover, Dunn's failure to assist Huggins did little to establish whether defendant committed the crimes with which he was charged.

▪▪▪ Although the evidence may not be admissible under *N.J.R.E.* 404(b), it did not turn the jury against defendant. The State never referred to this testimony again in its direct case, rebuttal or summation. The admission of this evidence was not clearly capable of producing an unjust result warranting reversal.

Next, defendant argues that Borm's testimony regarding defendant's "mug shot" impaired his ability to receive a fair trial. During the course of his testimony, Borm relayed the manner in which the Trenton Police came into contact with him. The prosecutor continued:

Q. Were you ever asked to view photographs?

A. Yes.

Q. Where did you do that for the first time?

A. At the police station.

Q. And tell us the kind and number of photographs that you were asked to view.

A. I was looking at pictures of mug shots, mostly black and white pictures. There were a few color, and they were a couple of file cabinet drawers filled to the top that I had to go through.

Borm stated that this photo identification took place in January 1993. Defendant did not object to this testimony nor did he request a curative instruction.

Reference to mug shots constitutes an impermissible reference to a defendant's criminal record. *State v. Cribb,* 281 *N.J.Super.* 156, 161–62, 656 *A.*2d 1279 (App.Div.1995). Although references to mug shots have been found to be error, solitary, fleeting references will generally not constitute reversible error. *See State v. Porambo,* 226 *N.J.Super.* 416, 425–26, 544 *A.*2d 870 (App.Div.1988); *State v. Miller,* 159 *N.J.Super.* 552, 562, 388 *A.*2d 993 (App.Div.1978).

 The reference to the mug shot was fleeting and came after testimony that defendant had been arrested in December 1992. Therefore, the jury was aware that mug shots of defendant existed. Despite the lack of a court instruction to the jury regarding Borm's statement, there was no harm.

### B.

### Gloria Dunn's Outburst

 Defendant contends that several extra-testimonial gestures and comments, which took place during Dunn's testimony, denied him a fair trial. We find that, when the comments were made, the court took immediate action to limit the impact that the comments might have had on the jury. Further, the jury's response to the questions posed by the court indicated that the jury was not aware of the worst of the exchanges.

During Dunn's testimony, the following sidebar took place outside the presence of the jury:

> Mr. Scully: Judge, it's been brought to my attention that while we were at sidebar, while the court reporter was obviously busy transcribing that which occurred at sidebar, that Miss Dunn made a statement to my client in the presence of my co-counsel, which was threatening in nature. I think that you should question her ... as to what she specifically said. So that's part of the record.
>
> The Court: Miss Dunn, what did you say, remember when I walked over and told you that you were to make no comments, what did you say?
>
> The Witness: I said murderer, and I said I hope they kill his ass. He heard me. You killed her.

The court admonished Dunn against any further outbursts. The court then placed the full exchange on the record.

> The Court, also, will place on the record that ... Miss Dunn, by her own admission turned to the defendant and said, "Murderer. I hope they kill your ass," or something to that effect. What the record does not reflect is what the Deputy Clerk of the Court, Miss Diaz, has revealed to the Court during the recess, and that is that when the witness, Miss Dunn said something to the defendant, that defendant mouthed back the word "Bitch." So that we have a little bit of an ongoing colloquy.

Upon the jury's arrival in the courtroom, the court immediately asked its members if they had heard Dunn's comments directed at defendant. The majority of the jurors responded that they had. The court instructed the jury to ignore the comments.

> The Court instructs you that those comments are to be ignored. Now, that does not mean that you can put them out of your mind, obviously, and as the Court has explained to you before, remember the comment and remember that you're not to consider it in your determinations. They are determinations for you in this case. They are not for the witness. They are argumentative. They are improper and should be disregarded.

Several days later, defense counsel requested that the court ask the jury whether any of its members had heard defendant's response to Dunn's outburst and, if any responded affirmatively, to interview each of the jurors individually to determine whether what they heard would prevent them from fairly deciding the case. The trial court agreed to question the jury but refused to question its members individually because the court reasoned that the outburst was not significant enough to overcome the "overwhelming evidence." No jurors indicated that they heard defendant's response.

Defendant moved for a mistrial based on Dunn's outburst. The court denied defendant's motion, finding that Dunn's comments

were nearly inaudible and reflected poorly on her rather than damaging defendant's case.

Additionally, during the jury charge at the end of the guilt phase, the court again warned the jury to ignore any improper remarks from the witnesses.

There was no error. The court's immediate curative action coupled with the fact that the jurors did not see or hear defendant's response to Dunn's comments limited the prejudice that defendant could have suffered here. Additionally, Dunn's statements, while improper and inappropriate, were in accord with the testimony that she was giving.

In *State v. Loftin*, 146 *N.J.* 295, 363, 680 *A*.2d 677 (1996), the Court addressed an outburst by a member of the gallery directed at one of the jurors who was moved to tears by the defendant's allocution. This outburst prompted the jurors to inform the trial judge that they feared for their safety. *Ibid.* The court immediately informed the jury that it was to share any concerns that it had about safety or the performance of its duties with the court. *Id.* at 363–64, 680 *A*.2d 677. Acceding to defense counsel's request not to question the jurors individually about the outburst for fear of drawing attention to it, the trial court simply asked a limited question whether any of them had seen or heard anything that would impact their ability to discharge their duties. *Id.* at 364, 680 *A*.2d 677. All of the jurors responded in the negative. *Ibid.*

Refusing to second-guess defense strategy, the Court rejected the defendant's argument on appeal that the trial court should have engaged in more extensive *voir dire* and provided a more specific jury instruction. *Id.* at 364–65, 680 *A*.2d 677. There, we found that the trial court did not abuse its discretion in taking the curative action that it did because the outburst had been brief, contained no factual information, and did not constitute victim impact evidence because the jury poll revealed that the jury was not affected by the episode. *Id.* at 366–67, 680 *A*.2d 677.

We recognize that the facts here are different. Dunn was a testifying witness whose outburst concerned the subject of her testimony. Her comments were directed at defendant and were audible to the jury. We find, however, that the same result should obtain.

The trial court's curative action was sufficient. The court polled the jury and found that, although the jury did hear Dunn's outburst, it did not hear defendant's response. Furthermore, the court concluded that Dunn had already testified that defendant was a murderer. Her comments directed at defendant were in accord with her testimony. Dunn's outburst was brief and appropriately handled by the trial judge. The comments were limited; the trial court's response was swift.

### C.

#### Exclusion of Anthony Boone's Testimony

Defendant sought to introduce the testimony of Anthony Boone to contradict Dunn's assertion that she had a nonviolent relationship with Boone, in order to challenge fully Dunn's credibility and provide the jury with grounds on which it could find that Dunn killed Huggins.

On cross-examination, Dunn testified that neither she nor anyone acting for her had ever threatened Boone. She said that she and Boone did not have a violent relationship.

Defense counsel represented that Boone would testify concerning his past relationship with Dunn, that she had threatened him and physically assaulted him, wielding a knife on one occasion. Because the State had made the extent of Dunn's participation in the murder a critical issue, counsel argued that Boone's testimony was admissible under *N.J.R.E.* 404(b), which allows, in certain circumstances, evidence of other crimes or wrongs on the part of a witness. Boone's testimony would rebut a material fact, that Dunn participated in the event only because she was afraid of Harris and was essentially his prisoner. The prosecutor respond-

ed, arguing that the extent of Dunn's participation was irrelevant to the current prosecution and that this evidence should be excluded because of its tenuous connection to the case.

The court gave three reasons for its decision to exclude Boone's testimony. First, the court found that *N.J.R.E.* 404(b) (other-crime evidence) was inapplicable because *N.J.R.E.* 405 (method of proving character) qualifies it by requiring conviction of crime if evidence of a character trait is at issue. It also found *N.J.R.E.* 608 and 609 (allowing character evidence for truthfulness and impeachment by evidence of conviction of a crime) inapplicable because the character evidence did not relate to "truthfulness." Second, the court found that under *Koedatich I, supra,* 112 *N.J.* 225, 548 *A.*2d 939 (excluding reference to a suspicious car at scene of crime), Boone's testimony was not sufficiently connected to an issue to warrant admissibility. Finally, the court found that the evidence had little other relevance to the case and was, thus, excludable under *N.J.R.E.* 403 because it would produce confusion or delay.

A defendant in a criminal trial has a Sixth Amendment right to offer any evidence that refutes guilt or bolsters a claim of innocence. *State v. Garfole,* 76 *N.J.* 445, 452–53, 388 *A.*2d 587 (1978) (allowing greater leeway to a defendant to offer 404(b) evidence of "other crimes or wrongs" on the part of a witness when relevant to an issue in the case). In all such inquiries concerning admissibility of evidence, the focus must be on the evidence and the fact that is sought to be proven thereby. What was the evidence in this case? It was evidence of a prior violent relationship between Boone and Dunn. Such evidence is often admissible to show that one of the parties to the violence would have reason to fear imminent harm from the other. *State v. Burgess,* 141 *N.J.Super.* 13, 357 *A.*2d 62 (App.Div.1976); *see also State v. Nance,* 148 *N.J.* 376, 689 *A.*2d 1351 (1997) (holding admissible bad acts of defendant evidencing jealousy as motive for killing another). But such was not the purpose of the evidence here. The purpose of the evidence was to show (1) that Dunn was

a violent woman, not likely to be intimidated by Harris and prone to commit the vicious act of murder of Kristin Huggins, and (2) that Dunn was an out-and-out liar.

■ To the extent that evidence was offered to prove that Dunn was a violence-prone woman, the evidence had little probative value to show that Dunn had been violent on this occasion. *See N.J.R.E.* 404(a). To the extent that the evidence had probative value (which it did) to show that Dunn was a liar, we agree that it was excludable under *N.J.R.E.* 403. If Boone had testified to a violent relationship, would the State then have the right to present further evidence to rebut Boone's testimony? We hold, however, that the trial court properly barred this testimony under *N.J.R.E.* 403. This rule permits a court to exclude evidence "if its probative value is substantially outweighed by the risk of . . . undue prejudice, confusion of issues, or misleading the jury. . . ." A court has broad discretion in applying the balancing test required under this rule. *State v. Sands,* 76 *N.J.* 127, 144, 386 *A.*2d 378 (1978). A trial judge's decision will only be overturned on a showing that there has been a "clear error in judgment." *Koedatich I, supra,* 112 *N.J.* at 313, 548 *A.*2d 939.

The court's ruling did not constitute a clear error in judgment. Dunn's relationship with Boone was far afield from the main issues in this case and, therefore, was of minimal probative value. The relationship took place years before Huggins' abduction and murder. The jury had no misconceptions about what type of person Dunn was. Evidence of a violent domestic relationship would have had little bearing on the jury's consideration of her testimony or on its belief in her degree of participation in the crime. The evidence would only divert attention from the true issues in this case.

## D.

### Instruction on Testimony of Accomplice

Gloria Dunn testified against defendant pursuant to a plea bargain. In exchange for the dismissal of murder charges against

her, Dunn agreed to plead guilty to kidnapping and robbing Kristin Huggins and to testify against defendant. There was a significant danger that Dunn's interest in receiving a lenient sentence for her own offenses would influence her testimony in defendant's prosecution. *See State v. Begyn,* 34 *N.J.* 35, 54, 167 *A.*2d 161 (1961) ("This special interest comes about by reason of hope, or even bargain, for favor in later prosecution treatment of the witness' own criminal conduct in return for aid in convicting the defendant."); *State v. Spruill,* 16 *N.J.* 73, 78, 106 *A.*2d 278 (1954) ("Accomplices, tainted as they are with confessed criminality, are often influenced in their testimony by the strong motive of hope of favor or pardon.").

This Court has "consistently recognized that the status of a witness as an accomplice or codefendant invites special consideration" with respect to that witness's credibility. *State v. Gross,* 121 *N.J.* 1, 16, 577 *A.*2d 806 (1990). As a means of enabling such special consideration, we held in *Spruill* that "there cannot be an arbitrary refusal to instruct the jury in specific terms that the evidence of an accomplice is to be carefully scrutinized and assessed in the context of his special interest in the proceeding." *Spruill, supra,* 16 *N.J.* at 80, 106 *A.*2d 278. In the same vein, the 1976 edition of New Jersey's Model Jury Instructions included the following model charge:

The law requires that the testimony of [an accomplice] be given careful scrutiny. In weighing (his/her) testimony, therefore, you may consider whether (he/she) has a special interest in the outcome of the case and whether (his/her) testimony was influenced by the hope or expectation of any favorable treatment or reward, or by any feelings of revenge or reprisal.

[New Jersey Model Criminal Jury Charges § 4.100 (1976) (citing *Spruill, supra,* 16 *N.J.* at 78, 106 *A.*2d 278, and *Begyn, supra,* 34 *N.J.* at 54, 167 *A.*2d 161).]

During the charge conference, defense counsel requested the trial court to "charge the jury with respect to credibility, that the presence of a plea agreement between the State and Gloria Dunn may be considered by the jury in evaluating the credibility of Ms. Dunn." The trial court "decline[d] to do that," calling it "a matter for argument."

The State argues that the court's decision on this matter did not constitute an arbitrary denial of an accomplice charge, in violation of our *Spruill* decision, because defense counsel's request was not sufficiently specific to notify the court that defendant sought the charge on the "accomplice rule." The State urges that defendant thus waived his right to the accomplice-credibility charge.

Although one need not "speak with the discrimination of an Oxford don," *Davis v. United States,* 512 *U.S.* 452, 476, 114 *S.Ct.* 2350, 2364, 129 *L. Ed.*2d 362, 382 (1994) (Souter, J., concurring), in order to preserve the right to a proper instruction, defense counsel would better have included in his request the version of the accomplice charge that formerly appeared at section 4.100 of our Model Criminal Jury Charges, or perhaps cited the cases that gave rise to that model charge. We need not debate whether defense counsel's request, because of the way it was phrased, constituted a failure to object for we are satisfied in the circumstances that the jury could not have misunderstood that Dunn's testimony was especially suspect.

To establish that the error warrants reversal, defendant must prove that the error was "of such a nature as to have been clearly capable of producing an unjust result." *R.* 2:10–2. Because defendant attacked Dunn's credibility so thoroughly during the course of the trial, and because witnesses other than Dunn provided ample evidence to implicate defendant as the actual shooter, the failure to give the accomplice charge was not reversible error.

Defendant undermined Dunn's credibility at almost every stage of the guilt-phase trial. During opening statements, defense counsel said, "You can't, you won't, you must not believe Gloria Dunn because she is simply unbelievable. She simply has no credibility, I submit to you right at the outset." After explaining that Dunn went to the police in order to collect a $25,000 reward, counsel continued, "She never got the 25,000 bucks, but she got a much more precious reward, because think to yourselves, ladies and gentlemen, what each and every day of your life is worth.

She got a king's ransom for ... providing the information to the State." He characterized Dunn as an opportunist:

> She's a fortune seeker, she's a cheater and she's a liar. She does nothing unless she gets paid off big time for it. The prosecutor here, probably not because she [the prosecutor] wants to but because that's the only way to go ..., has made a deal with the devil, has made a deal with the devil herself to execute him.

On cross-examination, defense counsel attacked Dunn's credibility even more effectively. He emphasized that she was testifying to "keep[ ][her] end of the deal," in exchange for fifteen-year parole eligibility on her guilty pleas to kidnapping and robbery. He had Dunn admit that she had been indicted for felony murder and as an accomplice to rape, which charges were dismissed when she pleaded guilty to kidnapping and robbery. She admitted that she had yet to receive sentences on those charges. Counsel alluded to Dunn's continued participation in the kidnapping in spite of defendant's alleged statement that he would kill their carjacking victim if that victim happened to be white. He stressed that Dunn failed to take advantage of several opportunities to withdraw from the criminal endeavor. Counsel showed several inconsistencies between her trial testimony and her statements to police, gleaning admissions from Dunn that she had lied to the police as well as repeated claims from Dunn that the police had recorded her statements inaccurately. He also elicited admissions that Dunn had previously pleaded guilty to welfare fraud and had both used and sold narcotics.

Dunn's lack of credibility was the refrain of defense counsel's summation. Over and over counsel warned the jury, "You can't trust her. You can't believe her. There's something wrong." Counsel referred repeatedly to Dunn's plea bargain and to the motivation for it. He said at one point, "She's made herself a heck of a deal.... You know what the deal is. The prosecutor's candid. She told you what that deal was. Based on ... [Dunn's] performance, ... she would receive a significantly lesser sentence." And counsel's final words to the jury were the following: "Are you willing to rely on Gloria? Are you willing to trust in

Gloria? Convict [defendant] for the sin of using the MAC card. Convict him, but don't condemn him on the word of a liar."

Defendant's impeachment of Gloria Dunn was extensive. It was obvious to any juror that Dunn was a witness whose testimony called for careful scrutiny. The absence of the benefit to defendant of the court's imprimatur on his argument through the accomplice-credibility instruction was not clearly capable of producing an unjust result.

### E.

### Instruction on Hearsay Statements

Trial witnesses testified to several inculpatory, out-of-court remarks by defendant. For example, Gloria Dunn testified that defendant said he would kill their carjacking victim if he or she were white; that he told Huggins in the course of raping her to "take your clothes off, bitch"; that defendant said he had to shoot Huggins a second time to make sure she was dead; that defendant threatened to "come looking" for Dunn if she reported their crime; and that defendant offered to "pop" Dunn's ex-boyfriend. Tariq Ayres testified that defendant bragged to him about "knock[ing] off some white girl."

Defendant challenges the court's failure to instruct the jury to use caution in considering such testimony of out-of-court statements. He also argues that the trial court erred by not instructing that the jury could not consider out-of-court statements as evidence unless it found beyond a reasonable doubt that the statements were credible.

Criminal defendants are entitled to an instruction that jurors use caution in evaluating testimony concerning out-of-court statements. *State v. Kociolek*, 23 *N.J.* 400, 421, 129 *A.*2d 417 (1957). Further, when the prosecution seeks to introduce a statement made by a criminal defendant, and the trial judge is required to determine the admissibility of that statement, the judge must instruct the jury to disregard the statement if it finds

it is not credible. *State v. Hampton*, 61 *N.J.* 250, 271–72, 294 *A.*2d 23 (1972) (codified at *N.J.R.E.* 104(c)). We recently rejected the argument now advanced by defendant that jurors should not be able to consider such testimony without being convinced of its credibility beyond a reasonable doubt. *State v. Chew*, 150 *N.J.* 30, 82–83, 695 *A.*2d 1301 (1997).

■ Defendant did not request the *Hampton* and *Kociolek* instructions at trial. However, a defendant need not request those instructions in order to preserve the right to them. In *State v. Jordan*, 147 *N.J.* 409, 688 *A.*2d 97 (1997), we held that the *Hampton* charge is required, "[w]hether requested or not, whenever a defendant's oral or written statements, admissions, or confessions are introduced in evidence." *Id.* at 425, 688 *A.*2d 97. "Like the *Hampton* charge, the *Kociolek* charge should be given whether requested or not." *Id.* at 428, 129 *A.*2d 417. However, we held in *Jordan* that if a defendant fails to request either the *Hampton* or the *Kociolek* instruction, a trial judge's failure to give the applicable charge is not *per se* reversible error. *Id.* at 425, 428, 129 *A.*2d 417. Rather, *Jordan* held that the omission of the *Hampton* instruction warrants reversal "only when, in the context of the entire case, the omission is 'clearly capable of producing an unjust result.' " *Id.* at 425, 688 *A.*2d 97 (citing *R.* 2:10–2). The same standard applies to the omission of an unrequested *Kociolek* charge. *See id.* at 428, 129 *A.*2d 417.

■ The omission of the *Kociolek* and *Hampton* charges, in the context of the State's entire case against defendant, was not clearly capable of producing an unjust result. The principal value of the *Kociolek* charge is to cast a skeptical eye on the sources of inculpatory statements attributed to a defendant. The devastating cross-examination of Dunn and Tariq Ayres accomplished that end. In addition, the *Kociolek* and *Hampton* instructions would have done nothing to affect the force of Gloria Dunn's eyewitness testimony or Tariq Ayres' evidence that defendant possessed the murder weapon.

## F.

### Jury Deadlock

Defendant argues that the trial court erred when it refused to accept the jury's indication that it was deadlocked on the rape charge and instead ordered further deliberation. Defendant contends that the court's instruction coerced a verdict on the count of aggravated sexual assault by forcing the minority of jurors, who were voting not guilty, to accept the position of the majority.

The jury had deliberated for approximately six hours over the course of three days. The guilt phase trial took six weeks. Additionally, the jury's note stated that the "split [was] very deep," but concluded that "there doesn't seem at present a way to resolve it," thus stating the deadlock conditionally.

■ Given this limited period of deliberation and the language of the jury's note, the court did not err in requiring the jury to continue deliberating. The jury had not yet reached a point at which agreement was impossible. Ordering further deliberation was not unreasonable. *See Ramseur, supra,* 106 *N.J.* at 304, 524 *A.*2d 188 (addressing penalty-phase deadlock).

Nor did the trial court coerce the minority of jurors into accepting the majority's position. The instruction to the jury to continue deliberations clearly instructed the jurors not to change their opinions simply to agree with the other jurors or to "surrender a view honestly held." Further, the court informed the jury that, should its opinion remain the same at the end of the morning session of the next day of deliberation, the court would accept its verdict. Consequently, the jurors were not confronted with the possibility of a lengthy deliberation, which possibility might have caused a juror to change his or her verdict in order to end the deliberation. The trial court simply requested that the jury spend one more morning in deliberation. This was not an unreasonable request. The court's instruction was in accord with our holding in *State v. Czachor,* 82 *N.J.* 392, 413 *A.*2d 593 (1980).

# V

## PENALTY PHASE ISSUES

### A.

### Presentation of Mitigating Evidence

#### 1. 180 Mitigating Factors

At the conclusion of the guilt phase, defense counsel informed the court that they intended to submit 180 mitigating factors, all falling under *N.J.S.A.* 2C:11–3c(5)(h) and all relating to defendant's childhood. The court replied, "I have to believe that most of these boil down to probably five or six mitigating factors, of which the balance would be subsections." Defense counsel did not agree to reduce the number of factors. In an effort to have the jury vote separately on each of the 180 factors, counsel argued that "the defendant has an opportunity to present to the jury as many mitigating factors under [*N.J.S.A.* 2C:11–3c(5)(h) ] as he pleases."

When the penalty phase began on February 26, 1996, the court said it would condense the 180 factors into one, which was "that the defendant suffered as a tortured, abused, or deprived child." It stated it would "inform the jury that the weighing process is qualitative, not quantitative," and that the "single mitigating factor may outweigh both aggravating factors [the escape-detection and felony factors] if the state establishes both." It also said it would instruct the jury that it was "free to find any other ... mitigating factor ... which is relevant to the defendant's character or record, or to the circumstances of the offense." Defense counsel objected. After taking the views of the State and the defense on the wording of the single factor, the court decided to describe the mitigating factor as "the childhood of Ambrose Harris."

At the end of the penalty phase, the court instructed the jury as follows:

The defendant has alleged one mitigating factor, that is, his childhood. The defendant has raised 180 specific points to support the existence of that mitigating

factor. Whether the evidence presented in mitigation is considered as a single factor or as the sum of a number of factors or specific points, it is to be weighed in its totality against the aggravating factor or factors which you find to exist.

The court later instructed,

If you have unanimously found that the State has proven beyond a reasonable doubt one or both of the aggravating factors alleged, then you must consider the evidence of mitigating factors. Here, the defendant alleges that his childhood was a mitigating factor, or is a mitigating factor, and he has submitted 180 points or arguments to support that contention. You have in your possession, or will have at the time of your deliberations, a list of all 180 points or arguments.

The court repeated, "In considering the mitigating factors alleged by the defendant, you are required to consider all the evidence received as it relates to the defendant's life prior to October 4, 1965, and his character prior to that date, including his mental or emotional condition."

With regard to the weight the jurors should attach to the mitigating factors, the court explained:

The weighing of aggravating and mitigating factors must be qualitative rather than quantitative. We do not count the number of aggravating factors against the total number of mitigating factors. Rather, it is the total weight of all aggravating factors which is measured against the total weight of the mitigating factors.

The weighing process, the balancing of aggravating and mitigating factors is not mechanical or numerical in nature. We do not count the number of factors. We consider them qualitatively. One aggravating factor may be found to outweigh beyond a reasonable doubt numerous mitigating factors. Similarly, many aggravating factors may be found not to outweigh a single mitigating factor.

In addition, the court explained that the jury could consider mitigating factors other than those the court submitted: "As judges in this case, you are not limited to a consideration of the mitigating factor listed on the verdict sheet. You may find and consider additional mitigating factors."

As noted above, defendant submitted all 180 of his mitigating factors under *N.J.S.A.* 2C:11–3c(5)(h) (hereafter c(5)(h)). That provision establishes what is known as the "catch-all" category of mitigating factors. It provides:

(5) The mitigating factors which may be found by the jury or the court are:

. . . .

(h) Any other factor which is relevant to the defendant's character or record or to the circumstances of the offense.

This Court has expressed a preference that courts should give juries specific guidance in the application of c(5)(h). For example, in *State v. Bey*, 112 *N.J.* 123, 548 *A.*2d 887 (1988) (*Bey II* ), we held to be inadequate a jury charge that merely recited the language of c(5)(h) in asking the jury whether it found "any other factor which is relevant to the defendant's character or record or to the circumstances of the offense." *Id.* at 169–70, 548 *A.*2d 887. We recognized there that "[the constitutional] requirement that capital sentencing must not preclude consideration of relevant mitigating circumstances would be hollow without an explanation of how the evidence can mitigate the imposition of the death penalty." *Id.* at 169, 548 *A.*2d .887. In another case involving a trial court's refusal to list separately the c(5)(h) factors submitted by the defendant, we stated: "Common sense compels the determination that when evidence of wholly-unrelated circumstances is offered pursuant to c(5)(h), it is not intended to be considered as a single factor by the sentencer." *Biegenwald IV, supra,* 126 *N.J.* at 48, 594 *A.*2d 172.

▆▆▆ The question in this case is whether a court must submit, as separate mitigating factors, a list of occurrences in a defendant's life. Because the 180 circumstances submitted by defendant were not "wholly unrelated," and because the judge supplemented the single mitigating factor with the 180 supporting points, we are satisfied that the trial court's charge was within its discretion. Section c(5)(h) does not require capital jurors to vote on such separate questions as whether "[i]n November, 1961, [defendant] was transferred to a special Fourth Grade class at Junior # 4." It would have been preferable in this case for the court and defense counsel to agree on a number of mitigating factors between one and 180 for the jury to consider and vote on separately—perhaps "five or six," as the judge suggested. However, given counsel's insistence on separate jury votes for all 180

factors, the trial court's presentation of the charge properly upheld defendant's rights under c(5)(h).[4]

In the context of jury consideration of aggravating and mitigating circumstances, the bedrock constitutional guarantee is that "the sentencer, in all but the rarest kind of capital case, not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio,* 438 *U.S.* 586, 604, 98 *S.Ct.* 2954, 2964–65, 57 *L. Ed.*2d 973, 990 (1978) (footnotes omitted); *accord Boyde v. California,* 494 *U.S.* 370, 377, 110 *S.Ct.* 1190, 1196, 108 *L. Ed.*2d 316, 327 (1990); *Ramseur, supra,* 106 *N.J.* at 294, 524 *A.*2d 188. The trial court honored this principle. Rather than precluding the jury from considering the 180 factors, the court directed juror attention to those aspects of defendant's life by providing a list of each one. He also explicitly instructed jurors they were not limited to the points submitted and could consider any other factor. We have held in the past that the Constitution does not require trial courts to list all mitigating factors proffered by defendants. *Biegenwald IV, supra,* 126 *N.J.* at 47, 594 *A.*2d 172; *see Ramseur, supra,* 106 *N.J.* at 292, 524 *A.*2d 188. Nor does the Constitution require a jury vote on each proffered circumstance.

In addition to guaranteeing that a jury not be precluded from considering mitigating circumstances, a capital defendant may not be sentenced to death based on a jury instruction that creates any possibility the jury might misunderstand its role in the sentencing process or fail to appreciate the meaning and function of mitigating circumstances. *Bey II, supra,* 112 *N.J.* at 168–69, 548 *A.*2d 887 (citing *Zant v. Stephens,* 462 *U.S.* 862, 890, 103 *S.Ct.*

---

[4] Should a similar scenario arise in a future case, should a capital defendant allege more mitigating factors than a trial judge considers appropriate for submission, defense counsel, after recording relevant objections, should work with the court to present a workable number of factors to the jury. The error claimed would be preserved. The defendant would have a better presentation.

2733, 2750, 77 *L. Ed.*2d 235, 258 (1983); *Peek v. Kemp,* 784 *F.*2d 1479, 1493–94 (11th Cir.), *cert. denied,* 479 *U.S.* 939, 107 *S.Ct.* 421, 93 *L. Ed.*2d 371 (1986); *Briley v. Bass,* 750 *F.*2d 1238, 1244–45 (4th Cir.1984), *cert. denied,* 470 *U.S.* 1088, 105 *S.Ct.* 1855, 85 *L. Ed.*2d 152 (1985)). The trial court's detailed instruction adequately removed that possibility. It closely tracked the model charge printed as Appendix J to the *Judges Bench Manual for Capital Causes.* That manual is prepared by the Trial Judges Committee on Capital Causes to outline the rights of capital defendants at the trial stage. It is "necessarily advisory." *Ramseur, supra,* 106 *N.J.* at 155, 524 *A.*2d 188. A judge's compliance with the manual does not foreclose constitutional challenge to trial procedure. However, the instructions suggested in the manual, and the charge given in this case, do more than is necessary to prevent juror misunderstanding regarding the jury's role [5] or the purpose of considering mitigating circumstances.[6]

New Jersey's Constitution does not require more in the presentation of mitigating circumstances to a death-penalty jury

[5] For example, the judge instructed that "each juror must individually determine whether a mitigating factor exists, and each juror must individually decide whether the aggravating factor or factors unanimously found by the jury outweigh beyond a reasonable doubt the mitigating factor or factors that he or she has found to be present."

[6] In particular, the judge explained,

It is important to remember that evidence of mitigating factors is not offered to justify or to excuse the defendant's conduct. Rather, it is intended to present extenuating facts about the defendant's life or character that would justify a sentence of less than death.

Mitigating evidence may be used to establish the existence of mitigating factors, to weaken the state's proofs concerning the weight of aggravating factors, or to bolster the weight of mitigating factors found to exist in relation to the weighing of aggravating and mitigating factors. In considering a mitigating factor, you may also take into account such sympathy as that mitigating factor may inspire. In considering the mitigating factors alleged by the defendant, you are required to consider all the evidence received as it relates to the defendant's life prior to October 4, 1965, and his character prior to that date, including his mental or emotional condition.

than do the Eighth and Fourteenth Amendments to the Federal Constitution. In particular, Paragraphs 1, 9, 10, and 12 of Article I of the State Constitution do not guarantee capital defendants the right to have jurors vote separately on each item of evidence of a mitigating factor those defendants allege.

Defendant cautions that "[i]f this single-factor approach is sustained, then all future trial courts need do to fulfill their duty is to instruct a jury to weigh a defendant's 'life' in mitigation under c(5)(h)." We doubt that will occur. In other capital cases, juries have been presented with separate mitigating factors under c(5)(h). *E.g., State v. Cooper,* 151 *N.J.* 326, 345, 700 *A.*2d 306 (1997) (eighteen separate c(5)(h) factors). In one instance a jury made an independent finding of a catch-all mitigating factor that had not been submitted. *Chew, supra,* 150 *N.J.* at 100, 695 *A.*2d 1301 (Handler, J., dissenting). It is possible that the submission of a broadly cast mitigating factor, such as a defendant's entire life, without the kind of supporting evidence the court submitted in defendant's case, would impermissibly create a reasonable possibility that the jury would misunderstand either its role in the capital sentencing process or the purpose of mitigating circumstances. *See Peek v. Kemp, supra,* 784 *F.*2d at 1494. The submission of defendant's "childhood," together with the exhibit listing 180 details of that childhood and the judge's tracking of the instructions in the *Judges Bench Manual,* sufficiently focused the jury on its role and the function of the proffered mitigating evidence.

### 2. "Inordinate Weight" Instruction

As part of its penalty phase charge to the jury, the trial court instructed the jurors that "in your assessment of the weight to be assigned to aggravating and mitigating factors, you should not give inordinate weight to evidence that supports more than one mitigating factor." Defense counsel objected: "On the double counting charge, I think you misspoke. You said that charge applies to mitigating factors. You threw the word 'mitigating' in, and I'll show you where." The court responded, "It's aggravating

or mitigating." The prosecution repeated the objection: "My only comment is the one that [defense counsel] made, that the word mitigating was included."

Following the sidebar discussion, the court re-addressed the jurors and amended its charge:

During the court's instructions, it told you that the same evidence which supports more than one factor should not—you should be aware of that, and you should not give it inordinate weight. When the court spoke with you, it made reference to mitigating factors. Obviously it applies to aggravating factors as well. It applies to both of them.

Defendant now submits that this "double-counting" instruction should apply to aggravating circumstances only. He also argues that the instruction not to "give inordinate weight to evidence that supports more than one mitigating factor" created an impermissible likelihood that the jury believed it was precluded from considering constitutionally relevant evidence.[7]

We disagree. Our cases have established that when the prosecution uses the same evidence to prove more than one aggravating factor, the jury must be instructed not to give undue weight to the facts supporting the multiple factors. *State v. Rose*, 112 *N.J.* 454, 527, 548 *A.*2d 1058 (1988). On the other hand, we have never stated that trial courts must prevent capital jurors from double-counting mitigating evidence offered in support of multiple mitigating factors. In *Biegenwald IV*, we rejected the State's argument that a listing of separate factors under c(5)(h) would lead to impermissible double-counting of mitigating circumstances. Because a jury's double-counting of mitigating circumstances would

---

[7] Defendant's double-counting argument undermines his challenge to the trial court's consideration of his mitigating factors. If the judge's packaging of the mitigating evidence into a single factor impermissibly precluded the jurors from considering other mitigating factors, then the double-counting instruction would not have applied. The jury would have no occasion to double-count evidence supporting more than one factor because there would not have been more than one factor. The double-counting argument implicitly acknowledges that there was more than one mitigating factor before the jury and that the court's presentation of the single factor was a reasonable accommodation made so that jurors would not have to conduct separate votes on 180 factors.

not implicate a defendant's constitutional rights the way an undue concentration on aggravating evidence would, and because *Lockett* and its progeny require jurors to be permitted to consider all mitigating evidence, we held that "the treatment of aggravating factors ... is not relevant to the treatment of mitigating factors, nor can it be." *Biegenwald IV, supra,* 126 *N.J.* at 48, 594 *A.*2d 172. However, the Constitution does not require that a capital jury must be allowed to give, say, double or triple weight to evidence supporting two or three mitigating factors. On the contrary, in *State v. Pennington,* 119 *N.J.* 547, 575 *A.*2d 816 (1990), we advised the trial court that on remand, after instructing the jury that the same evidence could be used to prove multiple mitigating factors, the court should tell the jury to "be cognizant that the same facts are being used to prove more than one [mitigating] factor." *Id.* at 599, 575 *A.*2d 816 (quoting *Bey II, supra,* 112 *N.J.* at 176, 548 *A.*2d 887) (internal quotation marks omitted).

Even if the Constitution required that jurors be allowed to double-count mitigating evidence, the challenged instruction would not have violated that requirement. The court merely instructed the jurors not to attach "inordinate weight" to evidence supporting more than one factor. Neither the federal nor the State Constitution guarantees capital defendants that jurors will be allowed to attach inordinate weight to mitigating or any other type of evidence.

## B.

### Penalty–Phase Summation

Defendant complains that the prosecution engaged in misconduct during its penalty-phase summation and thereby violated defendant's constitutional rights to a fair trial and a reliable sentencing determination.

Several of the 180 points that defendant submitted as mitigating evidence focused on the abuse he and his mother suffered from

defendant's stepfather, Walter Williams. In particular, defendant alleged that Williams beat defendant on a daily basis, that Williams physically frightened defendant, and that defendant lacked a father figure. The State called Williams to testify during the guilt phase but neither side called him during the penalty phase.

Defendant's penalty-phase presentation relied heavily on Sheila Fairchild, a social investigator who interviewed a number of people involved with defendant's childhood. Fairchild did not interview Walter Williams, however. She testified on cross-examination that defendant's mother, Mattie Williams, told her that Mr. Williams did not wish to be interviewed. On redirect examination, defense counsel brought out that Mattie Williams became uncooperative during her interviews. When Fairchild called Ms. Williams to arrange a third interview, Ms. Williams told Fairchild she did not want to talk to Fairchild anymore. Fairchild testified that her interaction with Ms. Williams during this call made Fairchild "physically frightened" to go to the Williams' house to interview either Walter or Mattie Williams. The trial judge did not allow defense counsel to elicit that Fairchild's awareness of Mattie Williams' prior murder conviction contributed to her fear.

In an attempt to undermine defendant's mitigating evidence, the prosecution criticized Fairchild's failure to interview Williams. The prosecutor submitted,

If Miss Fairchild really wanted to talk to Walter Williams, it could have happened. So why didn't she? Because Walter Williams would have contradicted some of the mitigation evidence that Sheila Fairchild was supposed to provide. He would have told you that he didn't beat Ambrose Harris daily like the materials suggested. He would tell you that Ambrose Harris had a father figure, and it was he. He would have told you that there was no reason for Ambrose Harris to have been physically frightened of him, because he didn't do anything. Is that why Miss Fairchild didn't interview Walter Williams, because she was afraid of what Walter Williams might say if he was asked and liked it much better if she could rely on Mattie Williams' statements as to what Walter Williams allegedly did?

After the State's summation, defense counsel requested a mistrial or a curative instruction. He argued that by highlighting Fairchild's failure to interview Walter Williams as a means of

suggesting that Fairchild's investigation was biased, the prosecution had "taken advantage" of the defense's inability to elicit that Mattie Williams' murder conviction made Fairchild afraid to go to the Williams' house. After hearing the prosecution's argument in opposition to defendant's application, the trial court declined to declare a mistrial and refused to issue a curative instruction. It said, "The court merely adopts [the prosecution's] comments as the reasons or reason for the denial of the application," namely, that the State was suggesting that the witness could have contacted Walter Williams outside of the presence of Mattie Williams whom the witness feared. Defendant argues on appeal that the prosecution, rather than calling Walter Williams to the stand as it had done in the guilt phase (to establish the source of the shovels), instead submitted its own testimony to the jury about what Mr. Williams would have said had he testified. He contends that the summation impermissibly ranged beyond the scope of the evidence and thereby deprived defendant of his right to a fair trial.

The prosecution in its summation may suggest legitimate inferences to be drawn from the record, but it commits misconduct when it goes beyond the facts before the jury. *State v. Roach*, 146 *N.J.* 208, 219, 680 *A.*2d 634, *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 540, 136 *L. Ed.*2d 424 (1996). The prosecution did that. There was no factual basis to support the prosecutor's assertion about what Walter Williams would have said had Sheila Fairchild interviewed him. A finding of misconduct does not end our inquiry, however. "Prosecutorial misconduct is not ground for reversal of a criminal conviction unless the conduct was so egregious that it deprived defendant of a fair trial." *Ramseur, supra,* 106 *N.J.* at 322, 524 *A.*2d 188.

The offending remark was an isolated comment in the beginning of a summation that concentrated more intently on the presence of aggravating factors than it did on the lack of mitigating ones. It unfairly undermined only three of the 180 circumstances that defendant proffered in mitigation. It did little to deflect the jury's focus from defendant's mitigating theory, that he suffered through

a horrendous childhood. Even if the jury believed the prosecution's conjecture about the way Walter Williams would have testified, it still had to confront unchallenged evidence that defendant grew up with an abusive, disturbed, and neglectful mother; that defendant suffered from several emotional disorders as a youth; and that defendant was institutionalized and diagnosed as "homicidal" during his childhood. The misconduct did not approach the unfairness seen in *Rose*, where the State warned jurors in summation that a death sentence was necessary to prevent defendant from murdering again, *Rose, supra,* 112 *N.J.* at 520, 548 *A.*2d 1058, and where the prosecution suggested that a sentence other than death would violate the law. *Id.* at 523, 548 *A.*2d 1058.

## C.

### Jury Instruction Concerning Mitigation

Defendant contends that the trial court's instruction that "to the extent reasonably possible you [the jury] should attempt to reach agreement on the question of whether a particular mitigating factor does or does not exist," impermissibly instructed the jury that it was to reach a unanimous verdict on the mitigating factors. The trial court did not err in giving the jury this instruction. Although, standing alone, an instruction of this type may be coercive, *see Loftin, supra,* 146 *N.J.* at 375–76, 680 *A.*2d 677, the court repeatedly instructed the jury that it was not required to find the existence of the mitigating factors unanimously. Viewing the jury charge as a whole, as we are required to do, *State v. Wilbely,* 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973), the danger of the erroneous charge was eliminated. *See Loftin, supra,* 146 *N.J.* at 376, 680 *A.*2d 677.

## D.

### Refusal to Instruct on Likely Aggregate Sentences

Prior to the penalty-phase instructions, defense counsel requested the court to instruct the jury on the maximum number

of years and the maximum amount of parole ineligibility *in the aggregate* that Harris was exposed to by virtue of his convictions on the related non-capital offenses of, among others, kidnapping, aggravated sexual assault, and robbery. That parole ineligibility period could have been over sixty years.[8] The court declined, stating that "it does not know that it would impose or could even rationally impose that many years. The jury is further informed that it is not to consider all of this when deciding on whether the death sentence should be imposed or a term of imprisonment." Consistent with this ruling, the court instructed the jury on the individual base sentence and the individual period of parole ineligibility on each charge that Harris could receive. The court explained concurrent and consecutive sentencing and told the jury that the court would decide "whether those sentences will be consecutive or concurrent." The court also instructed the jury that "[t]he possible sentences for the other convictions should not influence your decision regarding the appropriateness of a death sentence on the murder charge." Defendant contends that in refusing defense counsel's request for an instruction concerning Harris' aggregate sentence, including aggregate parole disqualifiers, and in instructing the jury not to consider these sentences, the court violated Harris' state and federal constitutional due-process right to a fair and reliable sentencing hearing and subjected him to cruel and unusual punishment.

Prior to our decision in *Loftin, supra*, 146 *N.J.* 295, 680 *A.*2d 677, our capital punishment jurisprudence had emphasized a trial court's obligation in the penalty phase of a capital case to inform the jury of its responsibility in determining the appropriateness of the death penalty, to apprise the jury of the practical effect of a life sentence, and to inform the jury about a defendant's prior

---

[8] Without considering the possible extended term sentences, Harris was eligible to receive life plus 75 years with 67½ years of parole ineligibility on all the crimes. (Life with 30 years parole ineligibility for murder, 30 years with 15 years parole ineligibility for kidnapping, 20 years with 10 years parole ineligibility for aggravated sexual assault, 20 years with 10 years parole ineligibility for robbery and 5 years with 2½ years parole ineligibility for theft.)

sentences in order "to preclude speculation about a defendant's release from distorting a jury's decision to impose life or death." *State v. Bey,* 129 *N.J.* 557, 601–02, 610 *A.*2d 814 (1992) (*Bey III* ), *cert. denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L. Ed.*2d 1093 (1995). Reflecting federal precedent concerning sentencing information that should be furnished to capital case jurors in the penalty phase, *see Simmons v. South Carolina,* 512 *U.S.* 154, 161–69, 114 *S.Ct.* 2187, 2192–96, 129 *L. Ed.*2d 133, 141–46 (1994), we concluded in *State v. Martini,* 131 *N.J.* 176, 619 *A.*2d 1208 (1993), *cert. denied,* 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L. Ed.*2d 137 (1995), that in the penalty phase of a capital case

> when defense counsel or the jury requests instructions on the potential sentences a defendant will receive for convictions arising from the same trial as his capital-murder conviction, such information should be provided by the trial court. The jurors should be informed of the sentencing options available to the judge, and that the determination of sentence had not yet been made. In addition, the trial court should explain that the sentence may or may not run consecutively to that for murder, but that the determination is left to the court. Finally, the court should inform the jury that defendant's possible sentence for the other convictions should not influence its determination regarding the appropriateness of a death sentence on the murder count. Such instructions will assist in dispelling confusion on the part of the jury and will help to safeguard against improper sentencing determinations.
>
> [*Id.* at 313, 619 *A.*2d 1208.]

The trial court followed the *Martini* guidelines. The judge explained the sentencing options for each of the offenses (omitting reference to possible extended terms for repeat offenders), that he would decide later whether to impose those sentences concurrently or consecutively, and that the potential sentences on other convictions should not affect their determinations on life or death.

■■■ The issue in *Simmons* was whether when future dangerousness is an issue for the sentencer, a capital jury should be informed that the non-capital sentence is effectively life without possibility of parole. In New Jersey, future dangerousness is not an issue for capital sentencers to consider. Nonetheless, we held in *Loftin* that

> in future cases, if the court, based on the evidence presented believes that there is a realistic likelihood that it will impose a sentence to be served consecutively to any of defendant's prior sentences, in the event the jury does not return a death

sentence, the jury should be so informed. We believe that in most cases the courts will conclude that there is a "realistic likelihood" that it will impose a consecutive sentence rather than a concurrent sentence in the event of a non-death verdict. However, not every court necessarily will reach that conclusion. In those cases, the court need not inform the jury whether a non-death sentence is likely to be consecutive or concurrent.

[*Loftin, supra,* 146 *N.J.* at 372, 680 *A.*2d 677.]

Considering that Harris was forty-three years old at sentencing, advising the jury that he was eligible to receive a non-death sentence under which he would be ineligible for parole until at least age 100 would have been the functional equivalent of advising the jury in *Simmons* that the defendant would be forever ineligible for parole. We agree that most trial judges, considering the type of crimes of which defendant was convicted, would find a "realistic likelihood" that some of the non-death sentences would be made consecutive to the thirty-year parole disqualifier for murder. Had defendant's trial taken place after *Loftin* announced its prospective rule, defendant would have been entitled to an instruction informing the jury of the likelihood of consecutive sentencing. *Loftin, supra,* 146 *N.J.* at 372, 680 *A.*2d 677. The *Loftin* rule did not apply, however, because we reached our decision in *Loftin* several months after defendant was sentenced. We further believe that defendant's jury could not have misunderstood the gravity of the non-capital sentences defendant would have faced. The court explained the sentencing options available to it. If any one of the sentences for other offenses were made consecutive to the murder sentence, Harris would have been at least eighty-three years old before release. Thus defense counsel could say to the jury that its choice was between death and "life in prison." We find no error in the pre-*Loftin* charge given by the court.

## VI

### OTHER ISSUES

For completeness of the record, we note and preserve defendant's challenge to the proportionality of his death sentence and

his assertion that the New Jersey death-penalty statute violates the Eighth Amendment. Defendant argues that the statute fails to define narrowly the class of death-eligible persons and fails to provide a system of meaningful appellate review.

Following proportionality review, we shall consider this challenge to his sentence. With respect to defendant's challenge to the constitutionality of the death-penalty statute, we adhere to our decision in *Ramseur, supra,* 106 *N.J.* at 190, 524 *A.*2d 188, in which we rejected arguments that the statute violated the Eighth Amendment of the United States Constitution or Article 1, paragraph 12 of the New Jersey Constitution.

Similarly, we also note and preserve defendant's challenge to the trial court's refusal to permit the possibility of a non-unanimous murder verdict in which jurors are divided between purposeful-or-knowing murder and felony murder. Under that non-unanimity theory, if some jurors believe that a defendant intended to kill while other jurors believe that he killed accidentally in the course of a felony and, hence, is guilty of felony murder but not purposeful-or-knowing murder, then the result is a non-death-eligible murder conviction.

That issue was resolved by the Court's decision in *Cooper, supra,* 151 *N.J.* 326, 700 *A.*2d 306. We add only that the absence of a non-unanimous murder verdict had far less potential for harm here than in *Cooper.* There was little doubt here that the murder was knowing or purposeful (two bullets to the head). The real issue was who fired the gun. On that score, the jury was permitted to return a non-unanimous verdict on the own-conduct charge. The jury thus had every opportunity realistically to convict defendant by non-unanimous verdict of the charge not carrying the death penalty.

Finally, post-verdict remarks of the trial court did not taint the verdict. After complimenting defense counsel and the prosecution team, and the jurors themselves, the court reflected on the jury's verdict: "Judges, like other citizens, may have

feelings about particular laws. This judge is philosophically opposed to the death penalty. But if it will ease your burden at all at this time, the court hastens to tell you that if it had been among you, it would have been the first to cast the vote for the death penalty, or if necessary, the last."

Coming as these remarks did, after the jury had returned its verdict, the words could not have influenced the verdict even though they entered the province of the jury. "Subsequent to a jury's discharge, it is not improper to thank or praise the jurors for having dutifully served on the jury and conscientiously performed their functions. In a long and complex capital trial ... it is understandable that the court might want to express gratitude to the jurors along these lines." *People v. Belmontes*, 45 *Cal.*3d 744, 248 *Cal.Rptr.* 126, 755 *P.*2d 310, 352 (1988), *cert. denied sub nom. Belmontes v. California*, 488 *U.S.* 1034, 109 *S.Ct.* 848, 102 *L. Ed.*2d 980 (1989). A court should, however, "refrain from making any comment indicating that it cannot, or will not, perform its remaining obligations fairly and impartially under the law." *Id.*, 248 *Cal.Rptr.* 126, 755 *P.*2d at 353. In capital cases, sentencing is the province of the jury. In this, as in all other aspects of a capital trial, a court must display the strictest impartiality. We do not believe, however, that the court's words conveyed any measure of partiality or prejudgment. This was a long trial; it was a hard trial. It is perhaps natural to express approval of a guilty verdict in so emotionally-laden a case. The defendant had derided both the judge and the other victims of his crime, the family of Kristin Huggins.

A shocking crime puts law to its severest test. Law triumphs over natural impulses aroused by such a crime only if guilt be ascertained by due regard for those indispensable safeguards which our civilization has evolved for the ascertainment of guilt. It is not enough that a trial goes through the forms of law. Especially where life is at stake it is requisite that the trial judge should so guide the jury that the jurors may be equipped to determine whether death should be the penalty for conduct. Of course society must protect itself. But surely it is not self-protection for society to take life without the most careful observance of its own safeguards against the misuse of capital punishment.

[*Fisher v. United States*, 328 *U.S.* 463, 477, 66 *S.Ct.* 1318, 1325, 90 *L. Ed.* 1382, 1391 (1946) (Frankfurter, J., dissenting).]

Cases such as this test the measure of our system of criminal justice—judges, lawyers, and law enforcement. Although outside influences sought to denigrate—indeed, to undermine fundamental safeguards of our civilization (the presumption of innocence, the assistance of counsel and the right to a fair trial), court and counsel, both prosecution and defense, ensured the observance in this case of those indispensable safeguards for the ascertainment of guilt.

## VII

We affirm defendant's convictions. We also affirm his sentence of death.

**SCHEDULE A**

**SAMPLE MEDIA PUBLICITY**

# The Trentonian

FRIDAY
February 16, 1996
Vol 58 No. 176
176,900
Trenton, N.J.

# One juror stalls verdict

Murder defendant Ambrose Harris holds forth for reporters at the start of the surprising second day of jury deliberations

PAGE 3

204

Friday, February 16, 1996 The Trentonian 3

# Dawdling Harris jury draws public's fire

By JEREMY KOHLER and APRIL ADAMSON
The Trentonian

"Most people figured the jury would think, 'We'll have lunch on the county, and we'll acquit him — this afternoon.'"
— Bill Sweeney, Trenton businessman

# Lone juror could save Harris' life

■ If the jury has trouble with conviction, they may have even more trouble agreeing on the death penalty

By JACLYN AUBRIA
The Trentonian

A lone juror apparently doubts Ambrose Harris killed Kristin Huggins — and has stalled deliberations and forced the jury to return for yet a third day to ponder the accused slayer's fate.

So far, the jury has deliberated for nearly 4½ hours over two days — and it doesn't appear jurors are any closer to reaching a verdict than they were on Wednesday, when the judge first handed them the case.

(Continued on Page 17)

AT A GLANCE

# The Trentonian

Vol 49 No 197 170,900 Trenton, N.J. Friday March 3, 1995 25¢

# Stop calling Ambrose names, lawyers whine

**They object to these names for the man who killed Kristin Huggins:**
**Squirt Boy, Maggot, Monster and Artist Slayer**

Friday, November 18, 1994 —————————————— The Trentonian

# BackTalk

## You missed the point

When "Creeping Justice" called to complain about how long it's taking to get around to trying the worthless piece of murdering scum BackTalk now refers to as "Squirt Boy," you said, "Yes, but take solace in knowing that eternity is long and hell's fires endless." Maybe so, Ed, but in the meantime we're still paying for Squirt Boy's room and board. These thugs enjoy prison too much and too long.

*Fed Up*

*I was only trying to look on the bright side. Squirt Boy will be screaming soon enough, and he'll be screaming forever and ever.*
— *Ed Note*

Monday, November 7, 1994 The Trentonian

# BackTalk

## Code name

I agree with you that "you-know-who's" name should never again be mentioned in BackTalk because he doesn't deserve the respect of being addressed by name. The trial is yet to come and he's going to do some dumb stuff to aggravate people and they are going to need to get it off their chest in BackTalk. I think we should give him a code name so we all know who we're talking about. I vote for "Scumbucket." I admit that's not my first choice, but you couldn't print my first choice.

*New No-Name*

*If we're going to use a nickname, I think it should be "Squirt Boy" since even the Wilentz court is going to have a hard time keeping you-know-who from his deserved date with the cold, cold gurney.*

— *Ed Note*

208

Sunday, July 4, 1993 The Trentonian

**Life of a career criminal**

# 'Satan' makes prison bloody, fiery hellhole

■ Ambrose Harris killed a young artist. In prison he's turning punks into monsters.

**David Leibowitz**

The killer hates to hunt alone, it seems. Ambrose Harris and his teen posse came for David Rose just after chow time last Tuesday night, while the news droned across the county jail's Four South wing.

Twelve strong, they came as Rose knew they would, armed with jail-made knives, jagged blades and handles wrapped with tape. They came with an attitude, bred when Rose tried to help victims of the gang's plot to extort commissary goods. They muttered words like "steel pigeon" and "kill."

Since David Rose and Ambrose Harris in way back in their years together in Trenton State Prison, Rose knew this would involve blood.

"What are you doing holding their stuff?" Harris asked him.

"You ain't taking nothing from nobody," Rose told his old friend.

Seconds there in Harris punches and kicks rained. Harris took his turn. Just off three months in isolation, in a blood rage, he moved forward with a knife.

*[Remaining article text is heavily degraded and illegible.]*

Ambrose Harris (above) and his "Posse All Stars" terrorized other convicts at Trenton State Prison. Says one victim: "They need to put him in the electric chair and burn him."

Wednesday, February 24, 1993 — The Trentonian — 3

# Life and crimes of Ambrose Harris

■ He was one of the top ten prison troublemakers, said corrections spokesman Jim Stabile.

By MARK MUELLER, DAVE GOLDINER and WAYNE WOOLLEY
The Trentonian

When scenes of violence flicker across the television screen in Ambrose Harris' cramped cell at the Mercer County workhouse, the alleged killer and rapist smiles.

When the dramatized scenes depict sex and gore, the smile widens.

"He won't look at that and enjoy it," said an inmate who lived in the same cellblock with Harris and asked that his name not be used. "Literally, when the TV and the stuff is vial, he loved that."

People who have experienced Ambrose Harris use words like "psycho," "whacko" and "weird" to describe him. The record reflects a violent, hate-filled past who injures others, even himself.

A career criminal who first landed in prison at the age of 13, Harris has been convicted of breaking and entering, armed robbery and weapons charges.

He "shot across Dec. 27, after only five months of freedom, as part of a trail of mercy that police say stretched three rapes and the seduction and murder of Bucks County artist Kristin Huggins.

Harris, formally charged with 1 count of murder Monday, allegedly shot the 82-year-old woman twice in the head because she was making terrible remarks and stood in the trunk of her car.

"He's a serial killer and a serial rapist" said Joe workhouse inmate who fed information to police Deputy Chief Jim Constance confirmed that the inmate aided the probe.

"He thinks of it as a joy to do them things," the inmate said "He was to be a violent woman. That's what he gets off on."

Although several of his victims and suspected victims are black women, Harris often told other women that he hated white women.

"He hated white women."

(Continued on Page 12)

■ **Editorial:** Except for some good police work, Harris might have killed a whole city? 24

■ Harris' long record? 7, 13

---

## Ambrose's mom: He's no monster

Matile Williams stands on the wooden steps outside her then-grown house and shivers in the dead of winter. She's shirted it before and now she'll stand it again.

Her stickat boy may be a lot of things, but he isn't a killer.

"They must three inhumans be solved, so they're returnable' Anderson," Matile says, her face locked in the flush of a pallear sunken light that sits on Corkland Street.

"If he's a monster, then they made him a monster." Her voice rises, it's frustration loud, louder than the traffic rushing by on Route 1 just 50 yards off. "They kept him locked in that Vroom Building for 12 years," she says.

There's a dead Christmas corner on the window sill behind Matile, and her face droops in that same defeated way. Too late understand the link. Her son Anderson — Anderson Harris — is being held on $768,000 bail for a string of rapes, a robbery, and for the murder of Kristin Huggins.

Matile walks around back and down the gravel driveway to her beige Ford station wagon. She pulls out a bag bulging with pots and pans. She'd just gotten it from church, Eli Bethel Baptist, where she says she goes most every day now.

For a moment Matile turns calm.

"I've prayed for that girl and for her family," she says. "No one deserve something like this to happen in their."

The calm is short-lived. There's a roar made Matile.

(Continued on Page 12)

David Leibowitz

# From boy to beast

Trentonian Photo/LANCE DENNIS

STEIN, J., concurring in part and dissenting in part.

The majority opinion accurately describes the judiciary's responsibility to guarantee a fair trial despite the exercise by the press of its constitutional right to circulate inherently prejudicial publicity before and during a trial.

> In an ideal world a free press would seek to foster fair trial rights by not circulating inherently prejudicial publicity at least during a time of trial. If this cannot be so, courts must guarantee the preservation of fair trial rights without any restraint of the editorial freedom of the press.

[*Ante* at 147, 716 *A*.2d at 470–71 (citation omitted).]

I fully agree with Justice Handler's conclusion that the trial court's refusal to take adequate preventative measures to address the prejudicial effects of the midtrial publicity compromised defendant's right to a fair trial. In my view, however, the prejudicial effect of the trial court's inaction undermined only the penalty phase of the trial. I therefore join part I(c) of Justice Handler's opinion, but only to the extent that it concludes that defendant's death sentence be vacated. Accordingly, I would vacate defendant's death sentence and remand for a new penalty trial. I join the majority opinion in all other respects, to the extent that it is not inconsistent with my conclusion concerning defendant's death sentence.

HANDLER, J., dissenting.

In an atmosphere of saturating, vicious publicity, a Burlington County jury convicted defendant Ambrose Harris in Mercer County for the carjacking, kidnapping, rape, and murder of Kristin Huggins. The same jury sentenced him to die. At trial defendant actively contested his guilt, particularly his status as trigger-man and, hence, his eligibility for the death sentence. Defendant directly appeals as of right his convictions.

The primary issue that defendant raises in this appeal relates to the massive, inflammatory pretrial and midtrial publicity about the case and its impact on his trial, his conviction, and his death sentence. Defendant also raises substantial claims concerning the adequacy of the jury *voir dire* as related to jury selection and jury taint, the failure to bifurcate the jury for the guilt and penalty phases of the trial, the trial court's failure in the penalty-phase of the trial to exclude or neutralize inadmissible evidence introduced at the guilt phase, and the failure to inform the jury that in the event defendant were not sentenced to die, he would receive lengthy consecutive sentences for the robbery, kidnapping, and aggravated sexual assault convictions.

I conclude that defendant's principal claims of error are valid and that their prejudicial impacts thwarted a fair trial. The Court

should reverse defendant's convictions and vacate his death sentence. I, therefore, dissent.

## I

A sea of horrendous, sensationalistic, and unremittant publicity engulfed this prosecution. The *Trentonian,* a daily tabloid newspaper, was the primary, almost exclusive, source of this unabated torrent.

Defendant initially requested that the proceedings be closed to the media, that venue be changed, and that, if the court declined to change venue, a jury from Camden County be impaneled. In ruling on those applications, the court acknowledged that the *Trentonian* posed a threat to a fair trial. The court, however, rejected defendant's requests. It nevertheless agreed to impanel a foreign jury from Hunterdon County.

On an interlocutory appeal from that ruling, the Appellate Division held that the impanelment of a foreign jury was appropriate but that the trial court, by failing to consider racial demographics and refusing to consider impaneling a Camden County jury, had abused its discretion. 282 *N.J.Super.* 409, 660 *A.*2d 539. On remand, the trial court, again rejecting defendant's request for a change of venue or for the impanelment of Camden County jurors, selected, for convenience, a jury from Burlington County although the circulation of the *Trentonian* and *Trenton Times* was significantly lower in Camden County than in Burlington County and the racial demographics between Mercer County and Camden County were similar. The Appellate Division denied leave to appeal that determination.

## A.

Publicity about the case started up as soon as Kristin Huggins disappeared in December 1992. The *Trentonian* and *Trenton*

*Times* devoted extensive coverage to this case.[1]

The majority of the articles in the *Trentonian* and the *Trenton Times* described the crime, the investigation, the victim, her family, the court proceedings, defendant, and defendant's criminal record. However, the *Trentonian*, and to a significantly lesser degree the *Trenton Times*, focused on defendant with shocking sensationalism that went vastly beyond factual reporting. As soon as defendant was implicated in the crime, the *Trentonian*, through its headlines, editorials, and letters to the editor, viciously attacked defendant. Its articles on Kristin Huggins, constantly referring to her as "artist" and stressing repeatedly that she had begged for her life, dwelled on her funeral and her family's grief. They were calculated to arouse enormous sympathy.[2]

Well before trial, the *Trentonian* ran cover headlines, in huge print, and article titles, often accompanied by large photos of defendant, such as "He Knows What He Did," "Suspect a Loud-mouthed Punk," "A Daily Dose of Terror,"[3] "Profile of a MONSTER: The man who killed Kristin Huggins committed his first

[1] Defendant submitted a five-volume appendix to this Court that contains hundreds of articles chronicling the extent and nature of the deleterious publicity, both before and during trial, that surrounded this case and that were carried in the *Trentonian*, the *Trenton Times* and other newspapers.

Most publicity by far occurred between the murder and April 1993, when defendant was arrested. It again spiked when defendant and Gloria Dunn were indicted in mid–1993, when defendant dismissed his attorneys at the end of 1993, when defendant was tried and convicted of an unrelated robbery charge in mid–1994, when Gloria Dunn pleaded guilty and agreed to testify for the State in late 1994, and as the trial of the present case began and proceeded in late 1994 and early 1995.

[2] The *Trentonian* ran headlines stating "Artist in hearts of many," "Thoughts of art filled her head hours before death," "Dear G-d, take good care of Kristin," "Kristin Huggins' death swept the residents of Trenton with waves of grief," and "City grieves year after artist's brutal murder." The *Trenton Times* ran a front-page headline stating "Missing artist's family lives in pain-filled limbo." When Huggins's parents testified at trial, the *Trentonian* further emphasized its sympathy.

[3] This headline referred to defendant's alleged terrorization of other inmates.

rape as a teenager," "From boy to beast," "Huggins slayer terrorizes prison," "He's Satan in disguise," " 'Satan' Makes Prison Bloody, Fiery Hellhole," "Expert says rape indictment will prompt jury to ... KILL HIM!," " 'Wild Animal' Guaranteed 30 Behind Bars," "Nevermind [sic] Konko, just call him maggot,"[4] and "Stop calling Ambrose names, lawyers whine."[5] The *Trentonian* frequently called defendant "Squirt Boy,"[6] but it also employed other epithets, such as "useless savage," "well known coward," "annoying armpit sweat," "executioner's bait," and "fruit of a faulty contraceptive."

The *Trentonian* at one point quoted someone as stating: "No trial. He shouldn't live. Just get on with it and fry him. No trial." A *Trentonian* reporter, responding to defendant's attempt to change his name to Konko Lumumba, stated: "[F]rankly, we couldn't care less what Ambrose/Konko calls himself. Just spell it right on the toe tag."

Direct and vicious attacks on defendant also appeared in the *Trentonian*'s page known as "BackTalk," in which the tabloid publishes readers' spoken opinions. The opinions selected for publication and the editorial responses grossly vilified defendant. For example:

*Opinion:* "Why don't we have a public hanging on Trenton High's Football Field? We can invite all the students. Heck, we can invite everybody from all around to see what happens to people who don't care about other people. Why not give it a shot? I'll pay for the rope!"

*Response:* "Nice try, but I was the first to offer to pay for the rope. You can buy the lumber for the gallows, though."

---

[4] This headline referred to defendant's attempt to change his legal name to Konko Lumumba.

[5] The *Courier Times,* a Pennsylvania newspaper, ran an article entitled "Huggins Suspect 'Would Kill You in a Heartbeat.' "

[6] The nickname "Squirt Boy" refers to the lethal injection the *Trentonian* has hoped defendant will receive.

*Opinion:* "I liked your response to the caller who said it costs more to execute someone than to keep them in prison. The comment about rope being cheap was very good."

*Opinion:* "Let's bring back the death penalty and let's set up a lottery to get rid of monsters like Ambrose Harris, ok? Let me be the first to pull the switch on this guy."

*Response:* "It turns out the hot squat [i.e., electric chair] isn't so pricey either, provided you get the industrial rate from the electric company. Two or three bucks tops for all those amps and volts. What a deal."

*Opinion:* "When 'Creeping Justice' called to complain about how long it's taking to get around to trying the worthless piece of murdering scum BackTalk now refers to as 'Squirt Boy,' you said, 'Yes, but take solace in knowing that eternity is long and hell's fires endless.' Maybe so, Ed, but in the meantime we're still paying for Squirt Boy's room and board. These thugs enjoy prison too much and too long."

*Response:* "I was only trying to look on the bright side. Squirt Boy will be screaming soon enough, and he'll be screaming forever and ever."

## The unsigned editorial page continued this egregious campaign:

Harris has to have a trial and he has to be provided the best representation taxpayers' money can buy. That's what our justice system requires. Then there will be the usual appeals and further appeals.

But someday, years from now, if there is justice, the last appeal will have been rejected and the last stay of sentence vacated.

On that day, Ambrose Harris—cold-blooded murderer—will be strapped to a prison gurney. A needle will be inserted into his arm and a lethal mixture of drugs will be injected into his veins.

Minutes later, one of the biggest pieces of human trash ever to blight Trenton's streets will be gone, and the world will be a far better place for his passing.

\* \* \*

The Trentonian ... at various times has referred to Harris as "Artist Slayer," "Maggot," and "Squirt Boy," the latter in anticipation of the happy day when the jury does what's right and sends him to the execution chamber to get the lethal injection he so richly deserves.

\* \* \*

Well, Mr. Call [defendant's attorney, who in his attempts to change venue, criticized the *Trentonian* 's coverage] can whine and moan all he wants about how his pet maggot is too much in the spotlight, but the truth is he put himself there by capping his criminal career with the rape and murder of Kristin Huggins. It may offend Call's sensibilities to hear his scumbag client referred to as "Artist Slayer" and "Squirt Boy," but an artist slayer he is and a squirt boy he will be if the jury does its duty. Like it or not, that's the way things are, Law Boy.

The *Trentonian* consistently portrayed defendant as negatively as possible. For example, the *Trentonian* repeatedly referred to defendant as "artist killer" and "career criminal Ambrose Harris." It titled one article "Life of a career criminal" and another "Life and crimes of Ambrose Harris."

In addition, by using large sensationalistic quotes that implied the statements were those of individuals—such as "He did it," "Grieving parents: All murderers must die," and "Ambrose a terror"—on its covers and in the titles of articles, the *Trentonian* injected inflammatory editorial comment and opinion in its ostensible factual reporting.

The *Trentonian* laced its factual reporting with references to defendant as a sociopath. It "reported" that "The Killer hates to hunt alone," that "Ambrose Harris sees 'murder as a joke,' " and that "[w]hen scenes of violence flicker across the television screen[,] . . . the alleged killer and rapist smiles." It also reported that fellow inmates and prison guards hated defendant.

The *Trentonian* ran a number of reports on opinions regarding defendant. One such article, entitled "People agree Harris 'shouldn't live,' " stated:

Ambrose Harris should die: That was the simple message yesterday from the young barmaid, the grizzled war vet, the guys from the ice house and the stylish secretary.

All across Greater Trenton, people called for the death penalty—even torture—for the suspected killer of Bucks County artist Kristin Huggins, whom Harris is accused of raping and killing on Dec. 17, 1992.

"There's no excuse for a human like that. He's a waste of space," said Annie Summers, a barmaid in her early 20s. Her call for speedier justice and longer sentences won support at Jule's Tavern in Trenton's Chambersburg.

"He should have been fried a long time [ago]. He's been a criminal [his.entire] life," said John Shaffer, 42, a Vietnam veteran who works at an ice house in Trenton. One of Shaffer's colleagues volunteered to put Harris on ice, so to speak.

"Let me give him the squirt (lethal injection)," said the man, who identified himself only as Paul L. "For all the suffering he put those girls through . . . they should make him suffer for a while."

Several people offered various modes of execution. A 62–year–old secretary from Trenton who offered one such idea said it should be done "at high noon on Broad and Market."

The American Civil Liberties Union wouldn't be happy to hear all the calls yesterday for simply shooting Harris, who has yet to stand trial for the Huggins murder.

"No trial," said an 81-year-old Burg man who fought in the Battle of the Bulge.

"He shouldn't live. He's no good. Just get on with it and fry him. No trial," said the WWII vet and retired city streets worker who wouldn't give his name.

Apart from the charges in the present case, defendant had an extensive record that included violent offenses. The *Trentonian* and the *Trenton Times*,. often referring to him as a "career criminal," a "one man crime spree," a "troll" who had engaged in a "rape spree," and the like, repeatedly publicized defendant's record in headlines and article titles. Most egregiously, on the first day of the penalty phase, the *Trentonian* published a glaring, front-page headline that revealed: "Ambrose eyed in '67 slay: Remains prime suspect in unsolved murder."

Some of the midtrial publicity was racially inflammatory. It dwelled on the fact that an urban African-American man raped and murdered a suburban white woman. It recounted testimony that defendant referred to Huggins as a "white bitch" and had stated that he would spare a black robbery victim but kill a white one. The *Trentonian* reported an alleged story about defendant's jailhouse campaign of terror against white inmates. It stressed that he had threatened another rape victim by allegedly telling her that she should not resist because he had "just killed a white girl." The *Trentonian* and other papers also stressed defendant's purported comment about having "knocked off some white girl."

Much of the publicity was clearly intended to influence the jury. For example, after the guilt-phase jury commenced its deliberations, it initially deadlocked over the charge of aggravated sexual assault. The *Trentonian* ran a cover stating "One juror stalls verdict" and reported about an alleged holdout juror who "could save Harris' life." Another headline remarked: "Dawdling Harris jury draws public's fire." After the trial court instructed the deadlocked jury to continue its deliberations, the jury convicted defendant of all the charges. The *Trentonian* ran the following front-page headline: "GUILTY! So why's this killer smiling?

Because he's seen juror No. 7 crying, and he thinks she'll never go for the death penalty." That reporting occurred while the *unsequestered* jury, which could leave the courthouse during lunch and which was not individually *voir dired* about exposure to publicity, continued to deliberate over a period of days. *See* discussion, *infra* at 225–30, 716 *A.*2d at 514–16. In a particularly vicious editorial, entitled "Death for Harris," the *Trentonian* published an unsigned open letter to the jury that urged it to sentence defendant to death.

The publicity was intensely concentrated in Trenton. The *Trentonian* is present throughout and around Trenton, the site of the crime and the trial. A plethora of streetcorner vending machines and "hawkers" sold the *Trentonian* in Trenton, including the area surrounding the Mercer County Courthouse. Due to the ubiquity of the *Trentonian* and the immense font used for the front-page headlines, the *Trentonian*'s cover page is inescapable in this State's capital.

## B.

In order to guarantee a criminal defendant the right to a fair trial by an impartial jury, *Irvin v. Dowd,* 366 *U.S.* 717, 722, 81 *S.Ct.* 1639, 1642, 6 *L. Ed.*2d 751, 755 (1961), the trial court must take sufficient precautions to minimize adverse pretrial and midtrial publicity that has the capacity to infect juror perceptions of the case. *State v. Williams,* 93 *N.J.* 39, 63, 459 *A.*2d 641 (1983) (*Williams I* ). Those precautions are necessary if a "realistic likelihood of prejudice from pretrial publicity" exists. *Id.* at 67–68 n. 13, 459 *A.*2d 641; *accord State v. Bey,* 112 *N.J.* 45, 77, 548 *A.*2d 846 (1988) (*Bey I* ). There can be no doubt that the pervasive pretrial and midtrial publicity that surrounded this prosecution created a realistic likelihood that defendant would not receive a fair trial. The precautions taken by the trial court to overcome that publicity were woefully inadequate to assure a fair trial.

In *State v. Biegenwald,* 106 *N.J.* 13, 524 *A.*2d 130 (1987) (*Biegenwald II* ), the Court recognized the distinction "between

cases in which the trial atmosphere is so corrupted by publicity that prejudice may be presumed and cases in which pretrial publicity, while extensive, is less intrusive, making the determinative issue the actual effect of the publicity on the impartiality of the jury panel." *Id.* at 33, 524 *A.*2d 130 (citations omitted).

In determining whether pretrial and midtrial publicity lead to a presumption of prejudice, several factors including evidence of extreme community hostility, prominence of the victim and/or the defendant, the nature and extent of the coverage, the size of the community, the nature and gravity of the crime, and the temporal proximity of the publicity to the trial, are relevant. *State v. Biegenwald,* 126 *N.J.* 1, 23, 594 *A.*2d 172 (1991) (*Biegenwald IV*); *State v. Koedatich,* 112 *N.J.* 225, 272–73, 548 *A.*2d 939 (1988) (*Koedatich I*). If the court determines that a presumption of prejudice does exist, then it must take curative steps without regard to its belief about the actual effect of the publicity on jurors.

In this case, both the trial court and the Appellate Division agreed that a presumption of prejudice existed. 282 *N.J.Super.* at 413–15, 660 *A.*2d 539. Given the sheer volume, intensity, and hatefulness of the *Trentonian*'s purported journalism in this case, the Appellate Division correctly held that the trial court had not abused its discretion in concluding that a presumption of prejudice existed. According to the Appellate Division,

> there is more than adequate support in the record for the trial court's findings that the *Trentonian,* as part of a "vengeance seeking crusade" against defendant, has published a "stream of invective" that has been "constant," "prolonged" and "sensationalized," that there is a "likelihood of its taint permeating the trial," and that "the *Trentonian* will continue to foster vengeance."
>
> [*Id.* at 415, 660 *A.*2d 539.]

The majority concurs: "There can be no doubt that this case was accompanied by widespread, inherently prejudicial pretrial media coverage. Strong measures were 'necessary to overcome the realistic likelihood of prejudice from pretrial publicity.' *Williams I, supra,* 93 *N.J.* at 67 n. 13, 459 *A.*2d 641." *Ante* at 145, 716 *A.*2d at 469.

The pretrial publicity in this case was in a different class from that experienced by the defendants in *Koedatich I, supra,* 112 *N.J.* at 272–73, 548 *A.*2d 939 (concluding presumption of prejudice did not arise because there was lack of evidence of community hostility against defendant, neither defendant nor victim was prominent in the community, the victim was not public servant, defendant was not outsider, the articles did not assume defendant's guilt, and there was two-year lapse between most intense publicity and trial) and *Biegenwald II, supra,* 106 *N.J.* at 35, 524 *A.*2d 130 (holding no presumption of prejudice arose because the publicity had been concentrated six months before trial). Many of the articles in this case unqualifiedly assumed and proclaimed defendant's guilt and stridently called for his death. The articles literally flooded Mercer County before *and* during the trial. *See Coleman v. Kemp,* 778 *F.*2d 1487, 1538–40 (11th Cir.1985) (annulling through writ of habeas corpus, defendant's conviction and death sentence for vicious killing of a family and basing its decision on the trial court's failure to grant change of venue in light of presumption of prejudice from saturation-level publicity, particularly publicized assumption of guilt by law enforcement, revelation of inadmissible evidence, hostile atmosphere, and calls for death), *cert. denied,* 476 *U.S.* 1164, 106 *S.Ct.* 2289, 90 *L. Ed.*2d 730 (1986).

Because the extensive, vicious publicity prejudiced defendant, the trial court had a constitutional obligation to take adequate measures to ensure that defendant received a fair trial. In the face of the compelling circumstances, those measures required a change of venue. *See Rideau v. Louisiana,* 373 *U.S.* 723, 727, 83 *S.Ct.* 1417, 1419–20, 10 *L. Ed.*2d 663, 665 (1963) (stating in case in which capital defendant's videotaped confession was televised that "we do not hesitate to hold ... that due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard [defendant's] televised 'interview.' "); *Biegenwald II, supra,* 106 *N.J.* at 34, 524 *A.*2d 130; *Coleman, supra,* 778 *F.*2d at 1541 & n. 25 (concluding that although change of venue is the normal remedy to counteract presumption of

prejudice, other remedies, such as thorough *voir dire,* can rebut presumption); *Mayola v. Alabama,* 623 *F.*2d 992, 1000–01 (5th Cir.1980) (same), *cert. denied,* 451 *U.S.* 913, 101 *S.Ct.* 1986, 68 *L. Ed.*2d 303 (1981). This Court has recognized the need for a venue change when prejudicial publicity infects a capital trial. "While we recognize that a change of venue may disrupt court administration, it is imperative that the defendant in a capital case receive an impartial jury. Trial courts should not be reluctant to grant motions for change of venue in capital cases. On the contrary, courts should grant such motions liberally." *Koedatich I, supra,* 112 *N.J.* at 282, 548 *A.*2d 939.

Although the Court has not generally found that failure to change venue in capital cases constitutes reversible error, those cases did not involve either the extensive or vicious quality of newspaper coverage present in this case that gave rise to the presumption of prejudice. *See State v. Marshall,* 123 *N.J.* 1, 73–78, 586 *A.*2d 85 (1991) (*Marshall I* ), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L. Ed.*2d 694 (1993); *Koedatich I, supra,* 112 *N.J.* at 282, 548 *A.*2d 939; *Biegenwald II, supra,* 106 *N.J.* at 36–37, 524 *A.*2d 130. If the refusal to change venue in *Koedatich I* was error, albeit not reversible error because there was no presumption of prejudice, then the failure to change venue in this case, which carries a presumption of prejudice, was reversible error.

I find no escape from the conclusion that a presumption of prejudice requires a change of venue and that, in the absence of a venue change, a reversal of defendant's convictions and vacatur of his sentence must follow.

The majority, noting "the empanelment of foreign jurors was the first trial management technique that *Williams I* suggested to combat the effects of preexisting prejudicial pretrial publicity," concludes otherwise. *Ante* at 146, 716 *A.*2d at 470. In that case, the Court enumerated several options for a trial court to employ, including change of venue, impanelment of a foreign jury, and augmentation of the jury pool, in order to contain the effects of adverse publicity. 93 *N.J.* at 67, 459 *A.*2d 641. The Court also

stressed the need for adequate *voir dire* to detect latent bias. *Id.* at 68, 459 *A.*2d 641.

The Court acknowledges merit in defendant's argument "that because the goal is to 'minimize the danger that prejudice [from extensive pretrial publicity] will infiltrate the adjudicatory process,' *Koedatich I, supra,* 112 *N.J.* at 268, 548 *A.*2d 939 (quoting *Williams I, supra,* 93 *N.J.* at 63, 459 *A.*2d 641), the most effective method of minimizing the potential was to select a jury from a county which was outside of the circulation range of the Trenton newspapers." *Ante* at 149, 716 *A.*2d at 471–72 (alterations in original). The Court concludes that "[t]he trial court took firm steps to ensure that none of those households that received the *Trentonian* (the newspaper containing the most inflammatory material) would be on this jury" and that "[i]t made little difference whether the jurors were from Burlington or Camden counties." *Id.* at 150, 716 *A.*2d at 472. I strongly disagree with that conclusion.

The trial court attempted to cure the presumed prejudice arising from pretrial publicity merely by empaneling a jury from Burlington County and by inquiring superficially about exposure to pretrial publicity during jury selection. The court's deficient response failed to overcome the effects of the overwhelming prejudicial publicity.

The trial court's general approach to pretrial publicity during *voir dire* was to inquire into the subject only if a juror had not been excused for a more fundamental reason, such as the inability to be death-qualified. When the court did proceed to the pretrial-publicity issue, it simply asked, often in leading form, whether the venireperson was a reader of Trenton newspapers or whether he or she had other knowledge of the case. If the venireperson answered negatively, the questioning ended. The court did not probe further about what the venireperson may have heard or read from others who had read about the case. For example, the court queried: "And I gather you never read the Trenton papers?" That question was, however, neither penetrating nor

extensive. Not surprisingly, the venireperson responded: "No, I never read them." One potential juror who read the *Trentonian* "regularly" incredulously professed not to know anything about the prosecution. As was the case with all *voir dire* after the second day of jury selection, the attorneys were not permitted to ask him questions. The *voir dire* ended without any examination of the rather incredible string of assertions by the venireperson that, although he had read the *Trentonian* and *Trenton Times* on a regular basis, he never even had heard of Ambrose Harris or any other aspect of the case. However, when a venireperson answered the publicity-exposure question affirmatively, then the court asked additional questions. In another such situation, despite the venireperson's clear knowledge of the case, her specific knowledge, gleaned from a *Trentonian* article, about defendant's use of Huggins's MAC card, and her admission that she had seen *Trentonian* headlines on the subject, the court barely explored what exactly she had seen and how that may have affected her.

When a venireperson communicated that she possessed some sort of knowledge about the case, the court engaged in a superficial, and often leading, discussion about the nature of the venireperson's exposure and failed to explore whether the venireperson had been exposed to the nastier and more inflammatory side of the *Trentonian*'s coverage.

Three of the seated jurors stated that they never had heard of the case before coming to court; the trial court did not attempt to delve much further with those jurors. Four jurors had a small degree of knowledge of the case, and the court generally barely evaluated that knowledge. Five seated jurors, however, demonstrated a potentially greater degree of knowledge or impression, to which the trial court responded with a slight degree of probing in the form of highly leading questions. One juror, for example, who, as indicated from the jurors' questionnaire, had "some knowledge about the defendant Ambrose Harris, or the facts of the case" was asked by the court: "And I gather, I don't want to put words in your mouth, but with the next question you indicate that

you knew nothing about a 22 year old artist who was missing and later found in a shallow grave; is that correct?" He answered: "That is correct."

Nor did the court pry into potential further knowledge about defendant's criminal record, which even the most cursory read of an issue of the *Trentonian* dealing with the case would reveal, especially given its repeated references to defendant as "career criminal Ambrose Harris." *See ante* at 216, 716 *A*.2d at 509. If a venireperson possessed some knowledge about the case, there was a reasonable chance that he or she knew, consciously or subconsciously, about other inadmissible aspects of the case.

The court's elimination of attorney participation contributed to the inadequacy of the *voir dire*. Defense counsel clearly perceived the problem of exposure of Burlington County jurors to the *Trentonian* and expressed to the court the comment of a venireperson about the high level of knowledge in Burlington County about the case. The trial court's attitude in that respect became particularly troublesome when it ended attorney-conducted *voir dire* and conducted its own limited questioning concerning pretrial publicity. The court took those steps in spite of defense counsel's clear statement that he intended to focus his *voir dire* questioning on exposure to pretrial publicity. The court's solution was to concentrate on the issue of exposure to pretrial publicity "from this point on." Thus, in response to a venireperson's expressed knowledge of the case and statement that many of the Burlington County jurors had knowledge of the case *precisely because of* Burlington County's proximity to Mercer County and the employment of many Burlington County residents in Mercer County, the trial court simply concluded that this fact was basically irrelevant because there would also be publicity in Cape May or Sussex County.

Even though the Court concludes that a presumption of prejudice can be overcome without changing venue, the trial court in this case failed to take sufficient precautions to counteract pretrial publicity. *See Coleman, supra,* 778 *F*.2d at 1542 (concluding trial

court's leading questions during *voir dire* did not overcome presumption of prejudice). Because Burlington County borders Mercer County, many residents of Burlington County work in or around Mercer County. Moreover, the *Trentonian* and *Trenton Times* each have circulations of about 11,000 in Burlington County. Consequently, the impanelment of the foreign jury from Burlington County, in light of the inadequacy of *voir dire*, did not provide an adequate substitute for a change of venue and did not rebut the presumption of prejudice. The pretrial publicity requires reversal of defendant's convictions and vacation of his death sentence.

## C.

The trial court also failed to counteract the effects the substantial midtrial publicity had on the jury. Defense counsel understandably was concerned about the effects of the midtrial publicity on the jurors and consequently proposed several prophylactic measures to the court. He proposed rerouting the juror bus and escorting jurors into the courthouse. The trial court rejected those proposals, even though they were unopposed by the State. The trial court also rejected defense counsel's request to require the jury to remain in the jury room during lunch, to sequester the jury during the penalty phase, and to *voir dire* the jurors individually during the penalty phase. Instead, the court only admonished the jurors each day not to read or watch anything dealing with the case; on three separate occasions, it also asked the entire jury in open court whether it had been exposed to publicity, and, on each occasion, the jurors shook their heads "no" in unison.

During the trial, the *Trentonian*'s wrath was typically directed at defendant. Nevertheless, the jury did not escape the tabloid's ire. After the jury was unable to reach a verdict on all counts after the first day of guilt-phase deliberations, the Trentonian's cover headline read: "One juror stalls verdict." Page three

articles were entitled "Dawdling Harris jury draws public's fire"[7] and "Lone juror could save Harris' life." The jury was not spared the day after it convicted defendant of all counts; the *Trentonian*'s front-page headline, appearing adjacent to a photograph depicting defendant grinning, announced: "GUILTY! So why's this killer smiling? Because he's seen juror No. 7 crying, and he thinks she'll never go for the death penalty." That week the *Trentonian* also reported that juror number five was a Quaker, and the newspaper feared that his religion's tenets opposing capital punishment would preclude him from voting to sentence defendant to die.

The midtrial publicity was most volatile on the first day of the penalty phase. That day, the *Trentonian* ran a cover headline implicating defendant in a 1967 murder. The headline, in large type, proclaimed: "Ambrose eyed in '67 slay: Remains prime suspect in unsolved murder." On page three, the newspaper printed an article reporting that the son of a woman killed in 1967 believed that defendant had committed the murder. It was also in this issue that the *Trentonian* printed an editorial that urged the jury to sentence defendant to death.

In response to this inflammatory issue of the *Trentonian*, defense counsel urged the trial court to *voir dire* each juror individually. That morning the court, declining to conduct an individual *voir dire*, merely asked the jury *en banc* if anyone had been exposed to newspaper articles or headlines and, noting the risk that Trenton newspapers could be seen in the courthouse, admonished the jury to avoid newspaper coverage of the trial. That was only the third time the court conducted an *en banc voir dire* concerning exposure to midtrial publicity. The court also permitted the jury to leave the courthouse during the lunch

---

[7] This article contained the following set-aside quote: "Most people figured the jury would think, 'We'll have lunch on the county, and we'll squirt him—this afternoon.'"

recess. In addition, the court never again inquired whether any juror had been exposed to the midtrial publicity.

In *Bey I, supra,* 112 *N.J.* at 79, 548 *A.*2d 846, the trial generated substantial publicity, much of which contained inadmissible information about the defendant, including his prior convictions and his pending indictment for another murder. This Court held that the trial court had abused its discretion in relying only on an admonition without polling the jury about exposure. *Id.* at 81, 548 *A.*2d 846. The Court stated that individual *voir dire* of jurors outside of the presence of other jurors was "likely to be more effective in uncovering any exposure than is questioning the jury *en banc,* in open court." *Id.* at 86–87 n. 26, 548 *A.*2d 846.[8] The Court concluded by stating:

> The procedure of questioning an impaneled jury when prejudicial publicity threatens the fairness and integrity of a defendant's trial should not be invoked begrudgingly. While we do not mean to suggest that *any* publicity relating to the defendant or the proceedings will automatically require that the jury be polled, a court might properly choose to err on the side of caution when ruling on such motions. The procedure is prophylactic in nature, designed to uncover potential prejudice to extremely significant constitutional rights that might otherwise go wholly undetected, and to do so at a time when corrective measures remain possible, that is, before ordering a new trial has become the only option.... "[W]e must remember that reversals are but palliatives; *the cure lies in those remedial measures that will prevent prejudice at its inception."*
>
> [*Id.* at 89–90, 548 *A.*2d 846 (citations omitted) (quoting *Sheppard v. Maxwell,* 384 *U.S.* 333, 363, 86 *S.Ct.* 1507, 1522, 16 *L. Ed.*2d 600, 620 (1966)) ].

The majority, noting simply that unlike the Bey jurors who were admonished, the "Harris' jurors were questioned generally and that inquiry revealed that no exposure had occurred," *ante* at

---

[8] The Court also cited favorably to the American Bar Association Standards for Criminal Justice, *Standards Relating to Fair Trial and Free Press* § 8–3.5(f) (1978), which states:

> If it is determined that material disseminated during the trial goes beyond the record on which the case is to be submitted to the jury and raises serious questions of possible prejudice, the court may on its own motion or shall on motion of either party question each juror, *out of the presence of the others,* about his exposure to that material.
>
> [*Bey I, supra,* 112 *N.J.* at 87–88 & n. 28, 548 *A.*2d 846 (internal quotations omitted) (emphasis added).]

153, 716 A.2d at 473, distinguishes *Bey I, supra,* and therefore concludes that "a denial of individual *voir dire* should not form the basis for reversing a conviction when there is no evidence of exposure," *ante* at 153, 716 A.2d at 473–74.

The Court's reasoning is flawed. The absence of direct evidence that the jury was exposed to the publicity, which was unavoidable in Trenton, can be attributed to the lack of individualized *voir dire.* Due to the trial court's woefully inadequate effort to uncover jury exposure to publicity, the Court's reliance on the absence of direct proof that the jury had been exposed to publicity is disingenuous and misplaced. Moreover, under *Bey I* 's two-part test, the trial court in this case was enjoined to take vigorous prophylactic measures to avoid juror exposure to midtrial publicity. First, the publicity given to defendant's criminal record and to the unsubstantiated allegations of his perpetration of a 1967 homicide, the calls for his conviction and execution, and the attempts to encourage jurors to convict and to sentence defendant as quickly as possible were calculated to influence the jurors and had the capacity to prejudice defendant. Second, given the sheer volume of coverage, the prominence of the *Trentonian's* cover stories, sales of the *Trentonian* and *Trenton Times* in and around the courthouse, and the newspapers' substantial circulations in Burlington County, there was a "realistic possibility that such information may have reached one or more of the jurors," *Bey I, supra,* 112 *N.J.* at 86, 548 A.2d 846.

Sequestration during the penalty-phase deliberations probably would also have been an effective means of shielding the jury during those charged deliberations. *Rule* 1:8–6(b) allows the trial court, at its discretion, to sequester a civil or criminal jury during deliberations. Due to the massive midtrial publicity, the court should have sequestered the jury during penalty-phase deliberations.

At the very least, the court should have barred the jurors from leaving the jury room during lunch and modified their bus route and entry into the courthouse to avoid exposure to the *Trentoni-*

*an*'s graphic and inflammatory covers. Although the jurors presumably were conscientious in attempting to avoid exposure to midtrial publicity, we cannot be confident that none was exposed, given the utter lack of preventive measures taken by the trial court. It is difficult to imagine that none of the jurors ever were exposed to prejudicial midtrial publicity. The jurors began their day by being bussed to the courthouse, probably passing by the *Trentonian*'s huge headlines, and by entering the courthouse without being guided away from the tabloid. By the time they were seated each morning, therefore, a significant possibility existed that one or more of them had been exposed either consciously or subconsciously to some sort of publicity regarding either defendant or the jury itself. At lunch, the jurors were permitted to wander around the courthouse and the downtown area; this increased the chance of exposure. During the entire trial, including the penalty phase, they went home each night, where they had yet another opportunity for inadvertent exposure. Yet, when asked by the trial court on three occasions whether they had been exposed, they failed to indicate that they had. Of course, that failure is not surprising given the attendant embarrassment to such an open-court admission.

Moreover, the one precautionary measure that the trial court actually took—occasional *voir dire* of the jury regarding potential exposure—was insufficient to neutralize the prejudice created by potential exposure to midtrial publicity. Although this Court in *Bey I, supra,* refused to create a blanket rule of individualized *voir dire* of jurors in order to gauge exposure, it strongly intimated its approval of such a procedure, 112 *N.J.* at 86–87 n. 26, 548 *A.*2d 846, and cited favorably to the ABA standard that recommends individualized *voir dire. Id.* at 87–88 & n. 28, 548 *A.*2d 846.

To rely exclusively on admonitions and occasional en banc *voir dire* in open court to discover, to gauge, and to counteract potential juror exposure to the massive and inflammatory midtrial publicity in this case was a seriously inadequate response. The trial court's consistent refusal to take serious steps to address the

midtrial-publicity problem—indeed, it even refused to take measures that the prosecutor did not oppose—is almost impossible to understand or to explain, and the Court does not do so. Because the trial court failed to discharge its duty to take adequate precautionary measures to minimize the prejudice flowing from midtrial publicity, the Court, on this basis alone, should reverse defendant's conviction. At the very least, the Court should vacate his death sentence.

### D.

The majority clearly recognizes the extreme danger posed by the publicity surrounding this prosecution:

> Because in cases involving the death penalty a trial court's responsibility under both the federal and state constitutions is to "minimize the danger that prejudice will infiltrate the adjudicatory process," *State v. Williams,* 93 *N.J.* 39, 63 [459 *A.*2d 641] (1983) (*Williams I* ), we hold that when hereafter there is a reasonable likelihood that the trial of a capital case will be surrounded by presumptively prejudicial media publicity (as that phrase is understood in the law) the court should transfer the case to another county. Other devices, such as restraints against the publication of material concerning the trial or the sequestration of jurors, have proven either to be unavailable to counter the effects of continuing prejudicial publicity or to produce a contrary effect than desired. In some cases a court may conclude that an initial tide of inherently prejudicial publicity will have subsided at time of trial and will not require a change of venue if the jury selection process yields an impartial jury. *E.g., State v. Koedatich,* 112 *N.J.* 225, 273–82 [548 *A.*2d 939] (1988), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L. Ed.*2d 803 (1989) (*Koedatich I* ). When, however, a court is satisfied that there is a reasonable likelihood of the continuing recurrence at a capital trial of presumptively prejudicial publicity that might infiltrate the trial, a change of venue is required.
>
> [*Ante* at 133–34, 716 *A.*2d at 463.]

Understanding the necessity of a venue change to preserve a fair trial in cases, such as this one, that are swamped by prejudicial publicity, the Court prospectively rules:

> In future capital cases a court should change the venue of a capital trial when there is a realistic likelihood that presumptively prejudicial publicity will continue during the conduct of a trial. Presumptively prejudicial publicity is recognized as a barrage of inflammatory reporting that may but need not include all of the following: evidence that would be inadmissible at the trial, editorial opinions on guilt or innocence, and media pronouncements on the death-worthiness of a defendant.
>
> [*Ante* at 147–48, 716 *A.*2d at 471.]

That belated and anemic concession of the trial court's error has a dull and hollow ring. It is too little and too late for defendant, who was sentenced to die by a jury that was inescapably exposed to highly prejudicial publicity.

## II

The *voir dire* in this case was wholly insufficient and failed to lead to the selection of an adequately death-qualified jury and was grossly inadequate in failing to overcome the high risk of racial bias.

### A.

Jury selection began on October 10, 1995. The trial court and parties agreed that the court-conducted *voir dire* would be followed by attorney follow-up *voir dire*. However, on October 16, the trial court terminated attorney-conducted *voir dire*. The court reasoned that New Jersey had characterized attorney-conducted *voir dire* in death-penalty cases as a "vestige" and that "all of the evils that the 1969 rule change sought to eradicate," including juror "shopping," remained in capital cases. The court, noting the "exasperation [of jurors] at the incomplete or twisted questions thrown at them" by defense counsel, expressed regret at having excused the two jurors who had been "confused" by defense counsel's hypotheticals. It limited counsel to inquiries "only for purposes of clarification." Counsel could not ask "hypothetical questions which are not strictly based on the law." As a result, the attorneys were no longer permitted to ask any questions. Further, defendant exhausted his allotment of peremptory challenges and was denied additional peremptories.

Although the determination of whether to allow attorney-conducted *voir dire* rests in the sound discretion of the trial court, *State v. Pennington*, 119 *N.J.* 547, 591, 575 *A.*2d 816 (1990); *State v. Hunt*, 115 *N.J.* 330, 347–48, 558 *A.*2d 1259 (1989); *State v. Williams*, 113 *N.J.* 393, 426–27 n. 10, 550 *A.*2d 1172 (1988) (*Williams II* ); *State v. Zola*, 112 *N.J.* 384, 394–97, 548 *A.*2d 1022

(1988); *Koedatich I, supra,* 112 *N.J.* at 291–92, 548 *A.*2d 939; *Biegenwald II, supra,* 106 *N.J.* at 28–30, 524 *A.*2d 130, in capital cases trial courts must be especially sensitive to suggested defense *voir dire* questions, *Williams II, supra,* 113 *N.J.* at 426–27 n. 10, 550 *A.*2d 1172; *Biegenwald II, supra,* 106 *N.J.* at 30, 524 *A.*2d 130. This Court has encouraged active attorney participation in *voir dire.* *See Pennington, supra,* 119 *N.J.* at 591, 575 *A.*2d 816.

The Court now validates the jury selection process that was followed in this case and concludes that the *voir dire* permitted the selection of a adequately death-qualified jury. *Ante* at 161–70, 716 *A.*2d at 477–82. I disagree.

The trial court excused three jurors out of seven for cause as a result of the attorney-conducted *voir dire* that was initially allowed. The trial court's accusations—that defense counsel was attempting to sabotage the process and was aggressively going after perceived pro-death jurors—were misplaced. Defense counsel was entitled to attempt to reveal the disqualifying opinions; that is the purpose of *voir dire.* Moreover, defense counsel's questions were not misleading. Unlike the Court's questions, they consisted of open-ended inquiries.

When the trial court terminated attorney-conducted *voir dire,* it permitted the parties to submit questions for the court to ask prospective jurors. Throughout the *voir dire* process, defendant, in written form, proposed many questions relating to a wide variety of subject areas. The trial court, however, asked few of his proposed questions.

The majority, indicating that "the [trial] court provided a 'thorough and searching inquiry' into the jurors' attitudes and biases," treats the ruling to eliminate and reduce attorney *voir dire* dismissively. *Ante* at 163, 716 *A.*2d at 478.

Before the termination of attorney-conducted *voir dire,* defense counsel spent considerable time with prospective jurors about their views on capital punishment. Once the trial court terminated attorney-conducted *voir dire,* it generally conducted, over

defense counsel's repeated and strenuous objection, death-qualification *voir dire* in a leading manner. In its *voir dire,* the court went through its routine of describing the death-penalty process and asking extended, leading questions to which the juror responded in the affirmative. Defense counsel objected to this superficial form of *voir dire.* Despite uncertainty and equivocation expressed by many of the prospective jurors, the court simply and uncritically qualified them.

In the *voir dire* of several prospective jurors who eventually were seated in the case, the jurors often initially responded that death was appropriate only for some murders. Upon further questioning about which types of murders were inappropriate for death, they responded that it was inappropriate for accidental deaths, self-defense, or some other form of nonmurder. The court then explained the definition of murder and again asked the juror what type of murder would be deathworthy. The juror would then respond that "vicious," "cold-blooded," "premeditated," "higher level," or some other type of intentional murder deserved the death penalty. Finally, the court would describe, in a leading manner, the mechanics of the death penalty in New Jersey and elicit affirmative responses from the jurors about their ability to follow the law.

In *Biegenwald IV, supra,* 126 *N.J.* at 36–43, 594 *A.*2d 172, this Court criticized the trial court for the leading nature of its questions, its failure to probe problematic responses, its frequent exclusion of defense counsel from the questioning process, and its failure to explain the definition of "murder" to obviously confused venirepersons. In *Williams II, supra,* 113 *N.J.* at 415–17, 550 *A.*2d 1172, this Court termed the trial court's refusal to go into further depth about the effect of other crimes on jurors "serious error." *See also State v. Martini,* 131 *N.J.* 176, 211–12, 619 *A.*2d 1208 (1993) (*Martini I*) (holding, if kidnapping is charged in addition to capital murder, trial court must inquire into effect of kidnapping charge on prospective jurors), *cert. denied,* 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L. Ed.*2d 137 (1995). In this case, the trial court committed the same error committed in *Biegenwald IV* and

*Williams II.* The court clearly should have asked more open-ended questions. *See Zola, supra,* 112 *N.J.* at 397, 548 *A.*2d 1022 (approving of open-ended questions to elicit jurors' feelings about appropriateness of death penalty for murders accompanied by robbery and rape).

Because defendant was charged with robbery, kidnapping, and rape, in addition to capital murder, the trial court simply asked prospective jurors if, assuming conviction on all counts, the existence of those other violent crimes would affect their ability to consider mitigating evidence. The court consistently asked similar minimalist, leading questions about other crimes despite defense counsel's repeated request for more in-depth *voir dire* on the subject.

The court's *voir dire* regarding the presumption of innocence was also inadequate. In *State v. Moore,* 122 *N.J.* 420, 455–56, 585 *A.*2d 864 (1991), the Court endorsed an individualized inquiry, either through direct questioning or a questionnaire, into juror attitudes about the presumption of innocence. Although the trial court asked a number of specific, open-ended questions on the subject, it allowed problematic juror responses to go unexplored even after defense counsel requested further questioning.[9] The court would rehabilitate jurors by engaging in leading descriptions of the presumption of innocence. It failed, however, to follow up by asking further open-ended questions to determine whether the court's description of the presumption of innocence had educated jurors or whether they still adhered to their problematic responses.

### B.

The most fundamental and egregious shortcoming in the jury-qualification process related to the subject of racial bias. Racial

---

[9] One juror stated that if the defendant did not testify, he must be "comfortable" with the State's story. The court did not attempt to elicit even the slightest explanation and did not return to the subject despite defense counsel's specific request that it do so.

bias was a critical problem in this case. This case involved the alleged carjacking, rape, and murder of a young, suburban white woman by an urban black man. Statements purportedly made by defendant caused the racial backdrop of the case to be even more focused and prominent. Defendant referred to Huggins as a "white bitch," there was testimony that he told Tariq Ayres that he had "knocked off some white girl," and he told Dunn that he would spare a black carjacking victim but kill a white one.[10] Because of those racial themes and overtones, defense counsel requested that the trial court engage in extensive *voir dire* on racial bias and submitted numerous questions to that effect. The proposed questions dealt with racial bias, reaction to the facts of the case, reaction to defendant's statements, and attitudes about Trenton and the changes that have occurred in cities.

Remarkably, the trial court, stating that race was, at most, "incidental," that it did not view the facts as "a bias type crime," and that race "is not the overriding issue by a long shot," had a different view of the case. The court thus perceived that this case did not implicate race. It stated: "[I]f it were to ask a great number of questions concerning race, the [c]ourt would be in effect, by its emphasis, telling the jury that this is a race case. And that is not the circumstance here." The court betrayed a serious misapprehension about the law that governs the conduct of a prosecution—particularly a capital-murder case—in which race by definition is a patent factor that must be taken into account to assure a fair trial.

The court-conducted *voir dire* included only minimal questioning about racial bias. Initially, the *voir dire* simply consisted of some sort of permutation of the following single question: "In this case, the defendant, Mr. Harris, is a black male. The victim, Kristin Huggins, was a 22 year old white female. Given those factors, would that in any way influence your determinations in

---

[10] Dunn's testimony regarding the role of Huggins's race in defendant's intent to kill was a surprise and, thus, was unknown during *voir dire*.

this case?" The question invariably, and predictably, elicited "no" answers. The court asked no other questions about race to each venireperson.

Defendant eventually moved to dismiss the qualified jurors because of the inadequacy of the *voir dire* concerning racial attitudes; he subsequently moved for a stay of *voir dire* pending the trial court's consideration of the motion. The trial court denied the stay, and the Appellate Division affirmed the denial. During oral argument in the Appellate Division, however, Judge Skillman apparently noted, without judging the adequacy of *voir dire*, that case-specific race questions were permissible if requested by a party. In response to that suggestion, defendant and the State compiled a joint list of ten race questions to be propounded to previously qualified jurors and to future prospective jurors. The trial court accepted the idea of recalling previously qualified jurors, but it refused to ask ten case-specific race questions.

Rather, the trial court's reformulated *voir dire* consisted simply of a few leading questions focused on the "white bitch" statement. The trial court generally treated the "white bitch" remark in a vacuum. The Court repeatedly conducted inadequate racial *voir dires*, including those of jurors who were ultimately seated. Most elicited answers similar to "I don't think so" in response to the trial court's question about whether defendant's allegedly having called Huggins a "white bitch" would affect the potential jurors' ability to be fair. In each instance, the trial court did not follow up on those uninformative and ambiguous responses. Others expressed a desire to know the context of the remark. For example, one venireperson said: "I'd want to know why he called her that." The venireperson added: "I don't think it would affect it. It's hard to imagine it standing alone. In some context it may, you know, have a different meaning. But by itself, it doesn't really." One juror, who was eventually seated, stated: "I don't think it has a bearing, and I assume that's the way he talks." Yet, the trial court failed to ask additional questions to these venirepersons. Consequently, defense counsel with good reason asserts

that "the court's question implied a correct answer and thereby virtually assured that the responses would be vapid and hollow, and of no use to counsel."

The Court has noted that in some cases, a single, general race question can be sufficient to ensure a fair and impartial jury. *E.g., State v. Loftin,* 146 *N.J.* 295, 342, 680 *A.*2d 677 (1996); *State v. Ramseur,* 106 *N.J.* 123, 244–48, 524 *A.*2d 188 (1987). The Court, however, has recognized that a more extensive *voir dire* is often required:

> Racial prejudice may be either blatant and easy to detect or subtle and therefore more difficult to discern. A probing *voir dire* that elicits more than a "yes" or "no" response will aid the trial court in excusing prospective jurors for cause and will assist the defense in exercising its peremptory challenges. When the defendant is a member of a cognizable minority group, a more searching *voir dire* should be conducted, if requested.
>
> [*Williams II, supra,* 113 *N.J.* at 428, 550 *A.*2d 1172.]

Several factors determine whether the trial court has an obligation to delve more deeply than one question into prospective jurors' racial attitudes. These include whether the crime is interracial in nature, *Ramseur, supra,* 106 *N.J.* at 245, 524 *A.*2d 188, whether race is inextricably bound up with the case, *id.* at 247, 524 *A.*2d 188, whether the defendant requests specific additional questions, *Loftin, supra,* 146 *N.J.* at 342, 680 *A.*2d 677, and whether defense counsel has an opportunity to delve more deeply into the subject, *State v. McDougald,* 120 *N.J.* 523, 551, 577 *A.*2d 419 (1990).

Under the factors that this Court has enumerated, the trial court's race-based *voir dire* was grossly inadequate. In-depth *voir dire* about race was clearly imperative. First, the crime was interracial in nature. Second, despite the trial court's firm personal belief to the contrary, race was a central feature of the case given the multiple racially motivated statements attributed to defendant and the crime itself, in which a white suburban woman had gone into the city and gotten carjacked, raped, and murdered by a black man. The murder itself appeared to have been racially motivated. Third, defendant repeatedly requested more extensive *voir dire* and even submitted an extensive list of proposed questions from which the court could have chosen. Fourth, the court

terminated all attorney-conducted *voir dire*, thus precluding deeper inquiry by defense counsel. The shortcomings of defense counsel's inability to participate fully was further exacerbated by the court's refusal to go into greater depth with specific jurors when requested by defendant. For example, the comment by a prospective juror who was eventually seated that "I assume that's the way he talks" and the court's failure to probe further into that comment are particularly troubling. Fifth, the questions were decontextualized and leading in nature, and thus they elicited short, vague responses. They were not tailored to go beyond obvious bias and to delve into latent bias. A number of jurors appeared to recognize the context-free nature of the questions in their responses, such as "I don't think so" and "I'd want to know why he called her that." The court did not follow up on these responses and did not allow counsel to do so.

The majority concludes that "[s]till, the questioning was sufficiently probing to enable court and counsel to gain a perception of jurors' attitudes." *Ante* at 480, 716 *A*.2d at 166. I cannot agree. The trial court's handling of the race issue in *voir dire* fell far short of this Court's standards. That error was amplified by the court's inadequate pretrial-publicity *voir dire*, especially because of the extensive publicity about defendant's remarks to an alleged rape victim that she should not resist because he already had killed a white woman.

## C.

The purpose of a searching *voir dire* is to ferret out biases that jurors may not express initially but that they may reveal with more sophisticated, open-ended questions. *Voir dire* does *not* exist simply to induce jurors, through leading questions, to abandon problematic responses and to agree with the court's "correct," death-qualifying answers so that the jury-selection process can end quickly with minimal dismissals for cause. The inappropriate approach, however, was the one that the trial court chose. The trial court's *voir dire* in a number of areas was seriously inade-

quate in its failure to delve substantially into important aspects of the case, its reliance on lectures and leading questions, and its acceptance of problematic responses, which it attempted to cure through leading questions.

The *voir dire* deficiencies cannot be considered harmless, given the centrality of the deficient aspects of *voir dire*, defendant's exhaustion of his peremptory challenges, and the trial court's refusal to augment the number of defense peremptories.

No defendant should be convicted of capital murder and sentenced to death based on the *voir dire* that occurred in this case. The Court should reverse defendant's convictions and vacate his death sentence.

### III

Early in the proceedings in this case, defendant moved for separate guilt-phase and penalty-phase juries so that he could testify during the guilt phase without exposing his criminal record to the penalty-phase jury. In an accompanying affidavit, defendant stated that he would testify if the trial were bifurcated. Defendant contends that the trial court's denial of his bifurcation motion effectively deprived him of his right to testify, in violation of his state and federal constitutional rights.

*N.J.S.A.* 2C:11–3c(1) provides:

Where the defendant has been tried by a jury, the [penalty] proceeding shall be conducted by the judge who presided at the trial and before the jury which determined the defendant's guilt, *except that, for good cause, the court may discharge that jury and conduct the proceeding before a jury empaneled for the purpose of the proceeding.*

[ (emphasis added).]

Thus, a trial court may impanel a second jury for the penalty phase if it determines that good cause exists.

In considering the definition of "good cause," this Court has focused on the existence of highly prejudicial evidence that is only admissible during one phase of a capital trial. *See State v. Erazo*, 126 *N.J.* 112, 130–33, 594 *A.*2d 232 (1991); *State v. Dixon*, 125 *N.J.*

223, 250, 593 *A.*2d 266 (1991); *State v. Long,* 119 *N.J.* 439, 474–75, 575 *A.*2d 435 (1990). As the Court stated in *Dixon, supra:* "Given the structured nature of capital sentencing, we have repeatedly emphasized that juries are not to be subjected to extraneous factors that may influence a jury's verdict in a way neither contemplated nor authorized by statute." 125 *N.J.* at 250, 593 *A.*2d 266.

The Court has recognized that, at times, a limiting instruction is insufficient and that limited admissibility of highly prejudicial evidence constitutes good cause, thus requiring a bifurcated jury. As the Court stated in *Erazo, supra:* "A separate penalty-phase jury commends itself when guilt-phase evidence is so prejudicial that the same jury could not fairly sit on both phases of the trial." 126 *N.J.* at 133, 594 *A.*2d 232. In *Biegenwald IV, supra,* 126 *N.J.* at 44–45, 594 *A.*2d 172, the Court held that reliance by the State on the prior-murder aggravating factor during the penalty phase generally would require separate juries because of the inadmissibility of that evidence during the guilt phase and the necessity of discussing that aggravating factor at *voir dire.*

The trial court concluded that the concerns expressed in *Erazo* and other like cases had been "assuaged" by *State v. Brunson,* 132 *N.J.* 377, 625 *A.*2d 1085 (1993), which required trial courts to "sanitize" criminal convictions that are presented to the jury. In fact, the trial court implied that *Erazo* 's endorsement of jury bifurcation in this type of case was no longer good law because *Brunson* effectively overruled it. That conclusion, however, was erroneous.

Under those standards, this case presents good cause. Defendant had an extensive record of serious and violent offenses that extend back a significant period of time. Had this record been introduced even in sanitized form during the guilt phase, a limiting instruction would have been insufficient to prevent it from substantially affecting the jury's deliberations during the highly subjective penalty phase. In light of the indication by six of the twelve seated jurors that they considered a defendant's record at

least somewhat relevant in determining the appropriateness of a given sentence, defendant stresses the high probability of such a prejudicial impact.

Another reason why jury bifurcation would have been highly appropriate in this case is that, unlike the other cases in which this Court and lower courts have considered jury-bifurcation motions, this case involved limited-admissibility evidence that the State could introduce only if defendant were to testify, in which case defendant's record would have impeached his credibility. Before trial, defendant indicated by affidavit that he wished to testify but that the lack of jury bifurcation would prevent him from doing so because of the prejudicial impact of his criminal record. As a result of the trial court's refusal to bifurcate the jury, defendant elected not to testify in his own defense. Consequently, the trial court's decision not to bifurcate the jury must be evaluated not only in light of the prejudicial impact of defendant's record on the jury's penalty-phase deliberations but also in light of defendant's right to testify in his defense, see Rock v. Arkansas, 483 U.S. 44, 107 S.Ct. 2704, 97 L. Ed.2d 37 (1987) (holding right to testify was federal constitutional right); State v. Savage, 120 N.J. 594, 626–28, 577 A.2d 455 (1990) (same holding under New Jersey Constitution).

In the context of a capital prosecution, a violation of the right to testify cannot be deemed harmless, because of its fundamental nature. State v. Rosillo, 281 N.W.2d 877, 879 (Minn.1979) (holding violation of right to testify could not be harmless). Further, defendant was prejudiced by the trial court's refusal to bifurcate. It is safe to assume that he would have challenged Gloria Dunn's allegation that he was the triggerman and that he would have testified that she actually pulled the trigger. That may be inferred from the defense strategy generally, which mostly focused on Dunn, and on defendant's allocution at his noncapital sentencing proceeding, in which he insisted that Dunn was the murderer. Thus, assuming that the court had granted the bifurcation motion and defendant had taken the stand and testified that Dunn, not he,

was the triggerperson, defendant's testimony reasonably could have affected the verdict.

Therefore, I conclude that the trial court's erroneous refusal to bifurcate the trial was not harmless beyond a reasonable doubt. The Court should vacate defendant's death sentence based on the reasonable possibility that defendant's testimony could have affected the determination of defendant's status as triggerman and, thus, defendant's death-eligibility.

## IV

Relying on its guilt-phase presentation, the State presented no new evidence during the penalty phase. The instructions that the jury received to guide its consideration, application, and evaluation of that evidence in reaching the ultimate determination—whether defendant should be put to death—were grossly inadequate, contradictory, and confusing.

Before defendant began his penalty-phase presentation, the trial court instructed the jury that "what the state has effectively done is this, it has placed in evidence all that you heard during the guilt phase of the trial, and it relies upon that to establish the aggravating factors which it alleges." In its opening instructions to the jury, the court had stated that "the only evidence which you may consider that was presented during the guilt phase of the trial is that evidence which may be used to support one or both of the aggravating factors alleged by the state." In its closing charge to the jury following the penalty-phase presentation, the court, after defining the elements of the felony-murder aggravated factor, stated that

the guilt and sentencing phases of the trial are considered separate proceedings. Therefore, you must deliberate anew, regarding any facts established in the guilt phase which the state relies upon to prove an aggravating factor. And you have a right to reach a different conclusion about such facts in the penalty phase.

Despite those instructions, the court never guided the jury about specific segments of guilt-phase evidence that may not have been admissible in the penalty phase. Although defendant did not

request such an instruction, its omission by the court constitutes a breach of its duty to ensure a fair trial and amounts to plain error.

Because the only issues before the jury during the penalty phase are the determination of aggravating and mitigating factors and the balancing of those factors, evidence admissible at the guilt phase is not necessarily admissible at the penalty phase. *Dixon, supra,* 125 *N.J.* at 249–50, 593 *A.*2d 266; *State v. Rose,* 112 *N.J.* 454, 507–08, 548 *A.*2d 1058 (1988). Because of the distinction between the two phases, the trial court must instruct the jury about guilt-phase evidence that the jury may not consider during its penalty deliberations. As the Court stated in *Erazo, supra:*

> When the same jury hears both phases of the trial, the court should provide instructions on the extent to which the jury may use guilt-phase evidence [in] its penalty-phase deliberations. Even when guilt-phase evidence is not incorporated in the penalty phase, the danger abides that the jury will rely on it during the penalty-phase deliberations. Thus, the court should instruct the jury concerning the evidence that it may use in its penalty deliberations and the purposes for which that evidence may be used.
>
> [126 *N.J.* at 133, 594 *A.*2d 232 (citation omitted).]

Several aspects of the guilt phase were not admissible during the penalty phase. Gloria Dunn's testimony regarding defendant's offer to "pop" her ex-boyfriend was admissible during the guilt phase, but was not admissible to prove either of the aggravating factors. Defendant's racially-based statements, including his references to Huggins as "white bitch," his purported statements that he had "knocked off some white girl," and his alleged assertion to Dunn that he would kill a white victim but spare a black victim, assuming they were admissible during the guilt phase, were clearly inadmissible to prove either of the aggravating factors.

The trial court, however, instructed the jury only that it had to redeliberate on any guilt-phase evidence on which it relied during the penalty phase and that the jury could rely only on guilt-phase evidence that was relevant to the aggravating and mitigating factors alleged. The trial court erred in not specifying which aspects of guilt-phase evidence could be used during the penalty phase and which could not. Had the court instructed the jury to

disregard that evidence at the penalty phase, the highly subjective balancing process that resulted in defendant's death sentence may have been different. The error prejudiced defendant. The Court should vacate defendant's death sentence.

## V

Defendant twice requested that the trial court charge the jury that it could find defendant guilty of the crime of murder under *N.J.S.A.* 2C:11–3a without being unanimous about whether he was guilty of purposeful-or-knowing murder or felony murder. The trial court denied the request. Instead, the trial court submitted the two types of murder separately. The court instructed the jury that "[b]ecause the elements or the criteria of purposeful or knowing murder are different from those of felony murder, you must consider each separately. You may find the defendant not guilty of both, guilty of both, or guilty of one but not of the other."

Although the Court upheld a similar jury instruction in *State v. Cooper*, 151 *N.J.* 326, 356–63, 700 *A.2d* 306 (1997), given the dynamics of a capital murder prosecution and the extraordinary importance of unanimity as the indispensable basis for determining both death-eligibility and deathworthiness, I believe it is patently unfair not to require the felony-murder nonunanimity instruction, *id.* at 431–42, 700 *A.2d* 306 (Handler, J., dissenting). A nonunanimity instruction on an element of murder is an indispensable condition of defendant's death-eligibility. It goes to the heart of the due process and punitive requirements of the death penalty and consequently is an essential part of the ultimate fundamental fairness that must surround capital prosecutions. Accordingly, I continue to insist that such an instruction be given.

## VI

In response to a defense request to inform the penalty-phase jury of what the aggregate sentence likely would be if defendant were spared the death penalty, the trial court determined that it instead would inform the jury of the minimum and maximum

sentence for each noncapital conviction and of its obligation not to consider those sentences in deciding whether to sentence defendant to death. The court told counsel that "[w]hat the [c]ourt has not done is it has not included a summary paragraph, suggested by the defense, explaining the maximum number of years that could be imposed and the maximum amount of parole ineligibility. The reason the Court has not done that is that it does not know that it would impose or could even rationally impose that many years."

In its instruction, the court informed the jury of the minimum and maximum term for each offense and the highest possible parole bar. The court then stated:

> The [c]ourt will decide at a separate sentencing proceeding whether those sentences will be consecutive or concurrent to the sentence to be imposed for purposeful-or-knowing murder. Consecutive sentences merely being one follows the other, and there is a continuum and you add the number. Concurrent meaning that they are all to be served at one time.
>
> The possible sentences for the other convictions should not influence your decision regarding the appropriateness of a death sentence on the murder charge. Your decision must be based only upon aggravating and mitigating factors presented by the evidence.

Despite having professed that "it does not know that it would impose" "the maximum number of years that could be imposed and the maximum amount of parole ineligibility," the court proceeded to mete out precisely those maximum sentences. After the death verdict, the trial court imposed the maximum sentence, including an extended term of life imprisonment with twenty-five years of parole ineligibility for aggravated sexual assault, on each nonmerged count and ordered that they run consecutively to each other and to the sentence that defendant had been serving. If defendant's death sentence were to be vacated, his prison sentence for the crimes against Huggins would total two life terms plus fifty-five years with eighty-two and one half years of parole ineligibility. That sentence would be consecutive to his prior sentence of life imprisonment with a thirty-year parole bar. Hence, if defendant's death sentence were reversed, he would face a total of 112½ years of parole ineligibility. Obviously, defendant,

who was forty at the time of his arrest, would die in prison if he were not executed.

The trial court should have informed the jury that defendant would receive the maximum aggregate sentence on the noncapital convictions. The majority's rationale for keeping the jury uninformed is totally unsatisfactory and terribly unfair to a defendant facing a death sentence.[11]

This Court repeatedly has held that penalty-phase juries must be informed of the legal effect of their sentencing decisions, including the noncapital sentences to which the defendant is subject. Consequently, the Court has required that juries be apprised of defendants' prior sentences, *State v. Bey*, 129 *N.J.* 557, 603, 610 *A.*2d 814 (1992) (*Bey III* ), *cert. denied*, 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L. Ed.*2d 1093 (1995), and of the possible noncapital sentences resulting from the current capital prosecution, *Martini I, supra*, 131 *N.J.* at 313, 619 *A.*2d 1208.

In *Loftin, supra*, the Court held that

in future cases, if the court, based on the evidence presented believes that there is a realistic likelihood that it will impose a sentence to be served consecutively to any of defendant's prior sentences, in the event the jury does not return a death sentence, the jury should be so informed. We believe that in most cases the courts will conclude that there is a "realistic likelihood" that it will impose a consecutive sentence rather than a concurrent sentence in the event of a non-death verdict. However, not every court necessarily will reach that conclusion. In those cases, the court need not inform the jury whether a non-death sentence is likely to be consecutive or concurrent.

[146 *N.J.* at 372, 680 *A.*2d 677.]

The rationale in *Loftin* was that, in order for the jury to be fully informed about the results of its various sentencing options, it

---

[11] In my opinion, under *Simmons v. South Carolina*, 512 *U.S.* 154, 114 *S.Ct.* 2187, 129 *L. Ed.*2d 133 (1994), defendant, by telling the jury how much time he was likely to serve as a result of committing those felonies in addition to the murder, was entitled to rebut the State's allegation that he deserved the death penalty because he committed the murder in the course of various felonies. *Cf. Loftin, supra*, 146 *N.J.* at 425, 680 *A.*2d 677 (Handler, J., dissenting) (concluding parole ineligibility should be admissible as mitigating evidence to rebut prior murder aggravating factor).

should know whether the sentences are likely to run consecutively. Though *Loftin* concerned whether the noncapital sentence would run consecutively to a prior sentence, that rationale applies to the contemporaneous-offense context. Although the trial court may not be sure what the exact sentences will be for the noncapital offenses, it may often—and, indeed, usually, if not invariably—have an idea about whether it will impose those sentences consecutively to the murder sentence.

The trial court should have told the jury of the possible sentences that defendant faced on each noncapital count and the likelihood that those sentences will run consecutively to the murder count. That would have apprised the jury of the likely legal effect of its decision.

Though the trial court complied with the first requirement by informing the jury of the possible sentences, it failed to tell the jury the likelihood that it would impose consecutive sentences. It justified that decision by stating that it did not know if it "rationally" could impose the sentences consecutively. Given the trial court's eventual imposition of maximum consecutive sentences, including an extended term for aggravated sexual assault—and its pointed and dramatic post-penalty-phase verdict statement that, had it been a juror, the court would have been the first to vote to execute defendant—the court's reasons for not so advising the jury appear disingenuous and are very unconvincing. It is naive for this Court to accept the trial court's protestation that it was unsure of the likelihood it would impose consecutive sentences.

The imposition of consecutive sentences in this case follows a pattern of trial courts imposing consecutive sentences in capital cases. In an example similar to this case, the trial court in *Martini I, supra,* 131 *N.J.* at 207, 619 *A.*2d 1208, imposed a consecutive extended term of a life sentence with a twenty-five year parole disqualifier on the defendant's kidnapping conviction. In *Loftin, supra,* 146 *N.J.* at 333, 680 *A.*2d 677, the trial court imposed the defendant's capital sentence consecutively to the life sentence he had received for committing a prior murder. Because

in this case the trial court imposed the maximum aggregate sentence against defendant and, in open court, expressed its subjective opinion that defendant should be executed and because courts invariably impose consecutive sentences in capital cases, the court was virtually certain that it would impose consecutive sentences on defendant. It should have informed the jury of its intention.

The majority, finding no error in the trial court's instructions, writes:

> The trial court followed the *Martini* guidelines. It explained the sentencing options for each of the offenses (omitting reference to possible extended terms for repeat offenders), that he would decide later whether to impose those sentences concurrently or consecutively, and that the potential sentences on other convictions should not affect their determinations on life or death.
>
> [*Ante* at 197, 716 A.2d at 496.]

While *Martini I* merely required that the court inform the jury of the possible sentences and that the decision about the actual sentences and whether those sentences will be consecutive is for the court and is not to be considered, the rationale of *Loftin* requires that the trial court tell the jury that it will impose consecutive sentences when there is a reasonable likelihood that it will do so. But, the trial court did not inform the jury that it would impose consecutive sentences on defendant.

The trial court's omission cannot be considered harmless. *See Loftin, supra,* 146 *N.J.* at 431, 680 *A.2d* 677 (Handler, J., dissenting) (concluding trial court's failure to inform jury of defendant's likely parole ineligibility was reversible error). Although, in his penalty-phase summation, defense counsel repeatedly told the jury that its choice was between lethal injection and "incarcer[ation] for the rest of his life," that reference was to the judge's instruction that defendant would receive between thirty years and life for the murder conviction. Counsel never argued to the jury that defendant would receive consecutive sentences for the noncapital counts. The Court "agree[s] that most trial judges, considering the type of crimes of which defendant was convicted, would find a 'realistic likelihood' that some of the non-death sentences would be

made consecutive to the 30–year parole disqualifier for murder."
*Ante* at 198, 716 *A.*2d at 496. Nevertheless, it finds "that defen-
dant's jury could not have misunderstood the gravity of the non-
capital sentences defendant would have faced." *Ante* at 198, 716
*A.*2d at 496. We cannot in this context guess about what the jury
understood. Neither counsel's summation nor the trial court's
instructions cure the prejudice that defendant suffered from the
absence of a clear instruction by the trial court to indicate that
defendant would spend the rest of his life in prison if not sen-
tenced to death.

Moreover,the court erred by instructing the jury to disregard
defendant's noncapital sentences. *See State v. Nelson,* 155 *N.J.*
487, 504–06, 715 *A.*2d 281, 290 (1998). The error was not harm-
less. *See id.* at 504, 715 *A.*2d at 289–90 (Handler, J., dissenting).

This Court should reverse defendant's death sentence due to the
trial court's failure to inform the jury that it would likely impose
consecutive noncapital sentences on defendant and give defendant
no prospect of ever leaving prison alive. The trial court's errone-
ously instructing the jury to disregard defendant's noncapital
sentence also mandates reversal.

## VII

Significant and irremediable errors infected this prosecution
and tainted defendant's convictions and death sentence. The
court's muted response to the pretrial and midtrial publicity is the
gravest of the errors.

Members of the venire were exposed to varying degrees of
vicious, inflammatory pretrial publicity, which affected many criti-
cal features of the case, such as the cross-racial nature of the
crime and the fact that the crime allegedly had occurred along
with a kidnapping, robbery, and rape; further, it implicated
important concerns such as the presumption of innocence, the
ultimate guilt of defendant, and the justification for the death
sentence. The trial court took minimal steps to cure any preju-
dice arising from the pretrial publicity. Despite the ubiquity of

the publicity in Mercer County, the court refused to change venue and merely impaneled a jury from Burlington County. The court's *voir dire* regarding pretrial publicity was far too cursory to uncover the injurious effects the publicity had on the jury venire.

In addition to the trial court's failure to change venue and to conduct a full and searching *voir dire* on exposure to pretrial publicity, the court utterly failed take serious measures to counteract exposure to midtrial publicity, which included an unsubstantiated allegation that defendant had committed a prior murder. Defendant's exposure to intense and prejudicial midtrial publicity thwarted a trial by an impartial jury. In failing to remediate that publicity, the court deprived defendant of an unbiased jury. Defendant had a right to be judged by an impartial jury guided solely by the evidence arising within the confines of the courtroom. This right was seriously impaired by a combination of the *Trentonian*'s death crusade and the trial court's unwillingness to counteract that crusade even after recognizing its existence. That confluence of circumstances denied defendant a fair trial and impugns the very foundation of his convictions and death sentence.

Further, the trial court's death-qualification *voir dire* had substantial shortcomings. The court repeatedly, through highly leading questions, coached jurors into agreeing that they could follow the law. The trial court often, without delving further into what the jurors really believed, allowed jurors to make wildly contradictory statements about whether the death penalty should be automatic for premeditated murders. The court almost totally shut out counsel. Except for the *voir dire* of the first seven venirepersons, counsel was not allowed to ask questions directly. Moreover, even if counsel informed the court of specific problematic responses by a venireperson, the court almost never asked further questions in response to those concerns. In general, the only questions suggested by counsel that the court then asked were the court's standard questions that it had forgotten to ask. This feeble *voir dire* was incapable of ensuring that the jurors who sentenced defendant to die were qualified to sit on a capital jury.

The inadequate death-qualification was exacerbated by the court's failure to *voir dire* the venirepersons sufficiently in respect of the racial overtones that pervaded the case. The court did not appreciate the pervasive role of race in this case and, accordingly, conducted a shallow *voir dire* that was unable to root out venirepersons' overt or subtle racial prejudices. The trial court's deficient *voir dire* requires reversal of defendant's convictions and death sentence.

This capital case should have been tried by a bifurcated jury. Given the seriousness and length of defendant's record, the similarity of the record to some of the offenses alleged at trial, defendant's indication that he wished to testify if his record were shielded from the penalty-phase jury, and the intense and subjective nature of the penalty phase, the trial court's decision not to bifurcate the jury was clearly an abuse of discretion. The error was patent in view of the trial court's determination that this Court's decision in *Erazo* was no longer valid and could be disregarded. As noted, this Court has stated repeatedly that bifurcation is favored in precisely this type of case. When confronted with compelling circumstances for bifurcation, however, the trial court misapplied the law by determining that *Erazo* was no longer controlling authority. That ruling unduly burdened defendant's right to testify. The court's misinterpretation confronted defendant with an unacceptable choice of testifying, and hence poisoning the jury's penalty-phase deliberations, or not testifying, and hence not rebutting the State's case. Because defendant's testimony would have cast doubt on his death-eligibility, the trial court's refusal to bifurcate the jury requires reversal of his death sentence.

Inadmissible and prejudicial guilt-phase evidence was allowed to pour over into the penalty phase. Consequently, the absence of penalty-phase instructions informing the jury that specific guilt-phase evidence was inadmissible in the penalty phase mandates reversal of defendant's sentence. Finally, the court's failure to charge that it intended to impose consecutive sentences on defen-

dant for the noncapital convictions, a sentence that would have forced defendant to spend the rest of his life in prison, requires reversal of the death sentence.

This decision exemplifies the inconsistency, chronic contradictions, and confusion that surround and permeate our capital-murder jurisprudence. Worse, the decision illustrates the regression in capital-punishment jurisprudence. Time and again, the Court has fashioned and pronounced sound and salutary principles to structure and guide the prosecution of capital-murder cases. Those principles reflect the singular protections that are required when a defendant is on trial for his life. They are the indispensable basis for the assurance, assuming such assurance is humanly possible, that the trial for capital murder is sufficiently fair under constitutional standards and that it will generate that level of comfort and confidence that society demands and expects before it will sentence a criminal to death. Yet, time and again, in successive cases, the Court repeats but nonetheless retreats from those principles by refusing to apply them in compelling situations that are often more egregious than those giving rise to the promulgation of the principles in the first place.

Perhaps this inconstant jurisprudence mirrors the intense ambivalence that is engendered by capital punishment and the controversy that pervades its administration. But the Court, in our constitutional judicial structure, is the institution responsible for assuring that the prosecution of capital cases will comport with constitutional standards and for preserving the legal regime envisioned by our Constitution. The Court cannot allow itself to be conflicted by the legal and social dilemmas that surround capital punishment. It must be resolute, consistent, and firm in its disposition of capital causes. Regrettably, in this case, it wavers.

*For affirmance*—Chief Justice PORITZ and Justices POLLOCK, O'HERN and GARIBALDI—4.

*For affirmance in part: reversal in part*—Justices STEIN and COLEMAN—2.

*For reversal and vacating*—Justice HANDLER—1.